J.(Cane/ my manner

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

KENYON RAHEEN GADSDEN,

    Petitioner,

    -vs-

JOHN FANELLO,
Warden, USP Allenwood,
    Respondent.

**1:CV-01-1122**

CIV. No. _____

J.(Cane, NBG

\* Crim Nos.96-CR-182    Prisoner Pe

\* From the District Court
  For the Eastern District
\* of Virginia

**FILED
HARRISBURG**

\*   \*   \*   \*   \*   \*   \*

**MOTION TO VACATE AND MODIFY PETITIONER'S SENTENCE** JUN 2 2 2001
**PURSUANT TO 28 U.S.C. SECTION 2241**

MARY E. D'ANDREA, CLERK

Per _____

**DEPUTY CLERK**

COMES NOW, the Petitioner herein, Kenyon Gadsden, by and

through counsel, who moves this Honorable Court to vacate the

sentences previously imposed, based on the decision in a recent

Supreme Court case.  See Apprendi v. New Jersey, 530 U.S. —, 120

S.Ct. 2348, 147 L.ED.2d 435 (June 26, 2000)  In light of the

Supreme Court's decision in Apprendi, the Petitioner's sentences

have been erroneously calcualted and are in excess of the

appropriate guideline range.  The Petitioner contends that both

his Fifth and Sixth Amendment rights were violated.  In support

thereof, the Petitioner states the following:

1.    The Petitioner was originally indicted by a Grand Jury

        sitting in the Eastern District of Virginia.  This multi-

        count indictment charged the Petitioner with multiple counts

        of distribution of cocaine.  Count One of the indictment

        alleged that the Petitioner was involved in a conspiracy to

to distribute cocaine and cocaine base from 1993 to September 26, 1996. (Exhibit A, Indictment)

2. The Petitioner was arrested on the instant charges on February 13, 1997 and arraigned the following day. (Exhibit B, Docket).

3. On March 17, 1997 the Petitioner entered into a plea agreement with the Government. (Exhibit C, Plea Agreement) Pursuant to this plea agreement, the Defendant agreed to enter a plea of guilty to Count One of the Indictment, Conspiracy to possess with the Intent to Distribute Cocaine and Cocaine Base. In exchange for his plea of guilty, the Government moved to vacate all other counts.

4. On July 7, 1997 the Petitioner proceeded to sentencing before the district court. The Presentence report recommended a base offense level of 38, a 4 level enhancement pursuant to USSG § 3B1.1(a), a two level enhancement for using a minor to committ the offense, USSG § 3B1.4, a two point enhgancement for possession of a weapon, USSG § 2D1.1, and a criminal history score of VI, based on his status as a career offender under USSG §4B1.1. (Exhibit D, Presentence Report). The Petitioner was then ultimately sentenced according to an adjusted offense level of 46 and a criminal history score of VI. This resulted in the imposition of a life sentence. (Exhibit E, Judgement) No

2

appeals or other post-conviction proceedings were taken.

5.   The Petitioner is now serving his sentences on the above

referenced convictions at USP Allenwood at White Deer,

Pennsylvania.  By nature of his confinement, The Petitioner

is now within the jurisidiction of this Court.


WHEREFORE, in consideration of the foregoing as well as

argument of law contained in the Memorandum of Law filed

herewith, the Petitioner respectfully prays that this Court

vacate the sentences imposed and remand his case for

resentencing.

Respectfully Submitted,

By:

Robert A. Ratliff
Attorney for Petitioner
11331 Grooms Road, Suite 2000
Cincinnati, Ohio 45242
(513) 469-7444

3

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing Motion and Memorandum of Law appended hereto has been sent this 2⁻ day of _____June_____, 2001, by regular U.S. Mail with sufficient postage affixed thereto to insure delivery thereof to:

David Barasch
Assistant U.S. Attorney
Federal Building
228 Walnut Street
Harrisburg, PA 17108

John Fanello
Warden
USP Allenwood
601 Liberty Street
White Deer, PA 17887

Robert A. Ratliff
Attorney for Petitioner
11331 Grooms Road, Suite 2000
Cincinnati, Ohio 45242
(513) 469-7444

4

# EXHIBIT A

# INDICTMENT



FILED
IN OPEN COURT

SE 2 6 1996

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 2:96CR*182* |
| | ) | **UNDER SEAL** |
| v. | ) | |
| | ) | 21 U.S.C. § 846 |
| KENYON RAHEEN GADSDEN | ) | Conspiracy to Distribute |
|    a/k/a Kenny R. Jones | ) | Cocaine Base and Cocaine |
|    a/k/a Todd Fuller | ) | (Count 1) |
|    a/k/a Kenyon Gadsen | ) | |
|    a/k/a "Kenya" | ) | 21 U.S.C. § 841(a)(1) |
| (Counts 1, 2, 5, 6, 7) | ) | Distribution and Possession |
| | ) | with Intent to Distribute |
| BRYAN LAMONT GRIMES | ) | Cocaine Base |
|    a/k/a James E. Gadsden | ) | (Counts 2 - 7) |
|    a/k/a "Little Bryan" | ) | |
| (Counts 1, 2, 7, 8) | ) | 18 U.S.C. § 1956(A)(1)(b)(1) |
| | ) | Money Laundering |
| DAMON MARQUETHE HILLS | ) | (Count 8) |
|    a/k/a Damon Keith Hill | ) | |
|    a/k/a "Keith" | ) | |
| (Count 1) | ) | |
| | ) | |
| JOHN BARRY ROBINSON | ) | |
|    a/k/a "John John" | ) | |
| (Counts 1, 2, 3) | ) | |
| | ) | |
| JOSEPH ELIJAH HARVEY | ) | |
| (Counts 1, 2, 4) | ) | |

SEPTEMBER 1996 <u>TERM</u> - at Norfolk, Virginia

<u>COUNT ONE</u>

THE GRAND JURY CHARGES THAT:

From in or about fall of 1993, the exact date being to the Grand Jury unknown, and continuously thereafter up to and including the date of this indictment, in the Eastern District of Virginia and elsewhere, KENYON RAHEEN GADSDEN, a/k/a Kenny R. Jones, a/k/a Todd Fuller, a/k/a Kenyon Gadsen, a/k/a "Kenya"; BRYAN LAMONT GRIMES, a/k/a James E. Gadsden, a/k/a "Little Bryan"; DAMON

MARQUETHE HILLS, a/k/a Damon Keith Hill, a/k/a "Keith"; JOHN BARRY ROBINSON, a/k/a "John John"; and JOSEPH ELIJAH HARVEY, all defendants herein, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together, with each other and with divers other persons to the grand jury both known and unknown to commit the following offenses against the United States:

1.   To knowingly, intentionally and unlawfully distribute fifty (50) grams or more of a mixture or substance containing cocaine base, commonly known as crack, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(iii).

2.   To knowingly, intentionally and unlawfully possess with the intent to distribute fifty (50) grams or more of a mixture or substance containing cocaine base, commonly known as crack, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(iii).

3.   To knowingly, intentionally and unlawfully distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(ii).

4.   To knowingly, intentionally and unlawfully possess with the intent to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(ii).

## WAYS, MANNER AND MEANS TO ACCOMPLISH THE CONSPIRACY

The ways, manner and means by which this purpose was carried out included but were not limited to the following:

1.   It was part of the conspiracy that the defendants and co-conspirators would and did play different roles, take upon themselves different tasks and participate in the affairs of the conspiracy through various criminal acts.  The defendants and co-conspirators would and did make themselves and their services available at various times throughout the conspiracy and would participate in selected narcotic distribution ventures on an "as needed" basis.  Certain roles assumed by these defendants and other co-conspirators were interchangeable at various times throughout the conspiracy.  Roles which the defendants and co-conspirators assumed and carried out included, among others:   organizer, manager, supervisor, supplier, distributor, enforcer, cooker or converter, packager, lookout, driver, armed security, and nominee for apartment and vehicle rentals, and nominee for vehicle purchases.

2.   It was further a part of the conspiracy that the defendants and co-conspirators would and did derive substantial income and gross receipts from their unlawful activities, that is, the primary object was to make money through their illegal drug dealing.

3.   It was further a part of the conspiracy that the defendants and other co-conspirators would and did supply and furnish to each other quantities of cocaine base, hereinafter

3

referred to as crack cocaine throughout the indictment, a Schedule II narcotic controlled substance; and quantities of cocaine, a Schedule II narcotic controlled substance, for distribution by the defendants and other co-conspirators on both a consignment and cash basis, and for personal use, in the Eastern District of Virginia and elsewhere.

4.    It was further a part of the conspiracy that the defendants and co-conspirators would and did meet at various times and locations to exchange packages of crack cocaine and cocaine, both Schedule II narcotic controlled substances, for money and at other times to receive the proceeds from the sales of the crack cocaine and cocaine.

5.    It was further a part of the conspiracy that the defendants and co-conspirators would and did utilize various locations such as apartments, businesses and the open air areas adjacent to such locations for the distribution of crack cocaine, including but not limited to the following:

(a)    the Plaza Apartment complex,
       Virginia Beach, Virginia;

(b)    1105 Waterfront Drive, Apartment 102,
       Virginia Beach, Virginia;

(c)    501 Fountain Lake Drive, Apartment 102
       Virginia Beach, Virginia;

(d)    540 Chapel Lake Drive, Apartment 201,
       Virginia Beach, Virginia;

(e)    550 Waterfront Cove, Apartment 102,
       Virginia Beach, Virginia

(f)    Apartment 362A in the Dockside Apartments complex,
       Norfolk, Virginia;

4

(g)  5385 East Princess Anne Road, Apartment 6,
     Norfolk, Virginia;

(h)  Mr. Spice's Restaurant,
     1000A Park Avenue
     Norfolk, Virginia; and

(i)  256 Red Cedar Court, Apartment 3D,
     Chesapeake, Virginia.

6.  It was further a part of the conspiracy that the defendants and unindicted co-conspirators would and did use various methods to conceal the conspiracy and their unlawful drug activities and to insure the conspiracy's continuing success, including but not limited to:

(a)  shootings, and other acts of intimidation;

(b)  possessing and using weapons, including handguns;

(c)  utilizing counter-surveillance, including lookouts and drivers, to avoid detection by law enforcement authorities;

(d)  purchasing vehicles in the names of nominees;

(e)  leasing apartments in the names of nominees; and

(f)  utilizing rented vehicles.

7.  It was further a part of the conspiracy that the defendants and other co-conspirators, both indicted and unindicted, would utilize the proceeds from the sales of crack cocaine and cocaine to purchase vehicles, lease vehicles, pay for insurance, rent apartments and for various other living expenses; including but not limited to expensive furnishings and other personal items.

8.  It was further a part of the conspiracy that KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES would and did obtain

multiple kilogram quantities of cocaine in New York City, New York, which was transported in vehicles to the Tidewater area of the Eastern District of Virginia, where the cocaine was converted into crack cocaine and provided to other members of this conspiracy for subsequent distribution.

9.   It was further a part of the conspiracy that KENYON RAHEEN GADSDEN, BRYAN LAMONT GRIMES, DAMON MARQUETHE HILLS and the other members of this conspiracy would and did distribute quantities of crack cocaine on a daily basis during the period of this conspiracy.

<u>OVERT ACTS</u>

In furtherance of the conspiracy and to accomplish one or more of the purposes thereof, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

1.   In or about the fall of 1993, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN obtained approximately four and one half (4 1/2) ounces of crack cocaine from a source of supply.

2.   In or about December, 1993, in the Pecan Gardens Apartment Complex in Virginia Beach, Virginia, within the Eastern District of Virginia, DAMON MARQUETHE HILLS, a/k/a/ "Keith," distributed a quantity of crack cocaine to a customer.

3.   In or about January or February, 1994, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN distributed one eighth (1/8) of an ounce of crack cocaine to a customer in exchange for services provided to KENYON RAHEEN GADSDEN.

6

4.    On or about February 15, 1994, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN obtained an apartment located at 1105 Waterfront Drive, Apartment 102, in the Watergate Apartment Complex in Virginia Beach, Virginia in the name of a nominee.

5.    In or about the spring of 1994, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN supplied approximately one eighth (1/8) ounce of crack cocaine to DAMON MARQUETHE HILLS which was intended for subsequent distribution.

6.    On or about April 27, 1994, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN obtained an apartment located at 501 Fountain Lake Drive, Apartment 102, in Virginia Beach, Virginia in the name of a nominee.  This apartment was used by KENYON RAHEEN GADSDEN to store and distribute crack cocaine.

7.    In or about the late spring or early summer of 1994, at Norfolk, Virginia, within the Eastern District of Virginia, DAMON MARQUETHE HILLS, a/k/a/ "Keith," distributed a quantity of crack cocaine to another individual in exchange for services rendered by the individual.

8.    In or about the summer of 1994, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN began to use an apartment located at the Dockside Apartment Complex in Norfolk, Virginia to manufacture, store and distribute crack cocaine.

9.    In or about the summer of 1994, in Virginia Beach, Virginia, within the Eastern District of Virginia, DAMON MARQUETHE HILLS distributed a quantity of crack cocaine to a customer.

10.    In or about the summer or fall of 1994, at the Watergate Apartment Complex, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN possessed approximately five (5) to six (6) ounces of crack cocaine, which was stored in a false bottom can.

11.    In or about summer or fall of 1994, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN received approximately one half (1/2) kilogram of crack cocaine from a source of supply.

12.    On or about September 4, 1994, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN obtained an apartment located at 540 Chapel Lake Drive, Apartment 201, in Virginia Beach, Virginia, which was leased in the name of a nominee.

13.    In or about December, 1994 or January, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN was in possession of approximately five (5) ounces of crack cocaine.

14.    On or about January 18, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN, BRYAN LAMONT GRIMES and JOHN BARRY ROBINSON began to utilize an apartment located at 5385 East Princess Anne Road, Apartment 6, to manufacture, store and distribute crack cocaine.

15. In or about February, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN supplied DAMON MARQUETHE HILLS, with multiple ounces of crack cocaine for subsequent distribution by DAMON MARQUETHE HILLS.

16. In or about the spring of 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN supplied a lower level distributor with $50 blocks of crack cocaine for subsequent distribution.

17. In or about the early spring of 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES possessed $10,000 U.S. currency, which was proceeds from the sale of narcotics.

18. On or about March 1, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, DAMON MARQUETHE HILLS, obtained an apartment located at 550 Waterfront Cove, Apartment 102, in Virginia Beach, Virginia, which apartment was obtained in the name of a nominee and was used to manufacture, store and distribute crack cocaine.

19. On or about March 8, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES was in possession of approximately 4.5 grams of crack cocaine and $1,521 in U.S. currency, which was proceeds from the sale of narcotics.

20. In or about April, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN shot at an occupied dwelling located in the vicinity of Rosemont and Lynnhaven Parkway, to retaliate against a resident of the dwelling,

for the theft of crack cocaine and money which was proceeds of the sale of crack cocaine.

21.  On or about April 8, 1995, in Chesapeake, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES obtained an apartment located at 256 Red Cedar Court, Apartment 3D, Chesapeake, Virginia, in the name of a nominee, which apartment was used to store and distribute narcotics.

22.  In or about May, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN distributed a quantity of crack cocaine to an individual in exchange for the use of his vehicle.

23.  In or about the early summer of 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN supplied another individual with a quarter (1/4) ounce of crack cocaine in exchange for $250 U.S. currency.

24.  In or about the early summer of 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES distributed approximately five (5) or six (6) ounces of crack cocaine to another individual for approximately $3,500 in U.S. currency.

25.  In or about late May or early June, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES received a quantity of cocaine from a source of supply.

10

26. In or about late May or early June, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES converted a quantity of cocaine into crack cocaine for subsequent distribution as crack cocaine.

27. In or about the summer of 1995, at an apartment within the Dockside Apartments complex, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN converted two (2) or three (3) ounces of cocaine into crack cocaine, which was intended for subsequent distribution as crack cocaine.

28. In or about the summer of 1995, in Norfolk, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES, was in possession of approximately $4,000 U.S. currency, which was proceeds from the sale of narcotics.

29. On or about July 6, 1995, in Portsmouth, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES obtained a pager, pager account number 804-326-4294, through the use of a nominee.

30. On or about July 19, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES, assisted by DAMON MARQUETHE HILLS, utilized $6,000 U.S. currency, which was proceeds from the sale of narcotics, to purchase a 1990 Infiniti Q-45 automobile from Auto Land Auto Sales, which vehicle was titled in the name of a nominee.

31. In or about late July or early August, 1995, in Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES distributed approximately four (4) ounces of crack cocaine

11

to DAMON MARQUETHE HILLS which was intended for subsequent distribution.

32. In or about July, 1995, in New York City, New York, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES lost in excess of $20,000 U.S. currency when they were robbed during a narcotics transaction.

33. On or about August 3, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES utilized in excess $3,000 U.S. currency, which was proceeds from the sale of narcotics, to purchase an audio sound system for his 1990 Infiniti Q-45 automobile.

34. On or about August 4, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, JOHN BARRY ROBINSON and another unindicted co-conspirator possessed approximately 27.23 grams of crack cocaine and $1,273 in U.S. currency.

35. On or about August 4, 1995, at 5385 East Princess Anne Road, Apartment 6, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN, BRYAN LAMONT GRIMES, JOHN BARRY ROBINSON and JOSEPH ELIJAH HARVEY possessed approximately 3.91 grams of crack cocaine.

36. On or about August 4, 1995, in the 1400 block of Gabriel Drive, Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN, BRYAN LAMONT GRIMES, JOHN BARRY ROBINSON and JOSEPH ELIJAH HARVEY possessed approximately 454 grams of crack cocaine, $1,360 in U.S. currency, a .380 caliber handgun and a digital scale.

37. On or about August 4, 1995, in 1400 of Shelton Avenue in Norfolk, Virginia, within the Eastern District of Virginia, JOSEPH ELIJAH HARVEY possessed approximately 1.28 grams of crack cocaine packaged in nine zip-lock baggies.

38. On or about August 4, 1995, at 256 Red Cedar Court, Apartment 3, in Chesapeake, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES possessed a quantity of crack cocaine, $1,849 in U.S. currency, a quantity of imitation crack cocaine and two .38 caliber firearms.

39. On or about August 4, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, JOHN BARRY ROBINSON possessed a shoe box containing U.S. currency, which was proceeds from the sale of narcotics.

40. In or about the late summer of 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN possessed approximately one ounce of crack cocaine and a 9 mm handgun.

41. In or about late August or early September, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN distributed approximately one and one quarter (1 1/4) ounces of crack cocaine for $850 in U.S. currency.

42. In or about September, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN distributed approximately nine (9) ounces of crack cocaine to DAMON MARQUETHE HILLS, this crack cocaine was intended for subsequent distribution.

13

43. In or about early fall, 1995 in Norfolk, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES distributed approximately four (4) ounces of crack cocaine for $2,800 in U.S. currency.

44. In or about late September, 1995, in New York City, New York, BRYAN LAMONT GRIMES utilized approximately $43,000 in U.S. currency which was proceeds from the sale of narcotics, to purchase two (2) kilograms of cocaine.

45. In or about late September, 1995, between New York City, New York and Norfolk, Virginia, BRYAN LAMONT GRIMES transported and caused to have transported two (2) kilograms of cocaine for distribution in the Tidewater area as crack cocaine.

46. In or about fall, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES distributed approximately nine (9) ounces of crack cocaine for $5,500 in U.S. currency.

47. In or about early October, 1995, in New York City, New York, BRYAN LAMONT GRIMES purchased approximately two (2) kilograms of cocaine which was transported to the Tidewater area of Virginia, within the Eastern District of Virginia for subsequent distribution as crack cocaine.

48. In or about late September or early October, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, DAMON MARQUETHE HILLS delivered and caused to have delivered approximately $10,000 in U.S. currency to BRYAN LAMONT GRIMES.

49. In or about October, 1995, in New York City, New York, BRYAN LAMONT GRIMES utilized approximately $60,000 in U.S. currency, which was the proceeds from the sales of narcotics, to purchase approximately three (3) kilograms of cocaine.

50. In or about October, 1995, between New York City, New York, and Norfolk, Virginia, BRYAN LAMONT GRIMES transported and caused to have transported three (3) kilograms of cocaine for the purpose of converting the cocaine into crack cocaine for distribution as crack cocaine in Norfolk, Virginia.

51. In or about October, 1995, in New York City, New York, KENYON RAHEEN GADSDEN lost approximately $18,000 U.S. currency, which was proceeds from the sale of crack cocaine, while attempting to purchase cocaine.

52. On or about October 25, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES utilized approximately $2,000 U.S. currency, which was the proceeds from the sale of narcotics, to purchase a 1989 Honda Civic automobile from Auto Land Auto Sales, which was titled in the name of a nominee.

53. In or about late October or early November, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES offered to pay a witness to provide false testimony in court.

54. Between November 6, 1995 and November 9, 1995, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES rented vehicles from Budget

15

Rent-A-Car for the purpose of travelling to New York City, New York to purchase cocaine which would be transported back to the Eastern District of Virginia for distribution as crack cocaine.

55.  On or about November 8, 1995, in New York City, New York, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES utilized approximately $40,000 U.S. currency, which was the proceeds from the sale of narcotics, to purchase approximately two (2) kilograms of cocaine.

56.  On or about November 8, 1995, between New York City, New York and the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES transported and caused to have transported two (2) kilograms of cocaine for the purpose of distributing this cocaine as crack cocaine in the Norfolk, Virginia area.

57.  On or about December 8, 1995, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN possessed and distributed approximately 82.2 grams of crack cocaine to an unindicted co-conspirator for subsequent distribution to an undercover officer.

58.  In or about January, 1996, in Norfolk, Virginia, within the Eastern District of Virginia, BRYAN LAMONT GRIMES distributed approximately one ounce of cocaine to DAMON MARQUETHE HILLS.

59.  In or about February, 1996, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN possessed a 9 mm semi-automatic handgun.

60.  On or about February 29, 1996, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN

16

GADSDEN and BRYAN LAMONT GRIMES possessed approximately $8,790 U.S. currency, which was proceeds from the sale of narcotics, a Lorcin .380 caliber handgun, and a digital scale, which scale had been utilized to weigh cocaine.

61.  In or about March, 1996, in Norfolk, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN converted a quantity of cocaine into crack cocaine, which was intended for subsequent distribution as crack cocaine.

62.  In or about April, 1996, in Virginia Beach, Virginia, within the Eastern District of Virginia, DAMON MARQUETHE HILLS possessed and distributed approximately one and one half (1 1/2) ounces of crack cocaine for $2,000 U.S. currency.

63.  On or about June 18, 1996, in Virginia Beach, Virginia, within the Eastern District of Virginia, KENYON RAHEEN GADSDEN and BRYAN LAMONT GRIMES possessed and distributed approximately 29 grams of crack cocaine.


(All in violation of Title 21, United States Code, Section 846.)

# EXHIBIT B

# DOCKET

Docket as of May 26, 1999 6:06 pm         Web PACER (v2.3)

# U.S. District Court

# Eastern District of Virginia (Norfolk)

# CRIMINAL DOCKET FOR CASE #: 96-CR-182-ALL

# USA v. Gadsden, et al

Filed: 09/30/96
Dkt# in other court: None

# Case Assigned to: Judge Unassigned

KENYON RAHEEN GADSDEN (1)
aka
Kenny R. Jones
aka
Todd Fuller
aka
Kenyon Gadsen
aka
"Kenya"
    defendant
    [term 07/09/97]

William Peters Robinson, Jr.
 [term 07/09/97]
[COR LD NTC ret]
Robinson, Banks & Anderson
256 West Freemason St
Norfolk, VA 23510
(757) 622-4686

Mark McRoberts McMillin
 [term 02/18/97]
[COR LD NTC cja]
125 St. Paul's Boulevard
Suite 302
Norfolk, VA 23510-2708
(757) 622-0986

Defendant Assigned to: Judge Rebecca Beach Smith

| Pending Counts: | Disposition |
|---|---|
| T.21:846 (21:846=ND.F) CONSPIRACY TO DISTRIBUTE NARCOTICS - conspiracy to dist. & poss. with intent to dist. a mixture & substance containing Cocaine Base, commonly known as "Crack" Cocaine & a mixture or substance containing a detectable amount of Cocaine - Sch. II (re: T. 21:841(a)(1) & (b)(1)(A)(ii) & (b)(1)(A)(iii) (1) | Life Imprisonment. Five (5) Years Supervised Release. $100.00 Special Assessment. (1) |
| T.21:841(a)(1) & T.18:2 (21:841A=ND.F) NARCOTICS - SELL, DISTRIBUTE, OR DISPENSE - Possess with intent to dist. a mixture or substance containing a detectable amount of Cocaine Base, commonly known as "Crack" Cocaine - Sch. II (2) | Dismissed on the Government's Motion (2) |

T.21:841(a)(1) & T.18:2                    Dismissed on the Government's
(21:841A=ND.F) NARCOTICS -                 Motion
SELL,      DISTRIBUTE, OR                   (5)
DISPENSE - Possess with intent
to dist. a      mixture or
substance containing a
detectable amount of
Cocaine Base, commonly known
as "Crack" cocaine - Sch. II
(5)
T.21:841(a)(1) & T.18:2                    Dismissed on the Government's
(21:841A=ND.F) NARCOTICS -                 Motion
SELL,      DISTRIBUTE, OR                   (6)
DISPENSE - Distribute a
mixture or substance
containing a detectable amount
of Cocaine Base, commonly
known as "Crack" cocaine -
Sch. II
(6)
T.21:841(a)(1) & T.18:2                    Dismissed on the Government's
(21:841A=ND.F) NARCOTICS -                 Motion
SELL,      DISTRIBUTE, OR                   (7)
DISPENSE - Possess with intent
to distribute  a mixture or
substance containing a
detectable amount of
Cocaine Base, commonly known
as "Crack" cocaine - Sch. II
(7)
Offense Level (opening): 4
Terminated Counts:
    NONE
Complaints:
    NONE

---

## Case Assigned to:  Judge Unassigned

BRYAN LAMONT GRIMES (2)                    William P. Robinson, Jr.
aka                                         [term 01/13/97]
James E. Gadsden                           [COR LD NTC ret]
aka                                        Robinson, Banks & Anderson
"Little Bryan"                             256 West Freemason Street
      defendant                            Norfolk, VA 23510
  [term 01/13/97]                          (804) 622-4686
Defendant Assigned to:  Judge Robert G. Doumar
Pending Counts:                                 Disposition
T.21:846 (21:846=ND.F)                     NEW SENTENCE PER 5/27/98 ORDER:
CONSPIRACY TO DISTRIBUTE                   167 MONTHS IMPRISONMENT AS   TO
NARCOTICS -  conspiracy to                 COUNT 1. ALL OTHER TERMS AND
dist. & poss. with intent to               CONDITIONS OF THE JUDGMENT
dist. a mixture   & substance              ORDER OF 1/13/97 ARE TO REMAIN
containing Cocaine Base,                   THE SAME. Former Sentence:
commonly known as                          Life imprisonment. Five (5)
"Crack" Cocaine & a mixture or             years supervised release.
substance containing a                     $50.00 special assessment.
detectable amount of Cocaine -             (1)
Sch. II {re: T. 21:841(a)(1)
& (b)(1)(A)(ii) &
(b)(1)(A)(iii)
(1)

T.21:841(a)(1) & T.18:2
(21:841A=ND.F) NARCOTICS –
SELL,      DISTRIBUTE, OR
DISPENSE – Possess with intent
to dist. a      mixture or
substance containing a
detectable amount of
Cocaine Base, commonly known
as "Crack" Cocaine – Sch. II
(2)

Dismissed on government motion
on 1/13/97
(2)

T.21:841(a)(1) & T.18:2
(21:841A=ND.F) NARCOTICS –
SELL,      DISTRIBUTE, OR
DISPENSE – Possess with intent
to distribute  a mixture or
substance containing a
detectable amount of
Cocaine Base, commonly known
as "Crack" cocaine – Sch. II
(7)

Dismissed on government motion
on 1/13/97
(7)

T.18:1956(a)(1)(B)(i) & 2
(18:1956-3300.F) MONEY
LAUNDERING  – INTERSTATE
COMMERCE  – Conduct financial
transactions      affecting
interstate & foreign commerce
(8)

Dismissed on government motion
on 1/13/97
(8)

Offense Level (opening): 4
Terminated Counts:
    NONE
Complaints:
    NONE

# Case Assigned to:  Judge Unassigned

DAMON MARQUETHE HILLS (3)
aka
Damon Keith Hill
aka
"Keith"
    defendant
  [term  02/11/97]

Larry W. Shelton
  [term  02/11/97]
Below Address Terminated on 9/4/97
[COR LD NTC cja]
Goldblatt, Lipken & Cohen, P.C.
415 St. Paul's Blvd, Suite 300
PO Box 3505
Norfolk, VA 23514-3505
(757) 627-6225

Defendant Assigned to:  Judge Henry C. Morgan, Jr.
Pending Counts:
T.21:846 (21:846=ND.F)
CONSPIRACY TO DISTRIBUTE
NARCOTICS –  conspiracy to
dist. & poss. with intent to
dist. a mixture  & substance
containing Cocaine Base,
commonly known as
"Crack" Cocaine & a mixture or
substance containing a
detectable amount of Cocaine –
Sch. II (re: T. 21:841(a)(1)
&  (b)(1)(A)(ii) &
(b)(1)(A)(iii)
(1)

                 Disposition
SENTENCE PER 7/23/98 ORDER:
120 MONTHS IMPRISONMENT. ALL
OTHER PROVISIONS OF THE DEFT'S
ORIGINAL SENTENCE SHALL
REMAIN IN EFFECT. Former
Sentence: Two Hundred Sixty-Two
(262) Months Imprisonment. Five
(5) Years Supervised
Release.  $50.00 Special
Assessment.
(1)

Terminated Counts:
    NONE
Complaints:
    NONE

---

# Case Assigned to:  Judge Unassigned

JOHN BARRY ROBINSON (4)
aka
"John John"
      defendant
  [term  01/03/97]

Jon M. Babineau
  [term  01/03/97]
[COR LD NTC cja]
First Virginia Tower
555 E Main Street
Suite 1102
Norfolk, VA 23510
(804) 622-8631

Defendant Assigned to:  Judge J. Calvitt Clarke, Jr.
Pending Counts:                    Disposition
T.21:846 (21:846=ND.F)          Dismissed on government motion
CONSPIRACY TO DISTRIBUTE        on 1/2/97
NARCOTICS -  conspiracy to      (1)
dist. & poss. with intent to
dist. a mixture   & substance
containing Cocaine Base,
commonly known as
"Crack" Cocaine & a mixture or
substance containing a
detectable amount of Cocaine -
Sch. II (re: T. 21:841(a)(1)
& (b)(1)(A)(ii) &
(b)(1)(A)(iii)
(1)
T.21:841(a)(1) & T.18:2         Two Hundred Ninety-Four (294)
(21:841A=ND.F) NARCOTICS -      Months Imprisonment.  Five
SELL,      DISTRIBUTE, OR       (5) Years Supervised Release.
DISPENSE - Possess with intent  $50.00 Special Assessment.
to dist. a       mixture or     (2)
substance containing a
detectable amount of
Cocaine Base, commonly known
as "Crack" Cocaine - Sch. II
(2)
T.21:841(a)(1) & T.18:2         Dismissed on government motion
(21:841A=ND.F) NARCOTICS -      on 1/2/97
SELL,      DISTRIBUTE, OR       (3)
DISPENSE - Possess with intent
to dist. a       mixture or
substance containing a
detectable amount of
Cocaine Base, commonly known
as "Crack" Cocaine - Sch. II
(3)
Offense Level (opening): 4
Terminated Counts:
    NONE
Complaints:
    NONE

# Case Assigned to:  Judge Unassigned

JOSEPH ELIJAH HARVEY (5)
    defendant
 [term  03/21/97]

Emma J. Simpson
 [term  03/21/97]
[COR LD NTC cja]
735 Newtown Road
Suite 203
Norfolk, VA 23502
(804) 455-8370

Defendant Assigned to:  Judge Robert G. Doumar

| Pending Counts: | Disposition |
| --- | --- |
| T.21:846 (21:846=ND.F) CONSPIRACY TO DISTRIBUTE NARCOTICS - conspiracy to dist. & poss. with intent to dist. a mixture  & substance containing Cocaine Base, commonly known as "Crack" Cocaine & a mixture or substance containing a detectable amount of Cocaine - Sch. II (re: T. 21:841(a)(1) & (b)(1)(A)(ii) & (b)(1)(A)(iii) (1) | One Hundred Twenty-Eight (128) Months Imprisonment.  Five (5) Years Supervised Release. $50.00 Special Assessment. (1) |
| T.21:841(a)(1) & T.18:2 (21:841A=ND.F) NARCOTICS - SELL,      DISTRIBUTE, OR DISPENSE - Possess with intent to dist. a      mixture or substance containing a detectable amount of Cocaine Base, commonly known as "Crack" Cocaine - Sch. II (2) | Dismissed on the Government's Motion. (2) |
| T.21:841(a)(1) & T.18:2 (21:841A=ND.F) NARCOTICS - SELL,      DISTRIBUTE, OR DISPENSE - Possess with intent to dist. a      mixture or substance containing a detectable amount of Cocaine Base, commonly known as "Crack" cocaine - Sch. II (4) | Dismissed on the Government's Motion. (4) |

Offense Level (opening): 4

Terminated Counts:
   NONE
Complaints:
   NONE
U. S. Attorneys:
 Laura P. Tayman
 [COR LD NTC]
 United States Attorney's Office
 World Trade Center
 101 W. Main Street
 Suite 8000
 Norfolk, VA 23510
 (804) 441-6331

# DOCKET   PROCEEDINGS

| DATE | # | DOCKET   ENTRY |
|------|---|----------------|

9/26/96   1   INDICTMENT RETURNED AND FILED IN OPEN COURT (UNDER SEAL) as to Kenyon Raheen Gadsden (1) count(s) 1, 2, 5, 6, 7; Bryan Lamont Grimes (2) count(s) 1, 2, 7, 8; Damon Marquethe Hills (3) count(s) 1; John Barry Robinson (4) count(s) 1, 2, 3; Joseph Elijah Harvey (5) count(s) 1, 2, 4.  On motion of govt., Court directs warrant to issue for all defts. except Joseph Harvey.  No bond recommendation.  Govt. to move for detention.  Warrant to be served by FBI or major case unit of Norfolk Police Dept.  Indictment to be sealed.  Govt. to prepare petition for writ for Joseph Harvey. (ward) [Entry date 09/30/96] [Edit date 09/30/96]

9/26/96   2   ORDER as to Kenyon Raheen Gadsden, Bryan Lamont Grimes, Damon Marquethe Hills, John Barry Robinson, Joseph Elijah Harvey sealing the indictment and this order in this case until such time as the defts. are in custody or have given bail or until further order of the Court, and that no person shall disclose the finding of the indictment or any warrant issued pursuant thereto, except as necessary for the issuance and execution of the arrest warrants in this matter; entered and filed 9/26/96 (Signed by Judge J. C. Clarke Jr.) (swar) [Entry date 09/30/96]

9/26/96   --   Arrest WARRANT issued and delivered to USM as to Kenyon Raheen Gadsden (ward) [Entry date 10/04/96]

9/26/96   --   Arrest Warrant issued and delivered to USM as to Bryan Lamont Grimes (ward) [Entry date 10/04/96]

9/26/96   --   Arrest Warrant issued and delivered to USM as to Damon Marquethe Hills (ward) [Entry date 10/04/96]

9/26/96   --   Arrest Warrant issued and delivered to USM as to John Barry Robinson (ward) [Entry date 10/04/96]

9/30/96   --   Initial appearance as to Bryan Lamont Grimes held before Magistrate Judge William T. Prince (Tape 2370 Pts. 280 - 477) USA appeared through: Laura Tayman, AUSA; Deft. present in custody without counsel. Govt. motion to unseal indictment. Deft. advised of rights, charges & right to counsel. Counsel desired. Deft. to retain counsel. Govt. motion for detention hearing - granted.  Detention Hearing set for 11:30 a.m. 10/2/96 for Bryan Lamont Grimes. Temporary detention ordered. Deft. remanded to custody of Marshal. (ward) [Entry date 09/30/96]

9/30/96   3   Arrest WARRANT Returned Executed by USM as to Bryan Lamont Grimes on 9/30/96, filed in open court. (ward) [Entry date 09/30/96] [Edit date 09/30/96]

9/30/96   --   Initial appearance as to Damon Marquethe Hills held before Magistrate Judge William T. Prince (Tape 2370 Pts. 280 - 685) USA appeared through: Laura Tayman, AUSA; Deft. present in custody without counsel.  Govt. motion to unseal indictment.  Deft. advised of rights, charges & right to counsel.  Counsel desired.  Court directed appointment of counsel.  Govt. motion for detention hearing - granted. Detention Hearing set 11:30 a.m. 10/2/96 for Damon Marquethe Hills.  Temporary Detention ordered.  Deft. remanded to custody of Marshal. (ward) [Entry date 09/30/96] [Edit date 10/01/96]

9/30/96   4      CJA 23 FINANCIAL AFFIDAVIT by Damon Marquethe Hills, filed
                 in open court (ward) [Entry date 09/30/96]

9/30/96   5      Arrest WARRANT Returned Executed by USM as to Damon
                 Marquethe Hills on 9/30/96, filed in open court (ward)
                 [Entry date 09/30/96]

9/30/96   --     Initial appearance as to John Barry Robinson held before
                 Magistrate Judge William T. Prince (Tape 2370 Pts. 280-685)
                 USA appeared through: Laura Tayman, AUSA; Deft. present in
                 custody without counsel.  Govt. motion to unseal
                 indictment.  Deft. advised of rights, charges & right to
                 counsel.  Counsel desired.  Court directed appointment of
                 counsel.  Govt. motion for detention hearing - granted.
                 Detention hearing set 11;30 a.m. 10/2/96 for John Barry
                 Robinson.  Temporary detention ordered.  Deft. remanded to
                 custody of Marshal. (ward) [Entry date 09/30/96]

9/30/96   6      CJA 23 FINANCIAL AFFIDAVIT by John Barry Robinson, filed in
                 open court (ward) [Entry date 09/30/96]

9/30/96   7      Arrest WARRANT Returned Executed by USM as to John Barry
                 Robinson on 9/30/96, filed in open court (ward)
                 [Entry date 09/30/96] [Edit date 09/30/96]

9/30/96   8      ORDER as to Kenyon Raheen Gadsden, Bryan Lamont Grimes,
                 Damon Marquethe Hills, John Barry Robinson, Joseph Elijah
                 Harvey Unsealing Indictment, filed in open court (Signed
                 by Magistrate Judge William T. Prince on 9/30/96) Copies
                 Mailed: 09/30/96 to AUSA    O.B. (ward) [Entry date 09/30/96]

9/30/96   --     Indictment unsealed as to Kenyon Raheen Gadsden, Bryan
                 Lamont Grimes, Damon Marquethe Hills, John Barry Robinson,
                 Joseph Elijah Harvey (ward) [Entry date 09/30/96]
                 [Edit date 02/14/97]

9/30/96   9      ORDER AND PETITION by USA  for Writ of Habeas Corpus ad
                 prosequendum as to Joseph Elijah Harvey (ward)
                 [Entry date 10/01/96]

9/30/96   --     WRIT of Habeas Corpus ad Prosequendum issued and delivered
                 to USM as to Joseph Elijah Harvey for October 2, 1996 @
                 2:00 p.m. (ward) [Entry date 10/01/96]

9/30/96   10     ORDER OF TEMPORARY DETENTION as to Bryan Lamont Grimes -
                 Detention Hearing set before Magistrate Judge Miller for
                 11:30 a.m. 10/2/96 for Bryan Lamont Grimes (Signed by
                 Magistrate Judge William T. Prince on 9/30/96) Copies Dist.
                 9/30/96 to USM, AUSA & PTSO (ward) [Entry date 10/01/96]

9/30/96   11     ORDER OF TEMPORARY DETENTION as to Damon Marquethe Hills -
                 Detention Hearing set before Magistrate Judge Miller for
                 11:30 a.m. 10/2/96 for Damon Marquethe Hills (Signed by
                 Magistrate Judge William T. Prince on 9/30/96)  Copies
                 Dist. 9/30/96 to AUSA, USM & PTSO (ward)
                 [Entry date 10/01/96]

9/30/96   12     ORDER OF TEMPORARY DETENTION as to John Barry Robinson -
                 Detention Hearing set before Magistrate Judge Miller for
                 11:30 a.m. 10/2/96 for John Barry Robinson (Signed by
                 Magistrate Judge William T. Prince on 9/30/96)  Copies
                 Dist. 9/30/96 to USM, AUSA & PTSO (ward)
                 [Entry date 10/01/96]

10/1/96   13     CJA 20 as to John Barry Robinson: Appointment of Attorney
                 Jon Michael Babineau - Voucher #0773040 (Signed by
                 Magistrate Judge William T. Prince on 9/30/96) (ward)
                 [Entry date 10/02/96]

10/1/96   14     CJA 20 as to Damon Marquethe Hills: Appointment of Attorney
                 Larry W. Shelton - Voucher #0773038 (Signed by Magistrate
                 Judge William T. Prince on 9/30/96) (ward)

[Entry date 0/02/96]

10/2/96 --    Detention hearing as to Bryan Lamont Grimes held before
              Magistrate Judge Tommy E. Miller (Tape 2372 Pts. 1735-1903)
              USA appeared through: Laura Tayman, AUSA; Deft. present in
              custody.  Counsel desired, no appearance by counsel.  Deft.
              remanded to custody of Marshal. (ward) [Entry date 10/02/96]

10/2/96 --    Detention hearing as to Bryan Lamont Grimes reset for 3:15
              p.m. 10/2/96 for Bryan Lamont Grimes (ward)
              [Entry date 10/02/96]

10/2/96 --    Detention hearing as to John Barry Robinson held before
              Magistrate Judge Tommy E. Miller (Tape 2372 Pts. 1735-2322)
              USA appeared through: Laura Tayman, AUSA; Dft(s) appeared
              through: Jon Babineau, c.a.   Deft. present in custody.
              Detention ordered.  Court to prepare order.  Deft. remanded
              to custody of Marshal. (ward) [Entry date 10/02/96]

10/2/96 --    Arraignment as to John Barry Robinson set for 8:30 a.m.
              10/9/96 for John Barry Robinson (ward) [Entry date 10/02/96]

10/2/96 --    Detention hearing as to Damon Marquethe Hills held before
              Magistrate Judge Tommy E. Miller (Tape 2372 Pts. 1735-2322)
              USA appeared through: Laura Tayman, AUSA; Dft(s) appeared
              through: Larry Shelton, c.a.  Deft. present in custody.
              Detention ordered.  Court to prepare order.  Deft. remanded
              to custody of Marshal. (ward) [Entry date 10/02/96]

10/2/96 --    Arraignment as to Damon Marquethe Hills set for 8:30 a.m.
              10/9/96 for Damon Marquethe Hills (ward)
              [Entry date 10/02/96]

10/2/96 15    ORDER OF DETENTION as to Damon Marquethe Hills, entered and
              filed 10/2/96 (Signed by Magistrate Judge Tommy E. Miller)
              Copies mailed & dist. 10/3/96  O.B. (ward)
              [Entry date 10/03/96]

10/2/96 16    ORDER OF DETENTION as to John Barry Robinson, entered and
              filed 10/2/96 (Signed by Magistrate Judge Tommy E. Miller)
              Copies mailed & dist. 10/3/96  O.B. (ward)
              [Entry date 10/03/96]

10/2/96 --    Detention hearing as to Bryan Lamont Grimes held before
              Magistrate Judge Tommy E. Miller (Tape 2373 Pts. 1637-2175)
              USA appeared through: Laura Tayman, AUSA; Dft(s) appeared
              through: William P. Robinson, Jr., ret.  Deft. present in
              custody.  Detention ordered.  Court to prepare order. Deft.
              remanded to custody of Marshal. On govt. motion, court
              directed warrant to issue as to deft. Harvey in this case.
              (ward) [Entry date 10/03/96]

10/2/96 --    ORAL ORDER directing that warrant be issued as to Joseph
              Elijah Harvey  (Entered by Magistrate Judge Tommy E.
              Miller) (see minutes for 10/2/96 detention hearing for
              deft. Grimes) (ward) [Entry date 10/03/96]

10/2/96 --    Arraignment as to Bryan Lamont Grimes set for 8:30 a.m.
              10/9/96 for Bryan Lamont Grimes (ward) [Entry date 10/03/96]

10/2/96 --    Arrest WARRANT issued as to Joseph Elijah Harvey and
              delivered to USM (ward) [Entry date 10/03/96]

10/3/96 17    ORDER OF DETENTION as to Bryan Lamont Grimes, entered
              10/2/96 (Signed by Magistrate Judge Tommy E. Miller) Copies
              mailed & dist. 10/3/96  O.B. (ward) [Entry date 10/03/96]

10/3/96 --    Plea Agreement Hearing as to John Barry Robinson held
              before Judge J. C. Clarke Jr. (Gloria Smith, OCR)  USA
              appeared through: Laura Tayman, AUSA; Dft(s) appeared
              through: Jon Babineau, c.a.  Deft. requested to withdraw



said count, Court explained to deft. taht by pleading guilty he waived jury trial. (ward) [Entry date 10/04/96]

10/3/96  18    Plea Agreement as to John Barry Robinson, filed in open court (ward) [Entry date 10/04/96]

10/3/96  --    PLEA entered by John Barry Robinson. Court accepts plea by John Barry Robinson Guilty: (4) count(s) 2. Continued for PSR. Remaining counts to be dismissed at later time. Court explained to deft. that by pleading guilty he waived his right of appeal, pursuant to plea agreement. (terminated arraignment deadline) (ward) [Entry date 10/04/96]

10/3/96  20    MOTION with Memorandum in Support as to Bryan Lamont Grimes by USA to Substitute Attorney (titled "Govt's Motion for Order of Disqualification") (ward) [Entry date 10/04/96]

10/3/96  --    Motion hearing as to Bryan Lamont Grimes re: [20-1] motion by USA to Substitute Attorney (to disqualify attorney - William P. Robinson, Esquire) set at 9:00 a.m. 10/8/96 for Bryan Lamont Grimes (ward) [Entry date 10/04/96] [Edit date 10/04/96]

10/3/96  --    Sentencing set for 9:00 a.m. 1/2/97 for John Barry Robinson (4) count(s) 2 (ward) [Entry date 10/04/96]

10/7/96  21    WRIT of Habeas Corpus ad Prosequendum returned unexecuted (not in custody) by USM as to Joseph Elijah Harvey (ward) [Entry date 10/09/96]

10/8/96  --    Motion hearing held, as to Bryan Lamont Grimes, before Judge Henry C. Morgan, Jr. re: [20-1] motion by USA to Substitute Attorney (Motion for Order of Disqualification). (Diane Gray, OCR) USA appeared through: Laura Tayman, AUSA; Dft(s) appeared through: William Robinson, ret. Came on for hearing on govt's motion to disqualify Mr. Robinson as counsel for deft. Argued. Comments of court heard and rulings read into the record. Comments of counsel and deft. heard. Counsel allowed to remain through arraignment and any contemplated plea. Court advised deft. if he wishes to proceed to trial or plea, Court will appoint a court appointed atty. at later time if deft. so desires. Deft. desires Mr. Robinson to remain as counsel at this time. Deft. remanded. (ward) [Entry date 10/08/96]

10/8/96  --    Initial appearance as to Joseph Elijah Harvey held before Magistrate Judge Tommy E. Miller (Tape 2376 Pts. 3099-3359). USA appeared through: Laura Tayman, AUSA; Deft. present in custody without counsel. Deft. advised of rights, charges & right to counsel. Counsel desired. Court directed appointment of counsel. Arraignment set for 8:30 a.m. 10/9/96 for Joseph Elijah Harvey. Govt. motion for detention hearing - granted. Detention Hearing set for 10:00 a.m. 10/9/96 for Joseph Elijah Harvey. Temporary detention ordered. Deft. remanded to custody of Marshal. (ward) [Entry date 10/08/96]

10/8/96  22    CJA 23 FINANCIAL AFFIDAVIT for appointing counsel by Joseph Elijah Harvey, filed in open court (ward) [Entry date 10/08/96] [Edit date 10/09/96]

10/8/96  23    CJA 20 as to Joseph Elijah Harvey: Appointment of Attorney Emma J. Simpson  Voucher #0773045 (Signed by Magistrate Judge Tommy E. Miller on 10/8/96) (ward) [Entry date 10/08/96] [Edit date 10/09/96]

10/8/96  24    ORDER OF Temporary DETENTION as to Joseph Elijah Harvey. Detention Hearing set for 10:00 a.m. 10/9/96 for Joseph Elijah Harvey (Signed by Magistrate Judge Tommy E. Miller on 10/8/96) Copies Dist. 10/8/96 (ward) [Entry date 10/08/96] [Edit date 10/09/96]

10/9/96    --    Arraignment as to Joseph Elijah Harvey held before
                 Magistrate Judge Tommy E. Miller (Sue Ash, OCR)  USA
                 appeared through: Laura Tayman, AUSA; Deft. appeared
                 through: Emma J. Simpson, c.a.  Copy of Indictment
                 previously furnished to deft.  Deft. waived formal
                 arraignment.  Deft. plead not guilty.  Jury demanded.
                 Preliminary Motion Filings due 10/23/96 for Joseph Elijah
                 Harvey, with responses due within 11 days from 10/23/96.
                 Jury Trial set for 10:00 a.m. 12/2/96 for Joseph Elijah
                 Harvey.  Court stated that deft. must be present at
                 preliminary hearings unless he executes and files waiver of
                 appearance form.  Deft. remanded to Marshal's custody. (ward)
                 [Entry date 10/09/96]

10/9/96    25    ORDER as to Joseph Elijah Harvey for Pre-trial discovery
                 (Signed by Magistrate Judge Tommy E. Miller), filed in open
                 court    Copies Mailed: 10/09/96 to AUSA & to counsel for
                 deft. (ward) [Entry date 10/09/96]

10/9/96    --    Arraignment as to Bryan Lamont Grimes held before
                 Magistrate Judge Tommy E. Miller (Sue Ash, OCR) USA
                 appeared through: Laura Tayman, AUSA; Deft. appeared
                 through: William P. Robinson, Jr., ret.  Copy of Indictment
                 previously furnished to deft.  Deft. waived formal
                 arraignment.  Deft. plead not guilty.  Jury demanded.
                 Preliminary Motion Filings due 10/23/96 for Bryan Lamont
                 Grimes, with responses due within 11 days from 10/23/96.
                 Jury Trial set for 10:00 a.m. 12/2/96 for Bryan Lamont
                 Grimes.  Court stated that deft. must be present at
                 preliminary hearings unless he executes and files waiver of
                 appearance form.  Deft. remanded to Marshal's custody. (ward)
                 [Entry date 10/09/96]

10/9/96    26    ORDER as to Bryan Lamont Grimes for Pre-trial discovery
                 (Signed by Magistrate Judge Tommy E. Miller), filed in open
                 court    Copies Mailed: 10/09/96 to AUSA and to counsel for
                 deft. (ward) [Entry date 10/09/96]

10/9/96    --    Arraignment as to Damon Marquethe Hills held before
                 Magistrate Judge Tommy E. Miller (Sue Ash, OCR)  USA
                 appeared through: Laura Tayman, AUSA; Deft. appeared
                 through: Larry W. Shelton, c.a.  Copy of Indictment
                 previously furnished to deft.  Deft. waived formal
                 arraignment.  Deft. plead not guilty.  Jury demanded.
                 Preliminary motion Filings due 10/23/96 for Damon Marquethe
                 Hills, with responses due within 11 days from 10/23/96.
                 Jury Trial set for 10:00 a.m. 12/2/96 for Damon Marquethe
                 Hills.  Court stated that deft. must be present at
                 preliminary hearings unless he executes and files waiver of
                 appearance form.  Deft. remanded to Marshal's custody. (ward)
                 [Entry date 10/09/96]

10/9/96    27    ORDER as to Damon Marquethe Hills for Pre-trial discovery
                 (Signed by Magistrate Judge Tommy E. Miller), filed in open
                 court.    Copies Mailed: 10/09/96 to AUSA and to counsel for
                 deft. (ward) [Entry date 10/09/96]

10/9/96    --    Detention hearing as to Joseph Elijah Harvey held before
                 Magistrate Judge Tommy E. Miller (Tape 2376 Pts. 3359-3685
                 & Tape 2377 Pts. 1-170) USA appeared through: Laura Tayman,
                 AUSA; Dft(s) appeared through: Emma Simpson, c.a.  Deft.
                 present in custody.  Deft. shall next appear in this Court
                 on 12/2/96 at 10:00 a.m. for trial.  Detention ordered
                 (Court to prepare order).  Deft. remanded to custody of
                 Marshal. (ward) [Entry date 10/09/96]

10/9/96    28    ORDER OF DETENTION as to Joseph Elijah Harvey (Signed by
                 Magistrate Judge Tommy E. Miller on 10/9/96)  Copies mailed
                 10/9/96 (ward) [Entry date 10/09/96]

10/9/96    29    Arrest WARRANT Returned Executed by USM as to Joseph Elijah
                 Harvey on 10/8/96 (ward) [Entry date 10/11/96]

10/16/96 --        Plea Agreement Hearing as to Bryan Lamont Grimes held
                   before Judge Robert G. Doumar (Sue Ash, OCR) USA appeared
                   through: Laura P. Tayman, AUSA; Dft(s) appeared through:
                   Cheryl Footman-Banks. Deft. requested to withdraw plea of
                   not guilty to count 1 and enter plea of guilty to said
                   count. Court explained to deft. that by pleading guilty he
                   waived jury trial. (ward) [Entry date 10/16/96]

10/16/96 30        Plea Agreement as to Bryan Lamont Grimes, filed in open
                   court (ward) [Entry date 10/16/96]

10/16/96 --        PLEA entered by Bryan Lamont Grimes. Court accepts plea
                   by Bryan Lamont Grimes (2) Guilty: count(s) 1. Continued
                   for PSR. Deft. remanded to custody of Marshal. Remaining
                   counts to be dismissed at later time. Court explained to
                   deft. that by pleading guilty he waived his right of
                   appeal, pursuant to plea agreement. (ward)
                   [Entry date 10/16/96]

10/16/96 --        Sentencing set for 9:15 a.m. 1/13/97 for Bryan Lamont
                   Grimes (2) count(s) 1 (ward) [Entry date 10/16/96]

10/18/96 32        MOTION by Damon Marquethe Hills for Disclosure of 404(b)
                   Evidence (ward) [Entry date 10/18/96]

10/18/96 33        MEMORANDUM by Damon Marquethe Hills in support of [32-1]
                   motion by Damon Marquethe Hills for Disclosure of 404(b)
                   Evidence (ward) [Entry date 10/18/96]

10/18/96 34        MOTION by Damon Marquethe Hills for appointment of
                   investigator (ward) [Entry date 10/18/96]

10/18/96 35        MEMORANDUM by Damon Marquethe Hills in support of [34-1]
                   motion by Damon Marquethe Hills for appointment of
                   investigator (ward) [Entry date 10/18/96]

10/30/96 36        RESPONSE by USA as to Damon Marquethe Hills re [32-1]
                   motion by Damon Marquethe Hills for Disclosure of 404(b)
                   Evidence (ward) [Entry date 10/31/96]

11/6/96 --         Plea Agreement Hearing as to Damon Marquethe Hills held
                   before Judge Henry C. Morgan Jr. (Diane Gray, OCR) USA
                   appeared through: Laura Tayman, AUSA; Dft(s) appeared
                   through: Larry Shelton, c.a. Deft. requested to withdraw
                   plea of not guilty to Count 1 and enter a plea of guilty to
                   said count. Court explained to deft. that by pleading
                   guilty he waived jury trial. (ward) [Entry date 11/07/96]

11/6/96 37         Plea Agreement as to Damon Marquethe Hills, filed in open
                   court (ward) [Entry date 11/07/96]

11/6/96 --         PLEA entered by Damon Marquethe Hills. Court accepts plea
                   by Damon Marquethe Hills (3) Guilty: count(s) 1.
                   Continued for PSR. Deft remanded to custody of Marshal.
                   Court explained to deft that by pleading guilty he waived
                   his right of appeal, pursuant to plea agreement. Terminated
                   Jury trial for deft Hills. Terminated motion: [34-1] motion
                   by Damon Marquethe Hills for appointment of investigator as
                   to Damon Marquethe Hills (3), [32-1] motion by Damon
                   Marquethe Hills for Disclosure of 404(b) Evidence as to
                   Damon Marquethe Hills (3) (ward) [Entry date 11/07/96]

11/6/96 --         Sentencing set for 9:00 a.m. 2/11/97 for Damon Marquethe
                   Hills (3) count(s) 1 (ward) [Entry date 11/07/96]

11/18/96 --        Plea Agreement Hearing as to Joseph Elijah Harvey held
                   before Judge Robert G. Doumar (Sue Ash, OCR) USA appeared
                   through: Laura Tayman, AUSA; Dft(s) appeared through: Emma
                   J. Simpson, c.a. Deft requested to withdraw plea of not
                   guilty to Count 1 and enter a plea of guilty to said count.

jury trial (ward) [Entry date 11/19/96]

11/18/96 39    Plea Agreement as to Joseph Elijah Harvey, filed in open
               court (ward) [Entry date 11/19/96]

11/18/96 --    PLEA entered by Joseph Elijah Harvey. Court accepts plea
               by Joseph Elijah Harvey (5) Guilty: count(s) 1. Continued
               for PSR. Deft remanded to custody of Marshal. Remaining
               counts to be dismissed at later time.  Court explained to
               deft that by pleading guilty he waived his right of appeal,
               pursuant to plea agreement. (ward) [Entry date 11/19/96]

11/18/96 --    Sentencing set for 9:15 a.m. 2/25/97 for Joseph Elijah
               Harvey (5) count(s) 1 (ward) [Entry date 11/19/96]

12/30/96 41    MOTION as to John Barry Robinson by USA for downward
               departure based on substantial assistance (sche)
               [Entry date 01/02/97]

12/30/96 42    POSITION with Respect to Sentencing Factors by John Barry
               Robinson (sche) [Entry date 01/06/97]

12/31/96 43    POSITION with Respect to Sentencing Factors by USA as to
               John Barry Robinson and response to defense objections
               regarding sentencing factors (sche) [Entry date 01/02/97]
               [Edit date 01/06/97]

1/2/97   --    Sentencing held before Judge J. C. Clarke Jr. (Gloria
               Smith, OCR) USA appeared through: Laura Tayman, AUSA;
               Dft(s) appeared through: Jon M. Babineau, c.a. as to John
               Barry Robinson (4) count(s) 2. Govt motion for downward
               departure - argued and taken under advisement. (sche)
               [Entry date 01/02/97]

1/2/97   --    Motion(s) taken under advisement as to John Barry Robinson:
               [41-1] motion by USA for downward departure under
               advisement as to John Barry Robinson (4) (sche)
               [Entry date 01/02/97]

1/3/97   44    JUDGMENT as to John Barry Robinson (4) count(s) 2:  Two
               Hundred Ninety-Four (294) Months Imprisonment. Five (5)
               Years Supervised Release. $50.00 Special Assessment, due in
               full immediately. The Court finds deft is unable to pay
               fine, cost of prosecution, cost of imprisonment or
               supervised release. John Barry Robinson (4) count(s) 1, 3:
               Dismissed on government motion on 1/2/97.  Standard
               conditions of supervised release apply along with the
               following additional conditions: deft shall refrain from
               any unlawful use of a controlled substance; deft shall
               submit to urinalysis testing for drug or alcohol abuse as
               directed by the PO; deft shall not commit any state, local
               or federal crime. Deft notified of right of appeal. (Signed
               by Judge J. C. Clarke Jr.) Terminated: party John Barry
               Robinson, [34-1] motion by Damon Marquethe Hills for
               appointment of investigator by Damon Marquethe Hills,
               motion by Damon Marquethe Hills for Disclosure of 404(b)
               Evidence by Damon Marquethe Hills, [20-1] motion by USA to
               Substitute Attorney by USA (sche) [Entry date 01/06/97]

1/3/97   45    POSITION with Respect to Sentencing Factors by USA as to
               Bryan Lamont Grimes (sche) [Entry date 01/06/97]

1/9/97   46    POSITION with Respect to Sentencing Factors by Bryan Lamont
               Grimes (sche) [Entry date 01/09/97]

1/13/97  --    Sentencing held before Judge Robert G. Doumar (Carrie Zahn
               - Zahn, Hall & Zahn) USA appeared through: Laura P. Tayman,
               AUSA; Dft(s) appeared through: William P. Robinson, Jr.,
               ret. as to Bryan Lamont Grimes (2) count(s) 1. (sche)
               [Entry date 01/13/97]

1/15/97  47    JUDGMENT as to Bryan Lamont Grimes (2) count(s) 1:  Life

imprisonme● Five (5) years supervised re●se. $50.00
special as●sment, due in full immediately. Restitution
waived. Court finds deft is unable to pay fine. Any special
assessment may be subject to penalties for default and
delinquency. Standard conditions of supervised release apply
along with the following additional conditions: deft shall
not commit another federal, state or local crime; deft shall
refrain from any unlawful use of a controlled substance and
submit to one drug test within 15 days of release on
supervised release and at least two periodic drug tests
thereafter, as directed by the PO; deft shall participate in
a program approved by the PO for substance abuse, which
program may include residential treatment and testing to
determine whether the deft has reverted to the use of drugs
or alcohol, with partial cost to be paid by the deft, all as
directed by the PO. If this jgm imposes a perid of
imprisonment, payment of Criminal Monetary Penalties shall
be due during the period of imprisonment. Bryan Lamont
Grimes (2) count(s) 2, 7 and 8: Dismissed on government
motion on 1/13/97. Deft notified of right of appeal. Court
noted that deft waived right of appeal in plea agreement.
dated 1/13/97 and filed 1/15/97 (Signed by Judge Robert G.
Doumar) Terminated: [20-1] motion by USA to Substitute
Attorney by USA. Copies dist. 1/16/97. O.B. (sche)
[Entry date 01/16/97] [Edit date 01/16/97]

| | | |
|---|---|---|
| 1/15/97 | 48 | MEMORANDUM OPINION as to Bryan Lamont Grimes that the enhancement for obstruction of justice was properly applied to Grimes; entered 1/13/97 and filed 1/15/97 (Signed by Judge Robert G. Doumar) Copies Mailed: 01/16/97 to all counsel. O.B. (sche) [Entry date 01/16/97] |
| 2/5/97 | 49 | POSITION with Respect to Sentencing Factors by Damon Marquethe Hills (popo) [Entry date 02/05/97] |
| 2/10/97 | 50 | POSITION with Respect to Sentencing Factors & Response to Defense Objections Regarding Sentencing Factors by USA as to Damon Marquethe Hills (popo) [Entry date 02/10/97] |
| 2/11/97 | -- | Sentencing held before Judge Henry C. Morgan Jr. (Diane Gray, OCR). USA appeared through: Laura Tayman, AUSA. Dft. present in custody appeared through c.a. counsel: Larry W. Shelton - Damon Marquethe Hills (3) count 1. PSR reviewed. Objections heard & rulings made. Evidence presented. Arguments heard. Statement of dft. heard. (popo) [Entry date 02/12/97] |
| 2/12/97 | 51 | JUDGMENT Damon Marquethe Hills (3) Count 1: Two Hundred Sixty-Two (262) Months Imprisonment. Five (5) Years Supervised Release. $50.00 Special Assessment which shall be due immediately. If dft. is unable to pay the special assessment at this time, the Court orders that it may be deducted from his prison account in accordance with the regulations applicable thereto. Standard conditions of supervised release apply along with the following additional conditions: Dft. shall refrain from any unlawful use of a controlled substance or abuse of alcohol & submit to one drug test within 15 days of release on supervised release & at least two periodic drug tests thereafter, as dir. by the P.O. Dft. shall participate in a program approved by the P.O. for substance abuse, which program may include residential treatment & testing to determine whether the dft. has reverted to the use of drugs or alcohol. If it is determined that the dft. has used a controlled substance or abused alcohol, the cost of the treatment shall be paid by the dft; if not, then he shall not be required to pay the cost of the treatment. Court finds dft. is unable to pay fine, cost of prosecution, cost of imprisonment or supervised release. Court noted that dft. waived right of appeal in the plea agreement. Dft. remanded. (Signed by Judge Henry C. Morgan Jr. on 2/11/97) & filed on 2/12/97. Dist. (popo) [Entry date 02/12/97] |

| | | |
|---|---|---|
| 2/14/97 | -- | Initial appearance as to Kenyon Raheen Gadsden held before Magistrate Judge William T. Prince (Tape: 2533, Pts. 2654-2931). USA appeared through Laura Tayman, AUSA. Dft. present in custody without counsel. Dft. advised of rights, charges & right to counsel. Counsel desired. Dft. sworn. Court directed appointment of counsel. Detention Hearing set for 3:00 p.m. on 2/18/97. Temporary Detention ordered. (popo) [Entry date 02/14/97] |
| 2/14/97 | 52 | CJA 23 FINANCIAL AFFIDAVIT by Kenyon Raheen Gadsden filed in open Court (popo) [Entry date 02/14/97] |
| 2/14/97 | 53 | Arrest Warrant Returned Executed as to Kenyon Raheen Gadsden on 2/13/97 (popo) [Entry date 02/14/97] |
| 2/14/97 | 54 | ORDER OF TEMPORARY DETENTION as to Kenyon Raheen Gadsden (Signed by Magistrate Judge William T. Prince on 2/14/97). cc to U.S. Marshals; AUSA & PTSO. (popo) [Entry date 02/14/97] |
| 2/14/97 | 55 | CJA 20 as to Kenyon Raheen Gadsden Appointment of Attorney Mark McRoberts McMillin – Voucher # 0782283 (Signed by Magistrate Judge William T. Prince on 2/14/97). Dist. (popo) [Entry date 02/14/97] |
| 2/18/97 | -- | Detention hearing as to Kenyon Raheen Gadsden held before Magistrate Judge William T. Prince (Tape: 2534, Pts. 2715-3659 & Tape: 2535, Pts. 1-257). USA appeared through: Laura Tayman, AUSA. Dft. present in custody appeared through c.a. counsel Mark McMillin & retained counsel Robert Neely w/William Robinson's firm. Dft. sworn. Dft's motion to substitute William Robinson as counsel for dft. heard. Court inquired of the dft. re conflict of interest – dft. waived his rights re conflict & Court substituted William Robinson as counsel. Detention Ordered (Court to prepare Order). Dft. remanded. (popo) [Entry date 02/19/97] |
| 2/18/97 | -- | MOTION in open court by Kenyon Raheen Gadsden to Substitute Attorney c.a. counsel Mark McMillin with retained counsel William P. Robinson (popo) [Entry date 02/19/97] |
| 2/18/97 | -- | ORAL ORDER as to Kenyon Raheen Gadsden granting [0-0] oral motion to Substitute Attorney c.a. counsel Mark McMillin with retained counsel William P. Robinson, Jr. – terminated attorney Mark McRoberts McMillin for Kenyon Raheen Gadsden Added William P. Robinson Jr. as to Kenyon Raheen Gadsden (1) (Entered by Magistrate Judge William T. Prince in open Court) (popo) [Entry date 02/19/97] |
| 2/18/97 | -- | Arraignment as to Kenyon Raheen Gadsden set for 9:00 a.m. on 2/19/97 (popo) [Entry date 02/19/97] |
| 2/18/97 | 56 | ORDER as to Kenyon Raheen Gadsden for Pre-trial Discovery (Signed by Magistrate Judge William T. Prince) & filed in open Court. Copies Mailed: Counsel & AUSA (popo) [Entry date 02/19/97] |
| 2/19/97 | -- | Arraignment as to Kenyon Raheen Gadsden held before Magistrate Judge Tommy E. Miller (Sue Ash, OCR). USA appeared through Laura Tayman, AUSA. Dft. present in custody with retained counsel Robert Neely of William Robinson's firm. Dft. was formally arraigned. Dft. plead not guilty. Jury demanded. Motion Filings due 3/3/97 for Kenyon Raheen Gadsden; Government's Response to Motions due 3/14/97 for USA; Jury Trial set for 10:00 a.m. on 4/9/97 for Kenyon Raheen Gadsden. Court stated that dft. must be present at prel. hearings unless he exec & files waiver of appearance form. Dft. remanded. (popo) [Entry date 02/19/97] |

| | | |
|---|---|---|
| 2/20/97 | 57 | ORDER OF DETENTION as to Kenyon Raheen Gadsden (Signed by Magistrate Judge William T. Prince). Copies dist. (popo) [Entry date 02/20/97] |
| 2/24/97 | -- | Sentencing reset for 9:30 a.m. on 3/21/97 for Joseph Elijah Harvey (5) Count 1 (popo) [Entry date 02/24/97] |
| 2/26/97 | 58 | Judgment returned executed as to John Barry Robinson on 2/4/97 (popo) [Entry date 02/26/97] |
| 3/17/97 | -- | Plea Agreement Hearing as to Kenyon Raheen Gadsden held before Judge John A. MacKenzie (Sue Ash OCR) USA appeared through: Laura Tayman, AUSA Dft(s) appeared through: William Robinson, Jr. (ret.) (rlam) [Entry date 03/17/97] |
| 3/17/97 | 59 | Plea Agreement as to Kenyon Raheen Gadsden, filed (rlam) [Entry date 03/17/97] |
| 3/17/97 | -- | PLEA entered by Kenyon Raheen Gadsden. Court accepts plea. by Kenyon Raheen Gadsden Guilty: Kenyon Raheen Gadsden (1) count(s) 1; Continued for PSR; Pursuant to the Plea Agreement, the defendant waived right of appeal. (rlam) [Entry date 03/17/97] |
| 3/17/97 | -- | Sentencing set for 9:00 a.m. on 6/12/97 for Kenyon Raheen Gadsden re: count(s) 1; Defendant remanded to custody of Mshl. (rlam) [Entry date 03/17/97] |
| 3/21/97 | -- | Sentencing held before Judge Robert G. Doumar (Sue Ash, OCR). USA appeared through: Laura Tayman, AUSA. Dft. present in custody appeared through c.a. counsel: Emma J. Simpson - Joseph Elijah Harvey (5) Count 1. PSR reviewed. Arguments heard & statement of dft. heard. (popo) [Entry date 03/24/97] |
| 3/24/97 | 61 | JUDGMENT Joseph Elijah Harvey (5) Count 1: One Hundred Twenty-Eight (128) Months Imprisonment. This sentence takes into account the time the dft. previously served in Docket No. CR95003552-00 in the Nofolk Circuit Court. The Court recommends that the dft. participate in an intense substance abuse program while incarcerated. Five (5) Years Supervised Release. $50.00 Special Assessment due immediately. Joseph Elijah Harvey (5) counts 2 & 4 Dismissed on the Government's Motion. Standard conditions of supervised release apply along with the following additional conditions: The dft. shall not possess a firearm, controlled substance or destructive device. The dft. shall refrain from any unlawful use of a controlled substance & submit to one drug test within 15 days of release on supervised release & at least two periodic drug tests thereafter, as dir. by the P.O. The Dft. shall participate in a program approved by the P.O. for substance abuse, which program may include residential treatment & testing to determine whether the dft. has reverted to the use of drugs or alcohol, with partial cost to be paid by the dft., all as dir. by the P.O. Court finds dft. is unable to pay a fine, cost of prosecution, cost of imprisonment or supervised release. (Signed by Judge Robert G. Doumar on 3/21/97) & filed on 3/24/97. Dist. (popo) [Entry date 03/24/97] |
| 6/2/97 | 62 | OBJECTIONS by Kenyon Raheen Gadsden to Presentence Investigation Report, received. (popo) [Entry date 06/03/97] |
| 6/5/97 | 63 | POSITION with Respect to Sentencing Factors by USA as to Kenyon Raheen Gadsden (popo) [Entry date 06/06/97] |
| 6/9/97 | 64 | RESPONSE by USA [62-1] to Defense Objections Regarding Sentencing Factors (popo) [Entry date 06/10/97] |
| 6/9/97 | 65 | Amended Objections by Kenyon Raheen Gadsden to Presentence Investigation Report (amended to show that a copy was |

served on ● Probation Officer & AUSA) (po●
[Entry date 06/10/97]

7/2/97  --   Sentencing reset for 2:00 on 7/7/97 for Kenyon Raheen
             Gadsden (1) Count 1 (popo) [Entry date 07/02/97]

7/7/97  --   Sentencing held before Judge Rebecca B. Smith (Gloria
             Smith, OCR). USA appeared through: Laura P. Tayman, AUSA.
             Dft. present in custody appeared through: William P.
             Robinson, Jr. - Kenyon Raheen Gadsden (1) Count 1.  PSR
             reviewed.  Objections withdrawn.  Arguments heard. (popo)
             [Entry date 07/09/97]

7/9/97  66   JUDGMENT Kenyon Raheen Gadsden (1) count 1: Life
             Imprisonment. Five (5) Years Supervised Release. $100.00
             Special Assessment due immediately. Kenyon Raheen Gadsden
             (1) counts 2, 5, 6 & 7 Dismissed on the Government's
             Motion.  The Court recommends that while incarcerated, the
             dft. shall participate in an educational program for
             substance abuse.  The Court recommends that while
             incarcerated, the dft. shall obtain his GED & a skill.
             Standard conditions of supervised release apply along with
             the following additional conditions: The dft. shall not
             incur new credit card charges or open additional lines of
             credit without the approval of the P.O.  The dft. shall
             provide the P.O. with access to requested financial
             information.  The court does not deny federal benefits. The
             dft. shall participate in an educational program for
             substance abuse, if deemed appropriate by the P.O.   If the
             dft. has not obtained his GED & a skill while incarcerated,
             he shall do so while on supervised release as dir. by the
             P.O.  Court finds dft. unable to pay fine, cost of
             prosecution, cost of imprisonment or supv. rel.  Dft.
             remanded. (Signed by Judge Rebecca B. Smith on 7/7/97) &
             filed on 7/9/97.  Dist. (popo) [Entry date 07/10/97]

7/9/97  --   Disposal Record (popo) [Entry date 07/10/97]

12/19/97 67  MOTION by USA for downward departure based on substantial
             assistance (sche) [Entry date 12/19/97]

12/24/97 68  ORDER as to John Barry Robinson granting [67-1] motion by
             USA for downward departure as to John Barry Robinson (4) (
             Signed by Judge J. C. Clarke Jr. ), entered and filed
             12/24/97, ob, Copies Mailed/distributed: 12/24/97 (dhol)
             [Entry date 12/24/97]

12/30/97 69  ORDER as to John Barry Robinson amending the court' sorder
             of 12/24/97 to state, "In all other respects the sentence
             previously imposed on January 2, 1997 shall remain
             unchanged."; entered and filed 12/30/97 (Signed by Judge J.
             C. Clarke Jr.) Copies Mailed: 12/30/97 (sche)
             [Entry date 12/30/97]

1/13/98  70  MOTION by USA as to Bryan Lamont Grimes SEALED MOTION (popo)
             [Entry date 01/14/98] [Edit date 07/07/98]

2/11/98  71  SEALED DOCUMENT as to Damon Marquethe Hills (dhol)
             [Entry date 02/12/98]

5/27/98  72  ORDER/AMENDED JUDGMENT:  Bryan Lamont Grimes (2) count(s) 1.
             NEW SENTENCE PER 5/27/98 ORDER: 167 MONTHS IMPRISONMENT AS
             TO COUNT 1. ALL OTHER TERMS AND CONDITIONS OF THE JUDGMENT
             ORDER OF 1/13/97 ARE TO REMAIN THE SAME. Former Sentence:
             Life imprisonment. Five (5) years supervised release. $50.00
             special assessment. ent & filed. ( Signed by Judge Robert
             G. Doumar ) cc mld. (scar) [Entry date 05/27/98]
             [Edit date 07/07/98]

7/1/98  --   Rule 35 hearing as to Damon Marquethe Hills re: [71-1]
             motion SEALED MOTION set at 11:00 on 7/21/98 for Damon
             Marquethe Hills (popo) [Entry date 07/01/98]

[Edit date 7/07/98]

7/21/98 --      Motion hearing held as to Damon Marquethe Hills re: Govt's [71-1] Sealed Motion before Judge Henry C. Morgan Jr. (Diane Gray, OCR). USA appeared through: Laura Tayman, AUSA. Dft. not present appeared through: Larry W. Shelton. Motion argued - GRANTED. SENTENCE: Dft's sentence reduced from 262 months to 120 months imprisonment. All of the remaining provisions of the sentence & period of supervised release previously imposed shall remain in full force & effect. Court to prepare Order. (popo) [Entry date 07/22/98]

7/23/98 73      ORDER AND OPINION/AMENDED JUDGMENT:  Damon Marquethe Hills (3) count(s) 1: SENTENCE PER 7/23/98 ORDER:  120 MONTHS IMPRISONMENT. ALL OTHER PROVISIONS OF THE DEFT'S ORIGINAL SENTENCE SHALL REMAIN IN EFFECT. Former Sentence: Two Hundred Sixty-Two (262) Months Imprisonment. Five (5) Years Supervised Release.  $50.00 Special Assessment. ( Signed by Judge Henry C. Morgan Jr. )    ent & filed 7/23/98. cc mld. (scar) [Entry date 07/24/98]

Case Flags:
CLOSED

END OF DOCKET: 2:96cr182-0

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/19/2001 11:34:06 | | |
| **PACER Login:** | nl0057 | **Client Code:** | |
| **Description:** | docket report | **Search Criteria:** | 2:96cr00182 |
| **Billable Pages:** | 24 | **Cost:** | 1.68 |

# EXHIBIT C

# PLEA AGREEMENT

FILED
IN OPEN COURT

MAR 1 7 1997

CLERK, U.S. DISTRICT COU
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

UNITED STATES OF AMERICA      )
                              )
        v.                    )      CRIMINAL NO.   2:96CR182
                              )
KENYON RAHEEN GADSDEN,        )
                              )
        Defendant.            )

## PLEA AGREEMENT

Helen F. Fahey, United States Attorney for the Eastern District of Virginia, and Laura P. Tayman, Assistant United States Attorney, and the defendant, KENYON RAHEEN GADSDEN, and the defendant's counsel, pursuant to Rule 11(e) of the Federal Rules of Criminal Procedure, have entered into an agreement, the terms and conditions of which are as follows:

1.    The defendant, KENYON RAHEEN GADSDEN, agrees to plead guilty to Count One of the pending indictment.  Count One charges the defendant with conspiracy to distribute and possess with the intent to distribute cocaine base and cocaine, in violation of Title 21, United States Code, Section 846.  The penalties for this offense are a mandatory minimum term of ten (10) years of imprisonment and a maximum term of imprisonment for life, and a maximum fine of $4,000,000, and at least five (5) years of supervised release.  The defendant is aware that this supervised release term is in addition to any prison term the defendant may receive, and that a violation of a term of supervised release could result in the defendant being returned to prison for the full term of supervised release.

2.   Before sentencing in this case, the defendant agrees to pay a special assessment of fifty dollars ($50.00) per count of conviction.

3.   The defendant agrees:  (a) that any monetary penalty that the Court imposes, including the special assessment, fine, costs or restitution, is due and payable immediately; (b) to submit a completed Financial Statement of Debtor form as requested by the United States Attorney's Office; and (c) to make no attempt to avoid or delay paying any monetary penalty through any bankruptcy proceeding.

4.   The defendant is aware that the defendant's sentence will be imposed in accordance with the <u>Sentencing Guidelines and Policy Statements</u>.  The defendant is aware that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense to which the defendant pleads guilty.  The defendant is aware that the Court has not yet determined a sentence.  The defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that the defendant may have received from the defendant's counsel, the United States or the probation office, is a prediction, not a promise, and is not binding on the United States, the probation office or the Court.  The United States makes no promise or representation concerning what sentence the defendant will receive, and the defendant cannot withdraw a guilty plea based upon the actual sentence.  The defendant is aware that Title 18, United States Code, Section 3742 affords a

2

defendant the right to appeal the sentence imposed.
Acknowledging all this, the defendant knowingly waives the right
to appeal any sentence within the maximum provided in the statute
of conviction or the manner in which that sentence was determined
on the grounds set forth in Title 18, United States Code, Section
3742 or on any ground whatever, in exchange for the concessions
made by the United States in this plea agreement. This agreement
does not affect the rights or obligations of the United States as
set forth in Title 18, United States Code, Section 3742(b).

5. The United States will not further criminally prosecute
defendant in the Eastern District of Virginia for offenses
arising from conduct charged in the indictment, except crimes of
violence presently unknown to the United States. Further, after
imposition of sentence in this case, the United States will move
to dismiss the remaining counts of the indictment against this
defendant. This plea agreement binds only the United States
Attorney's Office for the Eastern District of Virginia and the
defendant; it does not bind any other prosecutor in any other
jurisdiction.

6. The defendant agrees to cooperate fully and truthfully
with the United States, and provide all information known to the
defendant regarding any criminal activity. In that regard:

a. The defendant agrees to testify truthfully and
completely at any grand juries, trials or other proceedings.

b.   The defendant agrees to be reasonably available for debriefing and pre-trial conferences as the United States may require.

c.   The defendant agrees to provide all documents, records, writings or materials of any kind in the defendant's possession or under the defendant's care, custody, or control relating directly or indirectly to all areas of inquiry and investigation.

d.   The defendant agrees that, upon request by the United States, the defendant will voluntarily submit to a government polygraph examination.

7.   The United States agrees not to use any truthful information provided pursuant to this agreement against the defendant in any other criminal prosecution in the Eastern District of Virginia.   In accordance with § 1B1.8 of the Sentencing Guidelines, information provided by the defendant pursuant to this agreement shall not be used to enhance the defendant's guidelines range.   The United States will bring this plea agreement and the full extent of the defendant's cooperation to the attention of other prosecuting offices if requested. Nothing in this plea agreement, however, restricts the Court's or Probation Office's access to information and records in the possession of the United States.   Further, nothing in this agreement prevents the government in any way from prosecuting the defendant should the defendant provide false, untruthful or perjurious information or testimony.

4

8.   The parties agree that the United States reserves its option to seek any departure from the applicable sentencing guidelines, pursuant to Section 5K of the <u>Sentencing Guidelines and Policy Statements</u>, or Rule 35(b) of the Federal Rules of Criminal Procedure, if in its sole discretion, the United States determines that the defendant has provided substantial assistance and that such assistance has been completed.

9.   This plea agreement is being entered into by the United States on the basis of the defendant's express representation that the defendant will make a full and complete disclosure of all assets over which the defendant exercises control, directly or indirectly, or in which the defendant has any financial interest.  The defendant agrees to forfeit, and hereby forfeits, whatever interest the defendant has in any drug related asset that the defendant owns or over which the defendant exercises control, directly or indirectly.  The defendant agrees to waive any interest in any drug related asset in any administrative or judicial forfeiture proceeding, whether criminal or civil.

10.  If the defendant fails in any way to fulfill completely all of the obligations under this plea agreement, the United States may seek release from any or all its obligations under this plea agreement.

11.  Whether the defendant has breached any provision of this plea agreement, if contested by the parties, shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall be

5

admissible and at which the United States shall be required to establish a breach of the plea agreement by a preponderance of the evidence. The proceeding established by this paragraph does not apply, however, to the United States' decision whether to file a motion based on "substantial assistance" as that phrase is used in Rule 35(b) of the Federal Rules of Criminal Procedure and Section 5K1.1 of the <u>Sentencing Guidelines and Policy Statements</u>. The defendant agrees that the decision whether to file such a motion rests in the United States' sole discretion.

12. This written agreement constitutes the complete plea agreement between the United States, the defendant, and the defendant's counsel. The United States has made no promises or representations except as set forth in writing in this plea agreement. The defendant acknowledges that no threats have been made against the defendant and that the defendant is pleading guilty freely and voluntarily because the defendant is guilty. Any modification of this plea agreement shall be valid only as set forth in writing in a supplemental or revised plea agreement signed by all parties.

13. <u>Defendant's Signature</u>: I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending criminal indictment. Further, I fully understand all rights with respect to the provisions of the <u>Sentencing Guidelines and Policy Statements</u> which may apply in my case. I have read this plea agreement and carefully reviewed

6

every part of it with my attorney.   I understand this agreement
and I voluntarily agree to it.


Date: **3-17-97**                    *Kenyon Gadsden*
                                    KENYON RAHEEN GADSDEN
                                    Defendant

14.   <u>Defense Counsel Signature</u>: I am counsel for the
defendant in this case.   I have fully explained to the defendant
the defendant's rights with respect to the pending indictment.
Further, I have reviewed the provisions of the <u>Sentencing
Guidelines and Policy Statements</u> and I have fully explained to
the defendant the provisions of those Guidelines which may apply
in this case.   I have carefully reviewed every part of this plea
agreement with the defendant.   To my knowledge, the defendant's
decision to enter into this agreement is an informed and
voluntary one.


Date: **3/17/97**                    *William P. Robinson*
                                    William P. Robinson, Jr.
                                    Counsel for Defendant

                                    Respectfully submitted,

                                    HELEN F. FAHEY
                                    UNITED STATES ATTORNEY

                           By:  *Laura P. Tayman*
                                    Laura P. Tayman
                                    Assistant United States Attorney

APPROVED:
*Rf Seidel*
Robert J. Seidel, Jr.           Date: **3-14-97**
Criminal Unit Supervisor
POSTMAN.21/4.2

7

A TRUE COPY, TESTE
Norman H. Meyer Jr., Clerk
By: _____ Deputy Clerk

# EXHIBIT D

# PRESENTENCE REPORT

IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | PRESENTENCE INVESTIGATION REPORT |
| | ) | |
| Kenyon Raheen Gadsden | ) | Docket No.  2:96cr182 |
| | ) | |

Prepared for:     The Honorable John A. Mackenzie
                  U.S. District Judge

Prepared by:      Kristian M. Everett
                  U.S. Probation Officer
                  600 Granby Street, Suite 200
                  Norfolk, Virginia 23510
                  (757) 441-6673

**Assistant U.S. Attorney:**          **Defense Counsel:**
Laura Pellatiro Tayman, Esquire       William P. Robinson Jr., Esquire
World Trade Center                    256 Freemason Street
101 West Main Street, Suite 8000      Norfolk, Virginia  23510
Norfolk, Virginia  23510              (757) 622-4686
(757) 441-6331

**Sentence Date:**        June 12, 1997

**Offense:**  Count One:  Conspiracy to Distribute Cocaine Base and
                          Cocaine, 21 U.S.C. 846, a Class A Felony (10
                          years to Life, $4,000,000 fine, at least 5
                          years supervised release, and at least a $100
                          special assessment)

**Plea:**                 Guilty, on 3/17/97

**Mandatory Minimum:**    Yes (10 years)

**Release Status:**       Detained without bail since 2/13/97

**Detainers:**            None

**Codefendants:**         See Codefendants - Related Cases Section

**Related Cases:**        See Codefendants - Related Cases Section

**Report Prepared:**      5/6/97              **Addendum Prepared:**   6/4/97
                                      **Additional Addendum Prepared:**   6/9/97

## Identifying Data:

| | |
|---|---|
| Date of Birth: | 5/18/73 |
| Age: | 24 |
| Race: | Black/Non-Hispanic |
| Sex: | Male |
| | |
| S.S.#: | 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 |
| FBI#: | 192064NA9 |
| USM#: | 27821-083 |
| Other ID#: | SID: VA821893 |
| | |
| Education: | Seventh Grade |
| Dependents: | 2 |
| Citizenship: | United States |

Current Address:      Virginia Beach City Jail
                      2501 James Madison Boulevard
                      Virginia Beach, Virginia  23456

Legal Address:        935 North Newtown Road
                      Virginia Beach, Virginia  23462

Aliases:              "Kenny R. Jones"
                      "Todd Fuller"
                      "Kenyon Gadsen"
                      "Kenya"

PART A.   OFFENSE

### Charges

1.   Kenyon Raheen Gadsden, John Barry Robinson, Bryan Lamont
     Grimes, Damon Marquethe Hills, and Joseph Elijah Harvey were
     named in an Eight-Count Indictment returned by an Eastern
     District of Virginia Grand Jury on September 26, 1996.  Count
     One charges them with Conspiracy to Distribute Cocaine Base
     and Cocaine, in violation of 21 U.S.C. 846, from in or about
     the fall 1993, and continuously thereafter up to and including
     September 26, 1996.   Counts Two, Five, Six and Seven charge
     Gadsden with Distribution and Possession with Intent to
     Distribute Cocaine Base, in violation of 21 U.S.C. 841 (a)(1),
     on or about August 4, 1995; December 8, 1995; and June 18,
     1996, respectively.

### Convictions

2.   On March 17, 1997, in accordance with the terms of a written
     plea agreement, Gadsden pled guilty to Count One of the
     Indictment, charging him with Conspiracy to Distribute Cocaine
     Base and Cocaine, in violation of 21 U.S.C. 846.  The terms of
     the plea agreement call for the defendant to pay a special
     assessment of $100 per Count of conviction before sentencing
     in this case.   Additionally, the defendant knowingly waives
     his right to appeal any sentence within the maximum provided
     in the statute of conviction.  Also, the United States, as
     part of the plea agreement, will move to dismiss the remaining
     Counts of the Indictment against this defendant after
     imposition of the sentence in this case.

### Codefendants - Related Cases

3.   **Bryan Lamont Grimes (a/k/a: "James E. Gadsden" and "Little
     Bryan")** was charged with Conspiracy to Distribute Cocaine Base
     and Cocaine, Two Counts of Distribution and Possession with
     Intent to Distribute Cocaine Base and Money Laundering.   On
     October 16, 1996, in accordance with the terms of a written
     plea agreement, Grimes appeared before the Honorable Robert G.
     Doumar on a plea of guilty to Count One of the Indictment,
     charging him with Conspiracy to Distribute Cocaine Base and
     Cocaine.  On January 13, 1997, Grimes was sentenced to Life in
     the custody of the Bureau of Prisons, 5 years supervised
     release, and a $50 special assessment.

4.   **Damon Marquethe Hills (a/k/a: "Damon Keith Hill" and "Keith")**
     was charged with Conspiracy to Distribute Cocaine Base and
     Cocaine.   On November 6, 1996, in accordance with the terms of
     a written plea agreement, Hills appeared before the Honorable
     Henry Coke Morgan, Jr., on a plea of guilty to Count One of
     the Indictment, charging him with Conspiracy to Possess with

Intent to Distribute Cocaine Base and Cocaine. On February 11, 1997, Hills was sentenced to 262 months in the custody of the Bureau of Prisons, 5 years supervised release, and a $50 special assessment.

5. **John Barry Robinson** (a/k/a: "John John") was charged with Conspiracy to Distribute Cocaine Base and Cocaine, and Two Counts of Distribution and Possession with Intent to Distribute Cocaine Base. On October 3, 1996, in accordance with the terms of a written plea agreement, Robinson appeared before the Honorable J. Calvitt Clarke, Jr., on a plea of guilty to Count Two of the Indictment, charging him with Distribution and Possession with Intent to Distribute Cocaine Base. On January 2, 1997, Robinson was sentenced to 294 months in the custody of the Bureau of Prisons, 5 years supervised release and a $50 special assessment.

6. **Joseph Elijah Harvey** was charged with Conspiracy to Distribute Cocaine Base and Cocaine, and Two Counts of Distribution and Possession with Intent to Distribute Cocaine Base. On November 18, 1996, in accordance with the terms of a written plea agreement, Harvey appeared before the Honorable Robert G. Doumar on a plea of guilty to Count One of the Indictment, charging him with Conspiracy to Distribute Cocaine Base and Cocaine. On March 21, 1997, Harvey was sentenced to 128 months in the custody of the Bureau of Prisons, 5 years supervised release, and a $50 special assessment.

7. **Willie Tyler,** a related case, pled guilty to a One-Count Criminal Information charging him with Conspiracy to Distribute and Possess with Intent to Distribute Approximately Two Kilograms of Cocaine before the Honorable J. Calvitt Clarke, Jr., on July 15, 1996. On October 10, 1996, he was sentenced to 137 months in the custody of the Bureau of Prisons, five years supervised release, and a $50 special assessment.

## Offense Conduct

8. From fall 1993, and continuously thereafter up to and including September 26, 1996, Kenyon Raheen Gadsden, Bryan Lamont Grimes, Damon Marquethe Hills, John Barry Robinson, and Joseph Elijah Harvey conspired with each other and with diverse other persons to distribute and possess with intent to distribute, fifty (50) grams or more of cocaine base, commonly known as "crack," in the Eastern District of Virginia. The conspirators also conspired to distribute and possess with intent to distribute, five (5) kilograms or more of cocaine in the Eastern District of Virginia. During the conspiracy, the defendants and co-conspirators played different roles and took upon themselves different tasks and participated in the affairs of the conspiracy through various criminal acts. The

defendants and co-conspirators made themselves and their services available at various times throughout the conspiracy and participated in selected narcotic distribution ventures on an "as needed" basis. Certain roles assumed by these defendants and co-conspirators were interchangeable at various times throughout the conspiracy. Roles which the defendant and co-conspirators assumed and carried out included, among others, organizer, manager, supervisor, supplier, distributor, enforcer, cooker or converter, packager, lookout, driver, armed security, nominee for apartment and vehicle rentals and nominee for vehicle purchases.

9.    Further, as part of the conspiracy, the defendant and co-conspirators derived substantial income and gross receipts from their unlawful activities as the primary object was to make money through their illegal drug dealing. Members supplied and furnished to each other quantities of cocaine base and quantities of cocaine for distribution by the defendant and other co-conspirators on both a consignment and cash basis, and for personal use. These individuals met at various times and locations to exchange packages of "crack" cocaine and cocaine for money, and at other times, to receive the proceeds from the sales of the "crack" cocaine and cocaine. They used various locations such as apartments, businesses and the open air areas adjacent to such locations for the distribution of "crack" cocaine. Various methods were also used to conceal the conspiracy and the unlawful drug activities and to insure the conspiracy's continuing success. These methods included: shooting and other acts of intimidation; possessing and using weapons, including handguns; utilizing counter-surveillance, including lookouts and drivers, to avoid detection by law enforcement authorities; purchasing vehicles in the names of nominees; leasing apartments in the names of nominees; and utilizing rented vehicles. The proceeds from the sales of "crack" cocaine and cocaine were used to purchase vehicles, lease vehicles, pay for insurance, rent apartments and for various other living expenses. They utilized fictitious names and identifications and possessed weapons in order to conceal their identity, assets and travel from law enforcement officials.

10.    Specifically, it is known that during the course of the conspiracy, Kenyon Raheen Gadsden and Bryan Lamont Grimes, as partners, obtained multiple kilogram quantities of cocaine in New York, New York, and elsewhere which was transported in vehicles to the Tidewater area where the cocaine was converted into "crack" cocaine, and provided to other members of the conspiracy for subsequent distribution. Although the relationship between Grimes and Gadsden was very close, there came a time when Gadsden began treating people badly. Gadsden was known to put a lot of added ingredients, such as baking

soda, into cooking his cocaine into "crack" cocaine.  As a result, his "crack" cocaine had very poor quality.  While the quality of Gadsden's "crack" cocaine deteriorated, Grimes' "crack" cocaine maintained good quality.  If Gadsden needed drugs, he would go to Grimes in order to complete a transaction.  Both Gadsden and Grimes cooked their drugs separately but were both taught how to cook "crack" cocaine by John Barry Robinson.  Grimes and Gadsden paid him $200 each for the lesson.

11.   In fall 1993, in Virginia Beach, Virginia, Gadsden obtained five to six ounces of "crack" cocaine from a source of supply. Gadsden is responsible for this 141.75 gram quantity of "crack" cocaine.

12.   Around Christmas 1993, an unindicted co-conspirator purchased $25 worth of "crack" cocaine from Damon Marquethe Hills. Hills, at this time, was living at the Pecan Gardens Apartment complex in Virginia Beach, Virginia.  Approximately three days later, the unindicted co-conspirator purchased $30 worth of "crack" cocaine from Hills.  The unindicted co-conspirator continued to purchase between $25 and $50 worth of "crack" cocaine from Hills until April 1996 (at least $25 worth purchased each month between January and April = $100).  Hills is responsible for this 1.55 gram quantity of "crack" cocaine.

13.   According to Hills' debriefing, Gadsden was his source of supply at this time.  Hills' began buying sixteenths of "crack" cocaine from Gadsden, then moved up to two (2) ounce quantities.  Based on this information, Gadsden is also responsible for the 1.55 gram quantity of "crack" cocaine.

14.   In January or February 1994, in Virginia Beach, Virginia, Gadsden distributed one-eighth (1/8) of an ounce of "crack" cocaine to a customer in exchange for services provided to Gadsden.  Gadsden is responsible for this 3.5 gram quantity of "crack" cocaine.

15.   On February 15, 1994, in Virginia Beach, Virginia, Gadsden obtained an apartment located at 1105 Waterfront Drive, Apartment 102, in the Watergate Apartment complex in Virginia Beach, Virginia, in the name of a nominee.  Hills also had this nominee open an account at Beneficial Finance located in the Green Run area of Virginia Beach, Virginia, for him.

16.   Also, in winter/spring 1994, Gadsden received one-half of a kilogram of "crack" cocaine from his source of supply. Gadsden is responsible for this 500 gram quantity of "crack" cocaine.

17. In spring 1994, in Virginia Beach, Virginia, an unindicted co-conspirator drove Hills to a Hardee's Restaurant in Virginia Beach, Virginia, in order to meet Gadsden. While there, Hills received one-eighth of an ounce of "crack" cocaine from Gadsden, which was intended to help his subsequent distribution. Both Gadsden and Hills are responsible for this 3.5 gram quantity of "crack" cocaine.

18. Around this same time, an unindicted co-conspirator went to Hills' residence with another individual to help fix his door. While there, the other person purchased $20 worth of "crack" cocaine from Hills and shared the "crack" cocaine with the unindicted co-conspirator. Hills is responsible for this .2 gram quantity of "crack" cocaine.

19. On April 27, 1994, in Virginia Beach, Virginia, Gadsden obtained an apartment located at 501 Fountainlake Drive, Apartment 102, in Virginia Beach, Virginia, in the name of a nominee. This apartment was used by Gadsden to store and distribute "crack" cocaine.

20. In late spring or early summer 1994, in Norfolk, Virginia, an unindicted co-conspirator began purchasing directly from Hills. On one occasion, he purchased $20 worth of "crack" cocaine from Hills and on a later occasion, when Hills asked him to fix his vehicle, Hills paid the unindicted co-conspirator $30 worth of "crack" cocaine in exchange for services rendered by the individual. Hills is responsible for this .5 gram quantity of "crack" cocaine.

21. In summer 1994, Gadsden asked an unindicted co-conspirator if he could use his apartment at Dockside Apartments in Norfolk, Virginia, to meet with various girlfriends. The first time Gadsden used the apartment, the unindicted co-conspirator was paid $40 in cash. After the first time, he was paid in "crack" cocaine. Later, Gadsden agreed to pay the electric bill and the unindicted co-conspirator began to be supplied "crack" cocaine from Gadsden. The unindicted co-conspirator estimates that from 1994 through February 1996, he received $50 worth of "crack" cocaine per week from Gadsden in exchange for use of his apartment. Gadsden also used the apartment to manufacture, store, and distribute "crack" cocaine. Gadsden is responsible for this 44 gram quantity of "crack" cocaine (June 1994 through February 1996 = 88 weeks x .5 = 44 grams).

22. This same unindicted co-conspirator also purchased "crack" cocaine from Gadsden in the amounts of $20 or $30 on each occasion. He met Gadsden at numerous locations, including the Exxon station on Virginia Beach Boulevard and the Independence area of Virginia Beach, Virginia; the Food Lion located on Military Highway in Norfolk, Virginia; the 7-Eleven close to the beachfront in Virginia Beach, Virginia; the Food Lion

located off Holland Road in Virginia Beach, Virginia; the Farm Fresh located across from the Happy Crab restaurant in Virginia Beach, Virginia; by the 7-Eleven at Mount Trashmore in Virginia Beach, Virginia; the 7-Eleven on Indian River Road in Virginia Beach, Virginia; and various other grocery stores, gas stations, and shopping centers.   The purpose of the meetings was to purchase "crack" cocaine.   Gadsden is responsible for this 2 gram quantity of "crack" cocaine (ten locations named x $20 quantities).

23.   In summer or fall 1994, at the Watergate Apartment Complex in Virginia Beach, Virginia, Gadsden possessed approximately five to six ounces of "crack" cocaine which were stored in a false bottom can.   An unindicted co-conspirator broke into Gadsden's apartment by climbing through a window and took the false bottom can which looked like a soup can from the kitchen cupboard.   Inside the soup can were the five to six ounces of "crack" cocaine.   Gadsden is responsible for this 141.75 gram quantity of "crack" cocaine.

24.   Also, in summer or fall 1994, Gadsden and an unindicted co-conspirator went to Park Food Store located on Colonial Avenue in Norfolk, Virginia, where a drug supplier told them to follow another co-conspirator in order to receive the supply of "crack" cocaine they were after.   This co-conspirator took them to Tidewater Park, in Norfolk, Virginia, and told them to wait by the convalescent home located close to the Church of Saint Mary's in Tidewater Park.   At approximately 2:30 a.m., the co-conspirator gave a bag to Gadsden.   Gadsden opened the bag and checked to see that it was "crack" cocaine located inside.   The amount was approximately one-half of a kilogram of "crack" cocaine. Gadsden and the unindicted co-conspirator then left Tidewater Park and returned to the Chapel Lakes Apartments complex in Virginia Beach, Virginia, where Gadsden gave the unindicted co-conspirator two $20 pieces of "crack" cocaine.   The following day, when Gadsden picked up the unindicted co-conspirator, he had the remainder of the "crack" cocaine packaged and bagged up ready for sale in sixteenth's, eighth's, and also ounces.   Gadsden is responsible for this 500 gram quantity of "crack" cocaine.

25.   On September 4, 1994, in Virginia Beach, Virginia, Gadsden obtained an apartment located at 540 Chapel Lake Drive, Apartment 201, in Virginia Beach, Virginia, which was leased in the name of a nominee.

26.   In December 1994, an unindicted co-conspirator drove Gadsden in a co-conspirator's van and parked near a cleaners located by Roberts Park which is close to the store located on Princess Anne Road in Norfolk, Virginia, and waited there for a supplier to bring drugs.   When the supplier arrived, Gadsden

got out of his vehicle and got in the car with the supplier
and gave him money. Gadsden returned to the van and waited.
Shortly thereafter, two other individuals pulled up in a
vehicle and spoke with the supplier. After that, the
unindicted co-conspirator and Gadsden followed the supplier to
a grocery store located on Princess Anne Road in Norfolk,
Virginia. While in the parking lot, the supplier gave an
estimated 25 ounces of "crack" cocaine to Gadsden. Gadsden is
responsible for this 708.75 gram quantity of "crack" cocaine.

27. An unindicted co-conspirator estimates that he went with
Gadsden on five occasions in 1994 to a bank located on Holland
Road in the Chimney Hill Shopping Center in Virginia Beach,
Virginia, where Gadsden had an account and deposited at least
$1,000 cash at a time. In addition, the unindicted
co-conspirator accompanied Gadsden on three occasions in 1994
to New York. During the first trip, while in New York, the
unindicted co-conspirator waited in a van while Gadsden and
another co-conspirator took money and guns with them. They
returned 20 minutes later with drugs. During the second trip,
they stayed at Gadsden's sister's house. On the third trip,
the unindicted co-conspirator drove his van. Gadsden and an
associate of Gadsden's were passengers. Gadsden had promised
this unindicted co-conspirator a sixteenth of an ounce of
"crack" cocaine to drive up and a sixteenth of an ounce of
"crack" cocaine to come back. While in New York, the
unindicted co-conspirator stayed at Gadsden's sister's
apartment until Gadsden and the associate returned in the
early morning hours with their supply of drugs. The
quantities received from each trip are unknown. To avoid
double counting, Gadsden is not responsible for this 3.5 gram
quantity of "crack" cocaine.

28. Around Christmas 1994, an unindicted co-conspirator contacted
Hills who was at that time residing in the Chimney Hill
Apartment Complex in Virginia Beach, Virginia. Hills told the
unindicted co-conspirator that he was out of his supply, but
Gadsden would be stopping by that day. The unindicted
co-conspirator went over to Hills' apartment and waited until
Gadsden arrived. After Gadsden left, the unindicted
co-conspirator purchased $20 worth of "crack" cocaine from
Hills. Hills is responsible for this .2 gram quantity of
"crack" cocaine. However, to avoid double counting, Gadsden
is not responsible for this .2 gram quantity of "crack"
cocaine.

29. In December 1994 or January 1995, in Norfolk, Virginia,
Gadsden was in possession of approximately five ounces of
"crack" cocaine. To avoid double counting, he is not
responsible for this 141.75 gram quantity of "crack" cocaine.

30.  In January 1995, Grimes was released from Indian Creek Correctional Center.

31.  On January 18, 1995, in Norfolk, Virginia, Gadsden and John Robinson began to utilize an apartment located at 5385 East Princess Anne Road, Apartment 6, to manufacture, store, and distribute "crack" cocaine.

32.  In early 1995, on two or three occasions at Grimes' River Oak apartment, Robinson cooked a half-kilogram of powder cocaine into a kilogram of "crack" cocaine for Gadsden and Grimes. Robinson grew tired of cooking the cocaine and taught Gadsden and Grimes the process of cooking cocaine.  Gadsden is responsible for this 2 kilogram quantity of "crack" cocaine.

33.  In February 1995, in Virginia Beach, Virginia, Gadsden supplied Damon Hills with multiple ounces of "crack" cocaine for subsequent distribution by Hills.  To avoid double counting from the paragraph above, Gadsden and Hills are not attributed this minimum quantity of 56.7 grams of "crack" cocaine.

34.  In February 1995, Gadsden purchased a "big 8" which is approximately four and one-half ounces of powder cocaine from an unindicted source of supply.  Robinson then cooked the cocaine into "crack" cocaine at 1802 Greenleaf Drive, Norfolk, Virginia, the residence of Grimes' mother.  Robinson received seven ounces of "crack" cocaine, Grimes received one and one-half ounces of "crack" and Gadsden kept the rest.  Gadsden assisted Grimes in selling his one and one-half ounces, and Gadsden made approximately $750 off the sale of his quantity of "crack" cocaine (approximately 35.4 grams).  This conversion is based on an ounce of "crack" cocaine costing approximately $600 during the course of this conspiracy. Gadsden is responsible for 276.4 grams of "crack" cocaine.

35.  Again in February 1995, Gadsden purchased a "big 8", from an unindicted source of supply, for $3,000.  Grimes and Robinson were at Debbie Grimes' address, when Gadsden paged Grimes to let him know that he was getting another "big 8".  Gadsden arrived at the 1802 Greenleaf Drive address with the "big 8". Robinson cooked the four and one-half ounces of powder cocaine into seven ounces of "crack" cocaine.  Robinson was paid for cooking the "crack," Grimes received one and one-half ounces, and Gadsden received the rest.  Gadsden is responsible for this 198.45 grams of "crack" cocaine.

36.- Approximately one or two weeks later, Gadsden received another "big 8" from this unindicted source of supply, and it was cooked by Robinson.  Gadsden and Grimes then distributed the "crack" cocaine.  A conservative estimate is that they derived at least seven ounces of "crack" cocaine from this "big 8."

Gadsden is responsible for this 198.45 grams of "crack" cocaine.

37.  On March 8, 1995, an unindicted co-conspirator signed for some furniture for Gadsden and rented a U-Haul truck from the South Plaza Trail U-Haul located in Virginia Beach, Virginia. Bryan Grimes was with this unindicted co-conspirator for the purpose of taking the furniture to the Chapel Lakes Apartments complex in Virginia Beach, Virginia. At the time, Grimes had "crack" cocaine on him. The unindicted co-conspirator received "crack" cocaine from Grimes the whole afternoon for his personal use. As the two of them waited in the Chapel Lakes Apartment complex for Gadsden to let them into the apartment, two security guards started asking questions of the unindicted co-conspirator. He then consented to a search of the U-Haul truck. In the glove compartment, security officials found approximately 4.5 grams of "crack" cocaine. After Grimes was handcuffed, he took off running into the wooded section close to the apartments. Grimes was later captured and charged with Possession of "Crack" Cocaine. This incident caused them to move their business to the Cedars Apartments in Chesapeake, Virginia. Around October or November 1995, Grimes attempted to pay this individual $200 in exchange for testimony in State Court stating that he did not give permission to authorities to search the U-Haul truck. Grimes and Gadsden are responsible for this 4.5 grams quantity of "crack" cocaine.

38.  Prior to Grimes' arrest, the unindicted co-conspirator had co-signed on a television and put down $500 cash in order to purchase the television for Grimes. The $500 belonged to Grimes. The transaction took place at a Hub furniture store. The day after Grimes' arrest, the unindicted co-conspirator went back to the Hub furniture store and received a check for $500, which he cashed. A short time after Grimes' release, the unindicted co-conspirator told Grimes he took the money. Upon hearing this, Grimes pulled out a beer bottle and threatened the unindicted co-conspirator. Both Hills and Gadsden were present during the incident.

39.  In March or April 1995, Gadsden and Grimes discovered that they could get a better price on a "big 8" from an unindicted co-conspirator and Donnell Hawkins in Grandy Park. Gadsden and Grimes began receiving the "big 8's" from these two individuals for approximately seven to eight months, until Hawkins was arrested in January 1996. Gadsden is attributed the minimal amount of 127.58 grams of powder cocaine.

40.  In Spring 1995, Gadsden and Grimes traveled to New York in Tyler's white Dodge Spirit, in which they purchased twenty-seven (27) ounces of powder cocaine from an unindicted source of supply. Gadsden and Grimes waited in the car, while the unindicted source of supply entered an apartment, and

exited with a Nike shoe box, containing the cocaine. Gadsden and Grimes each had invested approximately $7,000 or $8,000 in the powder cocaine, and the source of supply received $1,000. They returned home with the Nike shoe box on the back seat of the car. Grimes and Gadsden split the twenty-seven (27) ounces evenly, thirteen and one-half ounces each. Grimes then cooked his powder cocaine into "crack." Gadsden is responsible for 382.73 grams of powder cocaine and a minimal quantity of thirteen and one-half ounces (382.73 grams) of "crack" cocaine.

41.  In Spring 1995, Gadsden and an unindicted co-conspirator traveled to New York in separate vehicles. The unindicted co-conspirator was driving a rental car with approximately $17,000 or $18,000 in U.S. currency, to purchase a kilogram of powder cocaine. Gadsden was driving Tyler's white Dodge Spirit. The unindicted co-conspirator was stopped by the New York Police Department and the money was seized. Gadsden is responsible for 1,000 grams of powder cocaine.

42.  In April 1995, an unindicted co-conspirator signed a rental lease at 256 Red Cedar Court, Apartment 3D, in Chesapeake, Virginia, for Grimes and Gadsden to use in their drug distribution activities. In April 1995, Gadsden was robbed by one of his own customers. At the time Gadsden was robbed, he had his baby boy with him in the car. Gadsden gave the drugs to the customer without a fight as he did not want his baby boy hurt. Later, in retaliation, while an unindicted co-conspirator drove a Maxima, Gadsden, in the passenger seat of the vehicle, fired approximately four shots into the upstairs apartment complex, located in the vicinity of Rosemont Road and Lynnhaven Parkway in Virginia Beach, Virginia, where the robber resided. Gadsden had a .9 millimeter and also some type of assault weapon with him. Prior to this incident, Gadsden had a habit of always taking a child with him while he made drug deliveries and placing the child in a car seat on top of the drugs. He did this as he felt this was a good cover. After the robbery, Gadsden no longer took any babies with him to make drug rounds.

43.  In spring or summer 1995, Grimes, Gadsden, and an unindicted co-conspirator sold approximately five or six ounces of "crack" cocaine. The transaction occurred around 10:00 p.m. at a Hardee's restaurant in Norfolk, Virginia. Grimes had just finished cooking the "crack" cocaine at the Princess Anne apartment location. Grimes and Gadsden are responsible for this 141.75 gram quantity of "crack" cocaine.

44.  Also in spring 1995, an unindicted co-conspirator was approached by Gadsden and asked if he wanted to make some money. A couple of weeks later, Gadsden gave this unindicted co-conspirator a $50 piece of "crack" cocaine (approximately

.5 gram) at the co-conspirator's residence in Virginia Beach, Virginia. The unindicted co-conspirator paid Gadsden $50 and purchased a second $50 piece from Gadsden. Thereafter, the unindicted co-conspirator began getting "crack" cocaine from Gadsden twice per week. Gadsden would either stop by the unindicted co-conspirator's house or the unindicted co-conspirator would page him if he needed an additional supply for subsequent distribution. Approximately two or three months after receiving his first "crack" cocaine from Gadsden (early summer 1995), this unindicted co-conspirator moved up to one-quarter ounce of "crack" cocaine. He paid $250 for the one-quarter ounce and made a total of $500 to $600. Gadsden is responsible for this 15.1 gram quantity of "crack" cocaine (8 weeks X 1 gram + 1/4 ounce). Therefore, Gadsden is attributed 8 grams of "crack" cocaine and a conservative one-quarter ounce of "crack" cocaine.

45. Also in spring 1995, in Virginia Beach, Virginia, Bryan Grimes possessed $10,000 which were proceeds from the sale of narcotics.

46. On March 1, 1995, in Virginia Beach, Virginia, Hills obtained an apartment located at 550 Waterfront Cove, Apartment 102, Virginia Beach, Virginia, in the Watergate Apartment Complex. The apartment was obtained in the name of a nominee and was used to manufacture, store, and distribute "crack" cocaine.

47. In May 1995, in Virginia Beach, Virginia, Gadsden purchased a vehicle for one-sixteenth of an ounce of "crack" cocaine. Gadsden is responsible for this 1.77 gram quantity of "crack" cocaine.

48. In late May or early June 1995, at the River Oaks Apartments located on Princess Anne Road in Norfolk, Virginia, Grimes and Gadsden purchased a large quantity of powder cocaine through an associate of Robinson's. The transaction occurred in a Burger King parking lot near Princess Anne Road in Norfolk, Virginia. Later, Willie Tyler was contacted by Gadsden and asked to assist him. No quantity was attributable as Tyler was unable to identify a quantity.

49. On another occasion, Tyler went to the apartment located on Princess Anne Road in Norfolk, Virginia, belonging to Grimes and Robinson, with Gadsden. While there, Tyler observed Robinson cooking one-half kilogram of "crack" cocaine in the kitchen. Subsequent to this, at the same apartment, a young male, approximately age 20 or 21, delivered $4,000 cash to Grimes which were from drug proceeds. Gadsden, Grimes, and Robinson are responsible for this 500 gram quantity of "crack" cocaine. In addition, based on Grimes' possession of $4,000 in drug proceeds, he is responsible for an additional 189 grams of "crack" cocaine.

50. In summer 1995, Gadsden left his Nautica coat on the kitchen table of Hills' Watergate Apartment. This coat had $10,000 in the pocket. Gadsden returned to the apartment one hour later, and told Hills he had $10,000 in the pocket.

51. In summer 1995, Hills observed Gadsden in possession of over $20,000 in the bedroom of his Chesapeake Apartment.

52. In summer 1995, at an apartment within the Dockside Apartment Complex in Norfolk, Virginia, Gadsden converted two or three ounces of cocaine into "crack" cocaine which was intended for subsequent distribution as "crack" cocaine. Gadsden is responsible for this 56.7 gram quantity of "crack" cocaine.

53. In summer 1995, Grimes, Gadsden and Robinson purchased a kilogram and nine ounces of powder cocaine from an unindicted source of supply, for approximately $35,000. Grimes purchased a half-kilogram, Robinson purchased a half-kilogram, and Gadsden purchased nine ounces. Robinson cooked all of the powder cocaine into "crack." Gadsden is responsible for 1,255.15 grams of "crack" cocaine.

54. In summer 1995, Grimes and Gadsden received three kilograms of powder cocaine from the same unindicted source of supply as indicated above, for approximately $28,000 to $30,000 per kilogram. Gadsden is attributed this 3 kilogram quantity of powder cocaine.

55. In summer 1995, Robinson gave money to Grimes to purchase a half-kilogram of powder cocaine, however Robinson received nine ounces of powder cocaine and $7,000 in cash back, because Grimes and Gadsden both purchased half-kilogram quantities of powder cocaine. Gadsden is responsible for this 1,255.15 grams of powder cocaine.

56. Based on a debriefing of Grimes that occurred subsequent to his plea agreement, it was learned that in summer 1995, codefendant Joseph Elijah Harvey held nine ounces of cocaine powder for Grimes. Only Harvey is responsible for this 255.15 gram quantity of powder cocaine (equals 2.55 grams of "crack" cocaine).

57. In June or July 1995, at the River Oaks Apartments, Grimes was observed by Robinson as he separated three kilograms of powder cocaine that Grimes and Gadsden had purchased in New York, with the assistance of an unindicted co-conspirator. Gadsden arrived at the apartment to assist in breaking down the cocaine. At this time, Robinson purchased one kilogram of cocaine from Grimes. Gadsden is responsible for 3 kilograms of powder cocaine.

58. On July 6, 1995, in Portsmouth, Virginia, Bryan Grimes obtained a pager, pager account number 8043264294, through the use of a nominee.  On July 19, 1995, in Virginia Beach, Virginia, a friend of Hills' purchased a 1990 Infiniti Q-45 from Autoland Auto Sales located on Aragona Boulevard in Virginia Beach, Virginia, for Grimes.  Grimes put down approximately $6,000 in drug proceeds and financed the balance.  He was assisted by co-conspirator Damon Hills. Grimes and Hills are also is attributed with 283.5 grams of "crack" cocaine.

59. In July 1995, in New York, New York, Gadsden and Grimes lost in excess of $40,000 when they were robbed during a narcotics transaction.

60. In late July or early August 1995, Hills received four ounces of "crack" cocaine from Grimes.  Thereafter, Hills began obtaining "crack" cocaine from Grimes on a more regular basis as he could make more money by dealing with Grimes as opposed to Gadsden.  Both Grimes and Hills are responsible for this 113.4 grams quantity of "crack" cocaine.

61. Also, in late July 1995, Grimes gave Harvey one gram of "crack" cocaine.  Only Harvey is responsible for this one gram quantity as this information was learned from a debriefing of Grimes, subsequent to his plea agreement.

62. On August 1, 1995, in Virginia Beach, Virginia, Grimes utilized in excess of $3,000 in proceeds from the sale of narcotics to purchase an audio sound system for his 1990 Infiniti Q-45 automobile.  Also on this date, Grimes gave Harvey seven grams of "crack" cocaine.  Harvey is responsible for this seven gram quantity.  Grimes is responsible for 141.75 grams of "crack" cocaine.

63. On August 4, 1995, John Robinson was observed leaving 5385 East Princess Anne Road, Apartment 6, in a blue Nissan Quest van.  Norfolk Vice and Narcotics investigators attempted to stop the van, at which time, a pursuit ensued.  During the pursuit, a plastic bag containing 27.23 grams of "crack" cocaine was thrown from the van.  This plastic bag was later recovered by the police and the van was eventually stopped at the 800 block of Merrimac Avenue in Norfolk, Virginia.  During a search of the van, $1,273 was recovered.  Robinson and Grimes are responsible for this 27.23 gram quantity of "crack" cocaine.  In order not to double count, Gadsden is not responsible for this 27.23 gram quantity of "crack" cocaine.

64. After the pursuit of the van, investigators executed a search
at Grimes' 5385 East Princess Anne Road, Apartment 6,
residence in Norfolk, Virginia.  There they found evidence
connecting Kenyon Gadsden, Bryan Grimes, and John Robinson
with approximately 3.91 grams of "crack" cocaine.  In order
not to double count, Gadsden is not responsible for this 3.91
grams of "crack" cocaine.

65. Officers also searched 256 Red Cedar Court, Chesapeake,
Virginia, Gadsden's residence, pursuant to a search warrant.
The search recovered .21 gram of powder cocaine, $1,849.75,
two flack jackets, two .38 caliber firearms, and several
cellular phones.  Grimes and Robinson are responsible for 87
grams of "crack" cocaine.  To avoid double counting, Gadsden
is not responsible for this 87 grams of "crack" cocaine.

66. A 1987 Honda Accord was also searched which resulted in the
recovery of 454.5 grams of "crack" cocaine, $1,360, a .380
caliber hand gun, and digital scales.  The car was registered
to Robinson; however, prior to the execution of the search
warrant, Gadsden was observed in possession of the vehicle and
the box containing the "crack" cocaine.  Robinson and Grimes
are responsible for this 518.76 gram quantity of "crack"
cocaine.  In order not to double count, Gadsden is not
responsible for this 518.76 gram quantity of "crack" cocaine.

67. On that same date, members of the Norfolk Police Department's
Vice and Narcotics Division stopped a black Infiniti at the
intersection of East Princess Anne Road and Shelton Avenue in
Norfolk, Virginia.  This vehicle had been associated with
individuals involved with the distribution of narcotics.
Joseph Elijah Harvey was one of four males found to be inside.
During a pat-down, an officer felt an object in Harvey's rear
left pocket.  The object was found to be 1.28 grams of "crack"
cocaine packaged in nine Ziplock baggies.  Harvey, Robinson
and Grimes are responsible for this 1.28 gram quantity of
"crack" cocaine.  In order not to double count, Gadsden is not
attributed this 1.28 grams of "crack" cocaine.

68. In late August or early September 1995, an unindicted
co-conspirator received approximately one and one-quarter
ounces of "crack" cocaine for $850 from Gadsden and an
unindicted co-conspirator.  In order not to double count,
Gadsden is not responsible for this 35.44 gram quantity of
"crack" cocaine.

69. In later summer 1995, in Norfolk, Virginia, an unindicted
co-conspirator was with Gadsden when he observed Gadsden in
possession of a .9 millimeter weapon.  Gadsden had just left
Plaza Apartments, when he caused it to discharge inside the
vehicle.  The next morning, Gadsden fired a round from the .9
millimeter weapon out of the vehicle in which he and the

co-conspirator were riding, to see if it was working properly. At this time, there was one ounce of "crack" cocaine rocks in the car. After this incident, Gadsden sold the .9 millimeter weapon and got a .38 caliber hand gun. To avoid double counting, Gadsden is not responsible for this 28.35 gram quantity of "crack" cocaine.

70. In early September 1995, Hills, Gadsden, and Willie Tyler went to the apartment located in the Dockside Apartment Complex and cooked up 10 ounces of "crack" cocaine. Hills is responsible for this 283.5 gram quantity of "crack" cocaine. To avoid double counting, Gadsden is not attributed with this 283.5 gram quantity of "crack" cocaine.

71. Also in September 1995, Harvey accompanied Grimes to New York, where Grimes acquired two kilograms of cocaine powder. Only Harvey is responsible for this two kilogram quantity of cocaine powder (equals 20 gram quantity of "crack" cocaine).

72. In September or October 1995, Tyler observed Hills cook "crack" cocaine at the 550 Waterfront Cove, Apartment 102, Virginia Beach, Virginia, residence. At this time, Hills was making quite a bit of money for Grimes and could sell $5,000 to $6,000 worth within one or two days. Hills cooked approximately one-half of a kilogram of powder cocaine and turned it into one whole kilogram of "crack" cocaine. Grimes was also instructing Hills on how to cook the "crack" cocaine on this occasion. Both Hills and Grimes are responsible for this one kilogram quantity of "crack" cocaine.

73. In early September 1995, Tyler and Hills met with Gadsden, at which time, Gadsden gave Hills nine ounces of "crack" cocaine. This transaction took place at a residence on Bonney Road in Virginia Beach, Virginia. Hills is responsible for this 255.15 gram quantity of "crack" cocaine. To avoid double counting, Gadsden is not responsible for this 255.15 grams of "crack" cocaine.

74. Also during this time, Grimes had one kilogram of powder cocaine. He sold two ounces of the powder cocaine to Robinson for $400. Grimes is responsible for this one kilogram quantity of powder cocaine (equals 10 grams of "crack" cocaine) and Robinson is responsible for this two ounce quantity of powder cocaine (equals .57 gram of "crack" cocaine).

75. During September 1995, Willie Tyler was asked by Grimes to do several things for him as Grimes and Gadsden liked to use different people to help them in their drug trade, using them to do things like buy vehicles in their names, or transporting cocaine to various transactions. Tyler also began to assist Grimes in selling "crack" cocaine by meeting with the

customers, giving them the cocaine, collecting the money from the sale, and then turning the money over to Grimes. Grimes would contact Tyler about a sale that was about to take place and the unindicted co-conspirator would go to Grimes' mother's residence on Campostella Road to pick up the cocaine. Tyler would use his vehicle to deliver the cocaine and meet the customer to complete the transaction. At least one transaction was for four ounces of "crack" cocaine which was sold for $2,800. At least one transaction was also for nine ounces of "crack" cocaine which sold for $5,500. Sometimes, Grimes or another individual would accompany Tyler on the transactions. On those occasions, Grimes or the other person would exit the vehicle and wait somewhere away from the vehicle where Tyler completed the transaction. Grimes is responsible for this 368.55 gram quantity of "crack" cocaine.

76. In September 1995, Grimes, while driving a Mercury Villager van, and Tyler, while driving a white Dodge Spirit with New Jersey license plates, drove to New York to purchase some powder cocaine. Once there, Grimes contacted an individual by phone from a Belford Hotel room, 155th and Broadway, New York, New York. After the phone call, everyone left the room and went to the Bronx area of New York and met the individual who was supplying the cocaine. Grimes paid $43,000 and received two kilograms of powder cocaine. Grimes then transported the powder cocaine to the Tidewater area for distribution as "crack" cocaine. Gadsden provided one of the vehicles for the trip but did not go himself. Both Grimes and Gadsden are responsible for this two kilogram quantity of powder cocaine (equals 20 grams of "crack" cocaine).

77. Between September 1995 and October 1995, Tyler made at least two additional trips in the same manner with Grimes to pick up cocaine from New York. On the third trip, three kilograms of powder cocaine were purchased for $60,000. The other trip was for two kilograms of cocaine. Grimes is responsible for this five kilogram quantity of cocaine powder (equals 50 grams of "crack" cocaine).

78. In late September or early October 1995, in Norfolk, Virginia, Hills delivered and caused to have delivered approximately $10,000 in drug proceeds to Bryan Grimes. Hills and Grimes are responsible for 472 grams of "crack" cocaine.

79. In October 1995, two unindicted co-conspirators and Gadsden made a trip to New York for the purpose of purchasing cocaine. While the two unindicted co-conspirators rode in a white Villager rented from Budget Rental in Norfolk, Virginia, Gadsden, along with another unindicted co-conspirator, rode in a green or blue 4-Runner, also another rental. Both vehicles were rented by unindicted co-conspirators for Gadsden. During this trip, Gadsden lost about $18,000 in drug proceeds due to

a bad drug deal. This trip coincided with the Million Man March in Washington, D.C., that Gadsden attended. Gadsden is responsible for 850.66 grams of "crack" cocaine.

80. On October 25, 1995, Willie Tyler was asked by Grimes to purchase a vehicle. Tyler later met with Grimes, Hills, and another male at Autoland Auto Sales on Aragona Boulevard in Virginia Beach, Virginia. Once there, Tyler signed some papers at the dealership and also obtained insurance in his name for the vehicle, which was a 1989 Honda Civic. Grimes utilized $3,000 in drug proceeds to assist in the purchase. Grimes is responsible for 141.75 grams of "crack" cocaine.

81. Between November 6, 1995, and November 9, 1995, in Norfolk, Virginia, Gadsden and Grimes rented vehicles from Budget Rent-A-Car for the purpose of traveling to New York, New York, to purchase cocaine which would be transported back to the Eastern District of Virginia for distribution as "crack" cocaine. During this time period, Grimes contacted an unindicted co-conspirator and advised him that he wanted him to go to New York. On this trip, they were accompanied by Gadsden and another individual. On November 8, 1995, in New York, New York, Gadsden and Grimes utilized approximately $40,000 in drug proceeds to purchase two kilograms of cocaine. Gadsden and Grimes are responsible for this two kilogram quantity of powder cocaine (equals 20 grams of "crack" cocaine).

82. During the trip back on November 8, 1995, an unindicted co-conspirator who had accompanied Grimes and Gadsden on this trip, was arrested by the New Jersey State Police with the two kilograms of powder cocaine. Officers had observed this person driving in an erratic manner which caused the officers to initiate the stop. This person was operating a white Ford, rented by Grimes. He was not listed on the agreement as an additional driver. The co-conspirator agreed to a search of the vehicle and the cocaine was found inside the left rear door.

83. On December 8, 1995, in Virginia Beach, Virginia, Gadsden possessed and distributed approximately 82.2 grams of "crack" cocaine to an unindicted co-conspirator for subsequent distribution to an undercover officer. To avoid double counting, Gadsden is not responsible for this 82.2 gram quantity of "crack" cocaine.

84. Also in December 1995, Grimes gave Harvey one ounce of "crack" cocaine. Only Grimes is responsible for this 28.35 gram quantity of "crack" cocaine.

85.    In January or February 1996, an unindicted co-conspirator picked up Hills and they drove to the corner of Princess Anne Road and Tidewater Drive in Norfolk, Virginia. Once there, Grimes pulled up in his vehicle. Both cars then drove to the East Coast gas station in Norfolk, Virginia, where Hills received one ounce of powder cocaine from Grimes. Both Hills and Grimes are responsible for this 28.35 gram quantity of powder cocaine (equals .28 gram of "crack" cocaine).

86.    In February 1996, an unindicted co-conspirator contacted Hills in order to purchase $25 worth of "crack" cocaine. Hills and another individual later came over to the unindicted co-conspirator's residence where Hills delivered the $25 worth of "crack" cocaine. Hills is responsible for this .25 gram quantity of "crack" cocaine.

87.    Also in February 1996, Hills sold a $20 piece of "crack" cocaine to a co-conspirator. Hills is responsible for this .2 gram quantity of "crack" cocaine.

88.    On February 29, 1996, Gadsden and Grimes possessed $8,790 in drug proceeds, a Lorcin .38 caliber hand gun, and a digital scale which had been used to weigh cocaine. Grimes is responsible for 415.3 grams of "crack" cocaine. To avoid double counting, Gadsden is not attributed this 415.3 grams of "crack" cocaine.

89.    In March 1996, when an unindicted co-conspirator entered Gadsden's Dockside apartment residence, he found Gadsden cooking at least two ounces of "crack" cocaine in the kitchen. This cocaine was intended for subsequent distribution as "crack" cocaine.

90.    In April 1996, Gadsden purchased nine ounces of powder cocaine from on unindicted source of supply. Gadsden is responsible for this 255.15 gram quantity of powder cocaine.

91.    In April 1996, an unindicted co-conspirator and Hills traveled to Hills' brother's apartment in order to complete a drug transaction. Hills had with him approximately one and one-quarter ounce of "crack" cocaine which he sold to a customer. Hills is responsible for this 35.4 gram quantity of "crack" cocaine.

92.    In addition, in April 1996, an unindicted co-conspirator picked up Hills and took him to the Scarborough Square Apartments in Virginia Beach, Virginia, where Hills gave another individual three or four ounces of "crack" cocaine. Hills is responsible for this 85 gram quantity of "crack" cocaine.

93. In April or May 1996, an unindicted co-conspirator met Hills at a gas station located at Lynnhaven and Holland Road in Virginia Beach, Virginia, to purchase a $30 piece of "crack" cocaine from Hills. Therefore, Hills is responsible for this .3 gram quantity of "crack" cocaine.

94. Based on debriefings of Grimes and Wilson, in May 1996, an unindicted source of supply went to Gadsden's Dockside Apartment with one kilogram of cocaine, in a bag. Grimes cooked the powder cocaine into two kilograms of "crack" cocaine, with the assistance of Gadsden. The unindicted source of supply was rushing Grimes and Gadsden, because he had a customer waiting that was going to pay $40,000 for these two kilograms of "crack" cocaine. The unindicted source of supply put the two kilograms of "crack" back in his bag and left the apartment. Gadsden is responsible for these two kilograms of "crack" cocaine.

95. In May 1996, an unindicted co-conspirator took another individual to Hills' apartment at the Watergate Apartments in order to obtain $20 to $30 worth of "crack" cocaine. Hills is therefore responsible for this .2 gram quantity of "crack" cocaine.

96. In June 1996, Gadsden went to Hills' Watergate Apartment and offered Hills $250 to allow him to cook his cocaine there. Gadsden and an unindicted co-conspirator cooked a half-kilogram of "crack" cocaine. Gadsden then paid Hills $250 for the use of this apartment. Gadsden is responsible for this 500 grams of "crack" cocaine.

97. On June 18, 1996, Virginia Beach, Virginia, police arrested an individual. This individual cooperated with authorities and paged Gadsden for "crack" cocaine. A short while later, Gadsden, Grimes, and others were arrested with 29 grams of "crack" cocaine. In order to avoid double counting, Gadsden is not attributed this 29 gram quantity of "crack" cocaine.

## Victim Impact

98. The offense of conviction falls under Title 21 USC and the Victim Witness Protection Act does not apply.

## Vulnerable - Official - Restrained Victim

99. The probation officer has no information to suggest that the offense involved a vulnerable victim, an official victim, or a restrained victim.

### Role in the Offense

100. Kenyon Raheen Gadsden (a/k/a: "Kenny R. Jones", "Todd Fuller", "Kenyon Gadsen" and "Kenya") was involved in the conspiracy from its inception in fall 1993 to June 1996.   He is considered to be the organizer of the conspiracy as he planned and carried out the activities necessary to purchase cocaine powder, convert cocaine powder, and distribute it as "crack" cocaine in the Eastern District of Virginia.   He collected monies from co-conspirators, recruited participants, paid participants with a role in his organization, gave co-conspirators instructions and received a large share of the proceeds.   He traveled between the Eastern District of Virginia and New York on numerous occasions to promote elements of the conspiracy. He utilized numerous individuals as nominees to purchase vehicles, rent vehicles, and lease apartments in furtherance of his drug conspiracy. On numerous occasions, he was in possession of firearms and used firearms as a method of intimidation, retaliation, and to ensure the success of the conspiracy.   He is considered to be equal partners with codefendant, Bryan Lamont Grimes.   Their roles were oftentimes interchangeable as supplier and buyer and they participated in the conspiracy both with each other and independent of each other.   Due to his role as organizer of the conspiracy that involved five or more participants, his offense level is enhanced by four levels in accordance with 3B1.1(a) of the U.S. Sentencing Guidelines.   By utilizing the apparatus provided by the U.S. Sentencing Guidelines to convert cocaine powder to cocaine base, Gadsden is attributed with 10.7 kilograms of cocaine base.

101. Bryan Lamont Grimes (a/k/a: "James E. Gadsden" and "Little Bryan") was involved in the conspiracy from 1995 to its conclusion in September 1996.   He is considered to be the organizer of the conspiracy as he planned and carried out the activities necessary to purchase cocaine powder, convert cocaine powder, and distribute it as "crack" cocaine in the Eastern District of Virginia.   He collected monies from co-conspirators, recruited participants, paid participants with a role in his organization, gave co-conspirators instructions and received a large share of the proceeds.   He traveled between the Eastern District of Virginia and New York on numerous occasions to promote elements of the conspiracy. He utilized numerous individuals as nominees to purchase vehicles, rent vehicles, and lease apartments in furtherance of his drug conspiracy. On occasion, he was in possession of firearms and used firearms as a method of intimidation, retaliation, and to ensure the success of the conspiracy.   He is considered to be equal partners with codefendant, Kenyon Raheen Gadsden.   Their roles were oftentimes interchangeable as supplier and buyer and they participated in the conspiracy both with each other and independent of each other.   Due to

his role as organizer of the conspiracy that involved five or more participants, his offense level is enhanced by four levels in accordance with 3B1.1(a) of the U.S. Sentencing Guidelines.  By utilizing the apparatus provided by the U.S. Sentencing Guidelines to convert cocaine powder to cocaine base, Grimes is attributed with 4.53 kilograms of cocaine base.  In addition, Grimes attempted to obstruct justice by unlawfully influencing a witness.

102.  **Damon Marquethe Hills (a/k/a: "Damon Keith Hill" and "Keith")** was involved in the conspiracy from December 1993 to its conclusion in September 1996.  He is considered a manager in this conspiracy as he had numerous individuals working for him and assisted the leaders of this conspiracy in the distribution of "crack" cocaine.  He carried out the organizers' instructions but did not exercise authority over other participants.  His role is not considered an aggravating or mitigating one.  By utilizing the apparatus provided by the U.S. Sentencing Guidelines to convert cocaine powder to cocaine base, Hills is attributed with 2.6 kilograms of cocaine base.

103.  **John Barry Robinson (a/k/a: "John John")** was involved in the conspiracy from fall 1994 to its conclusion in September 1996.  He is considered a manager in this conspiracy as he had numerous individuals working for him and assisted the leaders of this conspiracy in the distribution of "crack" cocaine.  He carried out the organizer's instructions but did not exercise authority over other participants.  During the course of the conspiracy, he used a firearm to facilitate the drug trafficking activities.  His role is not considered an aggravating or mitigating one.  By utilizing the apparatus provided by the U.S. Sentencing Guidelines to convert cocaine powder to cocaine base, Robinson is attributed with 1.14 grams of cocaine base.

104.  **Joseph Elijah Harvey** was involved in the conspiracy in August 1995.  His role was that of a low level street dealer who purchased his drugs from Grimes.  His role is considered to be a mitigating one given his involvement in the scope of the entire conspiracy.  During the course of the conspiracy, he did not possess a firearm to facilitate the drug trafficking activities, and due to his minor role as a participant of this conspiracy, his offense level is reduced by two levels in accordance with 3B1.2(b) of the U.S. Sentencing Guidelines.  Harvey is responsible for the distribution of 58.9 grams of cocaine base.

### Obstruction of Justice - Reckless Endangerment

105. Prior to and including the time of arrest, the defendant obstructed justice. He was aware that he was wanted by the authorities, however, remained a fugitive. At the time of his arrest, he gave a false name, Aldeshawn Barnes, to the agents. When the agents requested identification, Gadsden ran. Once he was apprehended, he had false identification in the name of Aldeshawn Barnes in his possession. A Virginia Beach Police Officer identified Gadsden, and only then did Gadsden state his real identity. However, based on the definition of obstruction of justice according to 3C1.1 of the U.S.S.G., no enhancement is applied.

### Acceptance of Responsibility

106. Shortly after his arrest, Gadsden made voluntary and candid admissions to authorities concerning his involvement in the instant offense. The defendant freely admitted his guilt in Court at the time of his plea, and appears to fully accept responsibility for his actions. During the interview with the Probation Officer, Gadsden stated that he had been selling drugs since he was 19, and that the frequency and amounts were increasing as time went on. He further stated that it was not worth it. Therefore, the defendant has clearly demonstrated acceptance of personal responsibility for his criminal conduct. As of April 29, 1997, the defendant had not yet been debriefed by the investigating agents. Gadsden timely notified authorities of his intentions to enter a guilty plea, thereby permitting the Government to avoid preparing for trial. In light of the above, the defendant's offense level has been reduced a total of three levels pursuant to Section 3E1.1 of the U.S.S.G.

### PART B. CRIMINAL HISTORY

### Juvenile Adjudications

| Date of Referral/Age | Charge/ Jurisdiction | Date Sentence Imposed/ Disposition |
|---|---|---|
| 107. 2/15/88 (age 14) | Concealment Dkt#: J65350-01<br><br>Juvenile & Domestic Relations Court Virginia Beach, VA | 4/26/88, Guilty, 4 days work force, $39 restitution. |

The defendant did conceal property belonging to Bannister's Shoe Store with a total value of less than $200. The defendant's mother was present in Court.

108. 7/14/88          Robbery (Felony)      1/17/89, Committed to
     (age 15)         Dkt#: J65350-03       State Department of
                                            Corrections, susp.,
                      Juvenile and          supervised probation
                      Domestic Relations    for indeterminate
                      Court                 period.
                      Virginia Beach, VA

The defendant did unlawfully and feloniously rob one Geraldine Williams, an adult, by threat or presentation of a deadly weapon (kitchen knife). The defendant carried away $81 in U.S. currency. The defendant was represented by Attorney A. Cahill.

109. 11/21/88         1. Assault by Mob     1. 7/13/89, Committed
     (age 15)         Dkt#: J65350-05       to State Department of
                                            Corrections.

                      2. Assault by Mob     2. 6/19/89, Dismissed.
                      Dkt#: J65350-06

                      Juvenile and
                      Domestic Relations
                      Court
                      Virginia Beach, VA

On or about November 21, 1988, the defendant did unlawfully assault by mob one Dustin Smith, age 12. The defendant did allegedly assault by mob one Rick Eubank, age 14. The defendant was released from custody on December 15, 1989. The defendant was represented by Attorney D. Wilson.

110. 12/8/88          Disorderly Conduct    7/13/89, Committed to
     (age 15)         Dkt#: J65350-04       State Department of
                                            Corrections.
                      Juvenile and
                      Domestic Relations
                      Court
                      Virginia Beach, VA

On or about December 8, 1988, the defendant did behave in a riotous or disorderly manner in public. The defendant was released from custody on December 15, 1989. He was represented by Attorney Elizabeth Gold.

| | | |
|---|---|---|
| 111. 3/9/90<br>(age 16) | 1. No Driver's<br>License<br>Dkt#: J65350-08 | 1. 3/26/90, Prohibited<br>from obtaining a<br>driver's license for 6<br>months from date he<br>becomes eligible. |
| | 2. Disregarding<br>Highway Signs<br>Dkt#: J6535-07 | 2. 3/26/90, $15 fine<br>and $20 Court cost. |
| | Juvenile and<br>Domestic Relations<br>Court<br>Virginia Beach, VA | |
| 112. 7/9/90<br>(age 17) | 1. Burglary<br>(Felony)<br>Dkt#: J65350-10 | 1. 9/12/90, Committed<br>to State Department of<br>Corrections for<br>indeterminate period. |
| | 2. Grand Larceny<br>(Felony)<br>Dkt#: J65350-11 | 2. 9/12/90, Committed<br>to State Department of<br>Corrections for<br>indeterminate period. |
| | Juvenile and<br>Domestic Relations<br>Court<br>Virginia Beach, VA | |

On or about July 9, 1990, the defendant did
feloniously break and enter the property of
James Shampoe, 3400 Poppy Crescent, Virginia
Beach, Virginia, with the intent to commit
larceny. Once inside, the defendant did steal
or carry away property belonging to Shampoe
having a total value in excess of $200. He
was released from aftercare on November 14,
1991. The defendant was represented by
Attorney Elizabeth Gold.

## Adult Criminal Convictions

| Date of<br>Arrest/Age | Conviction/<br>Jurisdiction | Date Sentence Imposed/<br>Disposition |
|---|---|---|
| 113. 10/1/91<br>(age 18) | Failure to Provide<br>I.D. to Police<br>Officer<br>Dkt#: 91023201-00 | 11/27/91, $250 fine<br>and $24 Court cost. |
| | General District<br>Court<br>Virginia Beach, VA | |

The defendant states he has never been denied the right to counsel.

| 114. | 6/17/92<br>(age 19) | Failure to Provide<br>I.D. to Police<br>Officer<br>Dkt#: 92-2461<br><br>Circuit Court<br>Virginia Beach, VA | 12/17/92, 6 months<br>jail, 5 months susp.,<br>1 year good behavior,<br>$200 fine, and $130<br>Court cost. |

The defendant was represented by Attorney R. Clarke.

| 115. | 8/26/92<br>(age 19) | Trespassing<br>Dkt#: 92017482<br><br>General District<br>Court<br>Virginia Beach, VA | 11/25/92, $50 fine<br>and $26 Court cost. |

On August 14, 1992, the defendant did trespass on the premises of Twin Canal Village, after having been forbidden to do so. The defendant states he has never been denied the right to counsel.

| 116. | 12/4/92<br>(age 19) | 1. Threat to Bomb,<br>Burn, or Destroy<br>(Felony)<br>Dkt#: 92023420 | 1. 3/4/93, Nolle<br>prossed. |
| | | 2. Concealed Weapon<br>(Misdemeanor)<br>Dkt#: 92023422<br><br>General District<br>Court<br>Virginia Beach, VA | 2. 2/9/93, $150 fine<br>and $26 Court costs. |

The defendant states he has never been denied the right to counsel.

| 117. | 12/14/92<br>(age 19) | 1. Transporting<br>Loaded Firearm<br>(Misdemeanor)<br>Dkt#: 92012544 | 1. 3/19/93, $100 fine<br>and $2 Court cost. |
| | | 2. Escape<br>(Misdemeanor)<br>Dkt#: 92012541<br><br>General District<br>Court<br>Chesapeake, VA | 2. 3/19/93, $100 fine<br>and $46 Court cost. |

The defendant indicates he was represented by Attorney William Robinson.

| | | | |
|---|---|---|---|
| 118. | 2/3/93<br>(age 19) | 1. Assault & Batter (Misdemeanor)<br>Dkt#: 93-2057-01 | 1. 9/16/93, $500 fine. |
| | | 2. Disturbing the Peace<br>Dkt#: 93-2057-02 | 2. 9/16/93, $750 fine and $110 Court cost. |
| | | Circuit Court<br>Virginia Beach, VA | |

The defendant represented himself in this matter, after waiving his right to an attorney.

| | | | |
|---|---|---|---|
| 119. | 7/5/93<br>(age 20) | Trespassing<br>Dkt#: 93011613-00<br><br>General District Court<br>Virginia Beach, VA | 12/21/93, 30 days jail, 20 days susp. conditioned upon good behavior and keeping the peace, to be served on weekends beginning 1/7/93, $26 Court cost. |

On July 5, 1993, the defendant did trespass on the premises at 3809 Keelboat Circle, Virginia Beach, Virginia, after having been forbidden to do so. The defendant states he has never been denied the right to counsel.

| | | | |
|---|---|---|---|
| 120. | 9/13/95<br>(age 22) | 1. Driving on Suspended License | 1. 6/13/96, $150 fine. |
| | | 2. Obstruction of Justice | 2. 6/13/96, $250 fine and $64 Court cost. |
| | | Circuit Court<br>Virginia Beach, VA<br>Dkt#: 95004668 | |

## Excluded Convictions - Traffic Infractions

121. Between 1992 and 1996, the defendant has had numerous traffic infractions. He has been convicted of Speeding 1-9 Miles Above the Speed Limit, in Virginia Beach, Virginia. He has been convicted of Speeding 10-19 Miles Above the Speed Limit on six (6) occasions, three times in Virginia Beach, Virginia, once in Maryland, once in Delaware, and once in Southampton County. He has received three summonses for Safety Belt

Violation, in Virginia Beach, Virginia. He has been convicted of Operating or Permitting Operation of an Uninsured Motor Vehicle, Drinking While Driving, and Open Container, in Virginia Beach, Virginia. Furthermore, he has been convicted of Improper Registration, Tags on Wrong Vehicle, No Registration and Inspection on Wrong Vehicle, in Virginia Beach, Virginia. According to the Department of Motor Vehicles, the defendant's license is currently suspended.

### Other Criminal Conduct

122. The probation officer is not aware of any other criminal conduct concerning the defendant.

### Pending Charges

123. Record checks with the Federal Bureau of Investigation, National Crime Information Center, and all appropriate state and local authorities reflect the defendant has no pending charges.

### Other Arrests

| Date of Arrest/Age | Charge/ Jurisdiction | Date/ Disposition |
|---|---|---|
| 124. 10/29/87 (age 14) | Petit Larceny Dkt#: J65350-09  Juvenile and Domestic Relations Court Virginia Beach, VA | 6/4/90, Nolle prossed. |

The defendant did allegedly steal, take or carry away personal property belonging to Jack Hildenbrandt having a total value of less than $200. The defendant was represented by Attorney Russell Siler.

| 125. 7/14/88 (age 15) | Attempted Grand Larceny Dkt#: J65350-02  Juvenile and Domestic Relations Court Virginia Beach, VA | 11/16/88, Nolle prossed. |

The defendant did allegedly steal, take or carry away a 1984 Ford Tempo, valued in excess of $200 belonging to Rosemont Auto Sales. The defendant was represented by Attorney A. Cahill.

126. 6/12/91
     (age 18)

1. Attempted
Malicious Wounding
Dkt#: 92000005-01

1. 3/2/92, Nolle
prossed.

2. Shooting into an
Occupied Dwelling/
Automobile
Dkt#: 92000005-02

2. 3/2/92, Nolle
prossed.

3. Use of a Firearm
in Commission of a
Felony
Dkt#: 92000005-03

3. 3/2/92, Nolle
prossed.

Circuit Court
Virginia Beach, VA

127. 9/9/93
     (age 20)

Suspended Operator's
License
Dkt#: 93054898

10/15/93, Dismissed.

General District
Court
Virginia Beach, VA

128. 1/15/94
     (age 21)

Failure to Pay
Jail Fees
Dkt#: 93011613-01

1/18/94, Dismissed.

General District
Court
Virginia Beach, VA

129. 8/4/95
     (age 22)

1. Possession With
Intent to Distribute
Cocaine
Dkt#: 96-224

1. 10/31/96, Continued
generally.

2. Possession of
Firearm and
Controlled Substance
Dkt#: 96-225

2. 10/31/96, Continued
generally.

3. Possession of
Police Scanner
Dkt#: 95007383

3. 12/29/95,
Dismissed.

Circuit Court
Chesapeake, VA

On August 4, 1995, the defendant did allegedly possess with intent to distribute cocaine and possess a firearm.  The charge of Possession of Police Scanner was dismissed in General District Court, Chesapeake, Virginia.  The defendant indicates he was represented by Attorney William Robinson.

| 130. | 10/28/95 (age 22) | 1. Trespassing Dkt#: 96000880-00 | 1. 3/28/97, Nolle prossed. |
| | | 2. Failure to Provide I.D. to Police Officer Dkt#: 96000882 | 2. 3/28/97, Nolle prossed. |
| | | General District Court Virginia Beach, VA | |

On October 27, 1997, the defendant did allegedly trespass on the property of Sebastian Court Apartments after being forbidden to do so.  At that time, he allegedly failed to provide identification to Police Officer.  The defendant was represented by Attorney William Robinson.

| 131. | 12/8/95 (age 22) | Possession of Stolen Property Dkt#: 95021603 | 12/18/95, Nolle prossed. |
| | | General District Court Virginia Beach, VA | |

The defendant did allegedly unlawfully buy, receive or aid in concealing from another person, stolen goods, namely a 1985 Mazda, having a value in excess of $200 and belonging to Virginia Beach School District (VOTECH).

| 132. | 12/9/95 (age 22) | 1. Possession of Cocaine With Intent to Distribute Dkt#: 96001359-00 | 1. 5/6/96, Nolle prossed in favor of Federal prosecution. |
| | | 2. Distribution of Drugs to a Minor Dkt#: 96001359-01 | 2. 5/6/96, Nolle prossed in favor of Federal prosecution. |

|  |  |  |
|--|--|--|
|  | 3. Distribution of Drugs Near School Property Dkt#: 96001359-02 | 3. 5/6/96, Nolle prossed in favor of Federal prosecution. |
|  | 4. Conspiracy Dkt#: 96001359-03 | 4. 5/6/96, Nolle prossed in favor of Federal prosecution. |
|  | Circuit Court Virginia Beach, VA |  |
| 133. 2/29/96 (age 22) | Failure to Appear Dkt#: 96000880-01 | 3/28/97, Dismissed. |
|  | General District Court Virginia Beach, VA |  |

The defendant did allegedly fail to appear in Court on January 29, 1996, for a Trespassing and Refusing to Provide Identification to Police Officer.

|  |  |  |
|--|--|--|
| 134. 6/21/96 (age 23) | Show Cause, $1,000 Surety Bond Dkt#: 96000880-04 | 3/28/97, Nolle prossed. |
|  | General District Court Virginia Beach, VA |  |

The defendant and Steve Powell did allegedly post a $1,000 surety bond on February 29, 1996, for Failure to Appear on Capias/Failure to Appear for Trespassing and Refusing to Provide Identification to Police Officer.

|  |  |  |
|--|--|--|
| 135. 9/19/96 (age 23) | Failure to Appear Dkt#: 96000880-03 | 3/28/97, Nolle prossed. |
|  | General District Court Virginia Beach, VA |  |

The defendant did allegedly fail to appear in Court on June 17, 1996, for Capias/Failure to Appear for Trespassing and Refusing to Provide Identification to Police Officer.

### Career Offender - Criminal Livelihood - Armed Career Criminal

136. The defendant does not qualify for a sentence enhancement under the Armed Career Criminal section, as defined in Chapter 4, Part B, of the Sentencing Guidelines.   Despite large portions of his income coming from illegal activity, Gadsden does not qualify for an enhancement for Criminal Livelihood, based on Chapter 4, Part B of the Sentencing Guidelines.

137. The defendant is a career offender based on the definition included in 4B1.1 of the U.S.S.G.  He was at least 18 at the time of the instant offense, the instant offense is a felony that involves a controlled substance, and the defendant has at least two prior felony convictions for crimes of violence (Robbery and Burglary).   Based on this assessment, the defendant's criminal history category shall be VI.

## PART C.   OFFENDER CHARACTERISTICS

### Personal History

138. Kenyon Raheen Gadsden indicates he was born on May 18, 1973, in Brooklyn, New York.  He states he is the youngest of six children born to the union of Isaac Earl Gadsden and Edna Ruth Gadsden.  He indicates that his parents were married at the time of his birth, however, states he never knew his father, because he left shortly thereafter.  Gadsden states that he was raised by his oldest sister, because his mother was at work.  He was always provided for physically, emotionally, and financially.  He states there was never any type of alcohol, drug or physical abuse.  He further indicates that he attended church on a regular basis, until the age of 10.

139. The defendant grew up without a male role model and without a great deal of discipline.  He got into some trouble as a child, but attributes that to hanging out with the wrong crowd.  He had numerous encounters with the law, beginning as early as age 15.  Gadsden was, however, involved in community football and basketball, as verified by his aunt.

140. Gadsden states that he still has no contact with his father and was never really close to his brothers, except James.  He further indicates that his family is mad at him now because of his current situation.

141. Gadsden states that he resided with his brother, Baron, and his aunt at 935 North Newtown Road, Virginia Beach, Virginia. Numerous attempts to contact Baron Gadsden were made, however, he never returned the Probation Officer's calls.   The Probation Officer was able to contact the defendant's aunt, Florence Hill, at the 935 North Newtown Road address.  She was able to confirm some of the information above.  Hill states

that Gadsden did not live there nor has he ever lived there, but his girlfriend and daughter do.

142. The Probation Officer attempted to locate any other family member and was unsuccessful.

### Parents and Siblings

143. The defendant's father, Isaac Earl Gadsden, age unknown, resides in Brooklyn, New York, and his occupation is unknown. The defendant's mother, Edna Ruth Gadsden, age 56, resides in Brooklyn, New York, and her occupation is unknown. The defendant's sister, Regina Gadsden, age 37, resides in Brooklyn, New York, and works for the United States Postal Service. The defendant's brother, Baron Gadsden, age 35, resides at 935 North Newtown Road, Virginia Beach, Virginia, and his occupation is unknown. The defendant's brother, Anthony Gadsden, age 28, resides in Virginia Beach, Virginia, and works at a restaurant. The defendant's sister, Pearl Gadsden, age 27, resides in Virginia Beach, Virginia, and works at a hotel. The defendant's brother, James Gadsden, age 25, location and occupation are unknown. The defendant's half-sister, Necee Gadsden, age unknown, resides in Brooklyn, New York, and her occupation is unknown. The defendant's half-sister, Wanda Gadsden, age unknown, resides in Albany, New York, and her occupation is unknown.

144. According to the Government's file, the defendant's mother, Edna Gadsden, is also known as Florence Hill, and resides at 935 North Newtown Road, Virginia Beach, Virginia.

145. Anthony Gadsden has criminal convictions in Virginia Beach, Virginia, for Grand Larceny, Burglary, and numerous probation violations. Baron Gadsden has a criminal conviction for Possession of Cocaine, in Virginia Beach, Virginia. The defendant indicates that his brother, James, has a juvenile conviction for Possession of Cocaine, in Virginia Beach, Virginia.

### Marital History

146. The defendant has never been married, however, has two children by two different women. Shaguan Deon Gadsden, age 3, resides with his mother, Felicia Owens, in Norfolk, Virginia. The defendant has Court ordered child support, and according to the Norfolk Department of Child Support Enforcement, Gadsden has a monthly obligation of $65, arrears of $1,375 and interest of $104.32.

147. The defendant's second child is Kajah Kashira Gadsden, age 1. She resides with her mother, Kesha Sutton, at the defendant's brother's address, 935 North Newtown Road, Virginia Beach, Virginia. There is no Court ordered child support for this child, and the defendant indicates that he is still currently involved with Sutton.

148. The defendant's "aunt", Florence Hill, informed the Probation Officer that Kesha Sutton and Kajah Gadsden do live at 935 North Newtown Road, however, the defendant does not currently, nor has he ever lived at this address. Numerous messages were left for Ms. Sutton, however, she never contacted the Probation Officer.

### Physical Condition

149. Kenyon Raheen Gadsden is a black male who is 5 feet 6 inches tall, and weighs 165 pounds. He has brown hair and brown eyes. Gadsden states he has a surgical scar on his right leg from where he was shot in 1993, at Norfolk General Hospital. According to medical records received from Norfolk General Hospital, he was seen in the Emergency Room on the following occasion: June 3, 1994, for a 4 centimeter laceration over his left eye; June 30, 1996, for a 3 centimeter laceration to his right wrist. He was also seen at Sentara Bayside Hospital in Virginia Beach, Virginia, on numerous occasions, according to their records. Gadsden was seen in September 1993 for a dressing change to his gunshot wound; in 1996 for a sexually transmitted disease, and on several occasions for ingrown toenails.

### Mental and Emotional Health

150. The defendant reports no history of psychological or psychiatric treatment and there is no documented evidence to suggest otherwise.

### Substance Abuse

151. The defendant reports that he began drinking alcohol at the age of 16. He states that he only drank on a "social" basis, which consisted of two or three liquor drinks per month, until the summer of 1996, when he states he stopped drinking. Gadsden indicates he has never used or experimented with any illegal substances.

### Educational and Vocational Skills

152. The defendant attended Plaza Junior High School until he withdrew during the eighth grade. According to school records, he was caught on school property, in possession of a substance that was believed to be cocaine. Expulsion was

recommended to the Superintendent, however, Gadsden's mother
withdrew him from school before a decision was rendered. The
defendant had been receiving below average to failing grades,
and had a moderate number of absences.   He had numerous
suspensions resulting from disruptive behavior, disturbing
class, unexcused tardy, and failing to report for detention.
His records indicate that he has an I.Q. of 94, based on a
Slossom Intelligence Test conducted in November 1983. Gadsden
was evaluated by the Department of Correctional Education and
referred to Virginia Beach Social Services' Job Training
Program.  He was enrolled in this program from July 1989 until
November 1989 and again from March 1990 until March 1991. The
objective of this program was to get Gadsden back in school or
employed and neither was achieved.

## Employment Record

153. Gadsden advised the Probation Officer that during all periods
of unemployment, he was supporting himself by selling drugs.

154. On and off between 1995 and 1996, according to personnel
records, Gadsden was employed part-time by Metro Cash and
Carry, Princess Anne Road, Norfolk, Virginia, as a cashier,
earning minimum wage.  According to the Internal Revenue
Service, Gadsden did not file taxes for 1995.

155. From 1993 until 1994, Gadsden indicates he was employed
part-time with Protemps, Virginia Beach, Virginia, as a
laborer, earning minimum wage.  Gadsden states he left this
position because the work was too hard.  According to
Protemps, they have no records indicating the defendant has
ever worked for them.  According to the Internal Revenue
Services, Gadsden did not file taxes for the years 1993 and
1994.

156. From October 1992 until December 1992, Gadsden indicates that
he was employed part-time by Commonwealth Street Cafe,
Virginia Beach, Virginia, as a dishwasher, earning minimum
wage.  He indicates that he "just quit." This establishment
is no longer in business, therefore, this information could
not be verified.

157. From July 1989 until November 1989, and again from March 1990
until March 1991, according to program records, Gadsden was
enrolled in the Job Training Program at Virginia Beach Social
Services.   He was removed from the program due to
non-compliance and being uncooperative.

## Military Service

158. The defendant reportedly has never served in any branch of the
U.S. Armed Services.

167. Note A:  The defendant indicated to the Probation Officer, that at the time of his arrest, he was bringing in approximately $2,500.00 per month from selling drugs.

168. Note B:  The defendant indicates that he pays approximately $60 per month for his portion of all his bills (rent, electricity, water, and telephone.)

169. Note C:  The defendant indicates that his girlfriend, Kesha Sutton, receives food stamps, therefore, he did not pay for groceries.

### Ability to Pay/Analysis

170. The above information reflects the defendant's income and expenses at the time of his arrest.  In consideration of the amount of loss, if any sustained by any victims as a result of the offense; the financial resources of the defendant; the financial needs and earning ability of the defendant and the defendant's dependents; as well as all other relevant factors, the following information and analysis is provided:

171. Concerning his financial status, he has a negative net worth, no liquid assets, limited job skills, two dependents to support and child support arrears.  Despite having a positive monthly cashflow at the time of his arrest (based on illegal activity), he does not appear capable of paying the minimum fine of $25,000, or any additional fine in an amount sufficient to pay the cost of imprisonment or supervision, or any interest on any fine.

**PART D.   SENTENCING OPTIONS**

172. **TOTAL OFFENSE LEVEL:**  43

173. **CRIMINAL HISTORY CATEGORY:**  VI

|  |  | Guideline Provisions | Statutory Provisions |
|---|---|---|---|
| 174. | CUSTODY: | Life | 10 years - Life |
| 175. | PROBATION: | Not Authorized | Not Authorized |
| 176. | SUPERVISED RELEASE: | 5 years | At least 5 years |
| 177. | FINE: | $25,000 - $4,000,000 | $4,000,000 |
| 178. | RESTITUTION: | Not Applicable | Not Applicable |

| 179. | SPECIAL<br>ASSESSMENT: | At least $100<br>(Unpaid) | $100 (Unpaid) |
| --- | --- | --- | --- |
| 180. | DENIAL OF<br>FEDERAL<br>BENEFITS: | Applicable | Applicable |

**PART E.  FACTORS THAT MAY WARRANT DEPARTURE**

181. The probation officer has no information concerning the offense or the offender which would warrant a departure from the prescribed sentencing guidelines.

**PART F.  EX POST FACTO CONSIDERATION**

182. There are no Ex Post Facto considerations in this case. The guideline computations and the worksheets in this presentence report were in effect at the time of sentencing (November 1, 1995 Edition).

Respectfully submitted,

*Kristian M Everett*    5/6/97

Kristian M. Everett                Date
U.S. Probation Officer

KME/pmo
Attachments

## ADDENDUM TO THE PRESENTENCE REPORT

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
### UNITED STATES V. KENYON RAHEEN GADSDEN, DKT.# 2:96cr182

### OBJECTIONS

#### By the Government

On June 4, 1997, Assistant U.S. Attorney Laura P. Tayman advised the probation officer that she has no objections to the presentence report.

#### By the Defendant

Numerous attempts to contact defense counsel William P. Robinson, Jr., have met with negative results.  Messages were left at his office on May 27, 1997; May 29, 1997; June 2, 1997; and June 3, 1997.  Therefore, the probation officer is not aware of any objections defense counsel may have to the presentence report.

Respectfully submitted,

Kristian M. Everett                6-4-97
Kristian M. Everett                Date
U.S. Probation Officer

KME/pmo

ADDITIONAL ADDENDUM TO THE PRESENTENCE REPORT

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
UNITED STATES V. KENYON RAHEEN GADSDEN, DKT.# 2:96cr182

UNRESOLVED OBJECTIONS

By the Defendant

On June 6, 1997, defense counsel William P. Robinson, Jr., advised the probation officer of three major objections to the presentence report which could not be resolved.

| | |
|---|---|
| Paragraph 88, Worksheet A: | Attorney Robinson objected to the assertion that the defendant was in possession of a firearm during the conspiracy, therefore, objected to the two point enhancement for possession of a firearm. The probation officer believes that based on the Government's evidence, the defendant was in possession of a firearm, therefore the two level enhancement is appropriate. Therefore, no changes have been made to this paragraph of the presentence report or the worksheet computations and this is an issue which the Court will have to resolve with a Finding of Fact. |
| Paragraph 100, Worksheet A: | Attorney Robinson objected to the assertion that the defendant was an organizer of this conspiracy. He indicates that the defendant states that he was an independent contractor in the distribution of the cocaine. Furthermore, Attorney Robinson objects to the two level enhancement for the use of a minor to commit a crime. The probation officer relies on the information presented in the offense conduct of this presentence report, as well as the information in the Government's file to support these enhancements. Furthermore, the probation officer relies on the definition of Aggravating Role in §3B1.1 and Using a Minor to Commit a Crime in §3B1.4 to support the four level and two level enhancements. Therefore, no changes have been made to this paragraph of the presentence report or the worksheet computations and this is an issue which the Court will have to resolve with a Finding of Fact. |

## FINDINGS OF FACT

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
UNITED STATES V. KENYON RAHEEN GADSDEN, DKT.# 2:96cr182**

Since defense counsel withdrew all objections to the presentence
report, the accuracy of the presentence report was not challenged
and the Court was not required to make any findings of fact
pursuant to Rule 32(c)(3)(D).

Respectfully submitted,

Kristian M. Everett          7/14/97
Kristian M. Everett          Date
U.S. Probation Officer

KME/pmo

# Worksheet A (Offense Level)

Defendant ____Kenyon Gadsden_____ District/Office ____E.VA/Norfolk____

Docket Number (Year-Sequence-Defendant No.) ___2:96cr182_____

Count Number(s) _____1_____ U.S. Code Title & Section ___21 U.S.C. 846____

Guidelines Manual Edition Used: 19_95_

Instructions:

For each count of conviction (or stipulated offense), complete a separate Worksheet A. Exception: Use only a s
Worksheet A where the offense level for a group of closely related counts is based primarily on aggregate value or qua
(see §3D1.2(d)) or where a count of conspiracy, solicitation, or attempt is grouped with a substantive count that wa
sole object of the conspiracy, solicitation, or attempt (see §3D1.2(a) and (b)).

1. **Offense Level** (See Chapter Two)
   Enter the applicable base offense level and any specific offense characteristics from Chapter Two and explain the base
   these determinations. Enter the sum in the box provided.

   | Guideline | Description | Level |
   |-----------|-------------|-------|
   | 2D1.1(a)(3) | Conspiracy to Distribute Cocaine Base (Use Drug Quantity Table) | - |
   | 2D1.1(c)(1) | 1.5 Kilograms or More of Cocaine Base (Actual Amount: 10.7 Kilograms) | 38   (ba |
   | 2D1.1(b)(1) | Possession of a Firearm | 2 |

   Notes: _____

   Sum    | 40 |

2. **Victim-Related Adjustments** (See Chapter Three, Part A)    § _____    | 0 |
   Enter the applicable section and adjustment. If more than one section is applicable, list each section
   and enter the combined adjustment. If no adjustment is applicable, enter "0."

3. **Role in the Offense Adjustment** (See Chapter Three, Part B)    § _3B1.4 - 2_____
                                                                     § _3B1.1(a) - 4___    | 6 |
   Enter the applicable section and adjustment. If more than one section is applicable, list each section
   and enter the combined adjustment. If the adjustment reduces the offense level, enter a minus (-) sign
   in front of the adjustment. If no adjustment is applicable, enter "0."

4. **Obstruction Adjustment** (See Chapter Three, Part C)    § _____    | 0 |
   Enter the applicable section and adjustment. If more than one section is applicable, list each section
   and enter the combined adjustment. If no adjustment is applicable, enter "0."

5. **Adjusted Offense Level**
   Enter the sum of items 1-4. If this worksheet does not cover all counts of conviction or stipulated    | 46 |
   offenses, complete Worksheet B. Otherwise, enter this result on Worksheet D, Item 1.

| X | Check if the defendant is convicted of a single count. In such case, Worksheet B need not be comple

| N/A | If the defendant has no criminal history, enter criminal history "I" here and on Item 4, Workshee
In such case, Worksheet C need not be completed.

# Worksheet C (Criminal History)

Defendant   **Kenyon Gadsden**                              Docket Number   **2:96cr182**

Date Defendant Commenced Participation in Instant Offense (Earliest Date of Relevant Conduct)   **Fall 1993**

1.  **3 Points** for each prior ADULT sentence of imprisonment exceeding ONE YEAR and ONE MONTH imposed within 15 YEARS of defendant's commencement of the instant offense OR resulting in incarceration during any part of that 15-YEAR period. (See §§4A1.1(a) and 4A1.2.)

2.  **2 Points** for each prior sentence of imprisonment of at least 60 DAYS resulting from an offense committed ON OR AFTER the defendant's 18th birthday not counted under §4A1.1(a) imposed within 10 YEARS of the instant offense; and

    **2 Points** for each prior sentence of imprisonment of at least 60 DAYS resulting from an offense committed BEFORE the defendant's birthday not counted under §4A1.1(a) from which the defendant was released from confinement within 5 YEARS of the instant offense. (See §§4A1.1(b) and 4A1.2.)

3.  **1 Point** for each prior sentence resulting from an offense committed ON OR AFTER the defendant's 18th birthday not counted under §4A1.1(a) or §4A1.1(b) imposed within 10 YEARS of the instant offense; and

    **1 Point** for each prior sentence resulting from an offense committed BEFORE the defendant's 18th birthday not counted under §4A1.1(a) or §4A1.1(b) imposed within 5 YEARS of the instant offense. (See §§4A1.1(c) and 4A1.2.)

    NOTE:  A maximum of 4 Points may be imposed for the prior sentences in Items 3.

| Date of Imposition | Offense | Sentence | Release Date** | Guideline Section | Criminal History |
|---|---|---|---|---|---|
| *4/26/88 | Concealment | 4 days work force, $39 restitution | | 4A1.2(d)(2) | 0 |
| *1/17/89 | Robbery | Committed to State Department of Corrections, suspended, supervised Probation for indeterminate period | | 4A1.1(c) | 1 |
| *7/13/89 | Assault by Mob | Committed to State Department of Corrections | 12/15/89 | 4A1.1(b) | 2 |
| *7/13/89 | Disorderly Conduct | Committed to State Department of Corrections | 12/15/89 | 4A1.1(b) | 2 |
| *3/26/90 | No Driver's License | Prohibited from obtaining driver's license for 6 months from date he becomes eligible | | 4A1.2(d)(2) | 0 |
| *9/12/90 | 1. Burglary | 1. Committed to State Department of Corrections with indeterminate period of Probation | Unknown | 4A1.1(c) | 1 |
| | 2. Grand Larceny | 2. Committed to State Department of Corrections with indeterminate period of Probation | | | |
| 11/27/91 | Failure to Provide ID to Police Officer | $250 fine, $24 cost | | 4A1.2(c)(1) | 0 |
| 11/25/92 | Trespassing | $50 fine, $26 cost | | 4A1.2(c)(1) | 0 |
| 12/17/92 | Failure to Provide ID to Police Officer | 6 months jail, 5 months suspended, 1 year good behavior, $200 fine, $130 cost | | 4A1.1(c) | 1 |

| Date | Offense | Sentence | Guideline | Points |
|------|---------|----------|-----------|--------|
| 2/9/93 | Concealed Weapon | $150 fine, $26 cost | 4A1.1(c) | 1 |
| 3/19/93 | 1. Transporting Loaded Firearm (Misdemeanor) | 1. $100 fine | 4A1.1(c) | (1) |
|  | 2. Escape (Misdemeanor) | 2. $100 fine | 4A1.2(a)(2) | 0 |
| 9/16/93 | 1. Assault & Batter | 1. $500 fine | 4A1.1(c) | (1) |
|  | 2. Disturbing the Peace | 2. $750 fine, $110 cost | 4A1.2(c)(1) | 0 |
| 12/21/93 | Trespassing | 30 days jail, 20 days suspended, to be served on weekends beginning 1/7/93 | 4A1.1(c) | (1) |
| 6/13/96 | 1. Driving on Suspended License | 1. $150 fine | 4A1.2(c)(1) | 0 |
|  | 2. Obstruction of Justice | 2. $250 fine, $64 cost | 4A1.2(c)(1) | 0 |

\*    Indicate with an asterisk those offenses where defendant was sentenced as a juvenile.

\*\*    A release date is required in only three instances:

a.    When a sentence covered under §4A1.1(a) was imposed more than 15 years prior to the commencement of the instant offense but release from incarceration occurred within such 15-year period;

b.    When a sentence counted under §4A1.1(b) was imposed for an offense committed prior to age 18 and more than 5 years prior to the commencement of the instant offense, but release from incarceration occurred within such 5-year period;  and

c.    When §4A1.1(e) applies because the defendant was released from custody on a sentence counted under §§4A1.1(a) or 4A1.1(b) within 2 years of the instant offense or was still in custody at the time of the instant offense (see Item 5).

Total Criminal History Points for §§4A1.1(a), 4A1.1(b), and 4A1.1(c) (Items 1,2,3)

8



*Robinson, Footman-Banks & Anderson*

*Attorneys and Counselors at Law*

256 WEST FREEMASON STREET
NORFOLK, VIRGINIA 23510

WILLIAM P. ROBINSON, JR.

CHERYL D. FOOTMAN-BANKS

GEORGE A. ANDERSON, JR.

WILLIAM T. MASO
OF COUNSEL

(757) 622-4686
(757) 622-5185
FAX (757) 622-4779

INVESTIGATOR:
COLEY FAULK, JR.

May 29, 1997

PLEASE REPLY TO:

Norman H. Mayer Jr., Clerk
United States District Court
Eastern District of Virginia, Norfolk Division
United States Court House
600 Granby Street
Norfolk, VA 23510

RECE
& filed
JUN - 9

CLERK, U.S. DIST
NORFOL

RE: Kenyon Gadsen        Docket #2:96CR182

Dear Sir:

Enclosed are the objections on behalf of the defendant to the presentence investigation filed herein pursuant to the sentencing guidelines and policy statements:

1. The defendant objects to the assertion in Paragraph 88 indicating that the defendant was in possession of a firearm.

2. The defendant objects to the assertion that the defendant was an organizer of a conspiracy. Defendant states that he was not an organizer, but admits participating as an independent contractor in the distribution of cocaine.

3. The defendant objects to being classified as a career offender, as set forth in Worksheet A, paragraph 3.

4. The defendant objects to the 6 point enhancement for his role in the offense as set forth in Worksheet A, paragraph 3.

5. The defendant objects to paragraph 1 of Worksheet A with respect to the alleged possession of a firearm and the 2 point enhancement in his guideline level therefore.

At this time, there are no other objections known to counsel with regard to these proceedings.

Very truly yours,

A TRUE COPY TESTE
Norman H. Mayer Jr. Clerk
By
Deputy Clerk

William P. Robinson, Jr.

WPR,Jr/dia
cc:  Christian Everett                    Laura P. Tayman
     U.S. Probation Office                8000 World Trade Center
     600 Granby St., Ste. 200             101 W. Main St., Ste. 8000
     Norfolk, VA 23510                    Norfolk, VA 23510

I 245 B (Rev. 5/93) Sheet 1 - Judgment a Criminal Case

FILED

OCT -9

CLERK, U.S. DISTRICT C
NORFOLK, VA

# UNITED STATES DISTRICT COURT
### Eastern District of Virginia

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br>Case Number: 2:96CR00182-001 |
| v. | |
| **KENYON RAHEEN GADSDEN**<br>AKA: Kenny R. Jones, Todd Fuller,<br>Kenyon Gadsen, "Kenya" | William P. Robinson, Jr.<br>Defendant's Attorney |

THE DEFENDANT:
[X]    pleaded guilty to count(s) _1_
[ ]    pleaded nolo contendere to count(s) _____
       which (was) (were) accepted by the court.
[ ]    was found guilty on count(s) _____
       after a plea of not guilty.

| Title & Section | Nature of Offense | Date<br>Offense<br>Concluded | Count<br>Numbers |
|---|---|---|---|
| T.21:846 | Conspiracy to distribute and possession with intent to distribute a mixture and substance containing cocaine base and cocaine - Sch. II (re: 21:841(a)(1) & (b)(1)(A)(ii) & (b)(1)(A)(iii)) | 9/26/96 | 1 |

The defendant is sentenced as provided in pages 2 through __6__ of this judgment. T
sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]    The defendant has been found not guilty on count(s) _____
[X]    **All remaining counts in the indictment** are dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for t
district within 30 days of any change of name, residence, or mailing address until all fine
restitution, costs, and special assessments imposed by this judgment are fully paid.

| | |
|---|---|
| Defendant's Soc. Sec. No.: **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** | July 7, 1997 |
| | Date of Imposition of Judgment |
| Defendant's Date of Birth: **05/18/73** | |
| Defendant's USM No.: **27821-083** | *Rebecca Beach Smith* |
| | Signature of Judicial Officer |
| Defendant's Mailing Address:<br>**Virginia Beach City Jail**<br>**2501 James Madison Boulevard**<br>**Virginia Beach, VA 23456** | **Rebecca Beach Smith**<br>**U.S. District Judge**<br>Name & Title of Judicial Officer |
| Defendant's Residence Address:<br>**935 North Newtown Road**<br>**Virginia Beach, VA 23462** | July 7, 1997<br>Date |

A TRUE COPY, TESTE
Norman H. Meyer Jr., Clerk
By _____
Deputy Clerk

AO 245 B (Rev. 5/93) Sheet 2 - Imp

DEFENDANT:     KENYON KAHEEN GADSDEN                    Judgment - Page _2_ of _6_ Pag

CASE NUMBER:  2:96CR00182-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prison to be imprisoned for a term of __LIFE__ .

[X]    The court makes the following recommendations to the Bureau of Prisons:

The court recommends that while incarcerated, the defendant shall participate in an educational progr for substance abuse.

The court recommends that while incarcerated, the defendant shall obtain his GED and a sk

[X]    The defendant is remanded to the custody of the United States Marshal.

[ ]    The defendant shall surrender to the United States Marshal for this district.

    [ ]    at _____ a.m./p.m. on _____.
    [ ]    as notified by the United States Marshal.

[ ]    The defendant shall surrender for service of sentence at the institution designated by t Bureau of Prisons.
    [ ]    before 2 p.m. on _____.
    [ ]    as notified by the United States Marshal.
    [ ]    as notified by the Probation or Pretrial Services Office.

## RETURN

**I have executed this judgment as follows:**

_____

_____

_____


    Defendant delivered on _____ to _____
at _____, with a certified copy of this judgment.

        _7/9/97_ (n-q)
cc:   P.O. Jar (2)
      Mshl. (.) (2)
      U.S. Atty                              UNITED STATES MARSHAL
      U.S. Coll.
      ob                              By_____
      Bur. of Prisons
      Def. counsel                            Deputy Marshal
      P.T.S.
      C.V.B.
      Financial

DEFENDANT:     KENYON RAHEEN GADSDEN                          Judgment - Page _3_ of _6_ Pages
CASE NUMBER:  2:96CR00182-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of
FIVE (5) YEAR(S).

The defendant shall report to the probation office in the district to which the defendant is
released within 72 hours of release from the custody of the Bureau of Prisons.

While on supervised release, the defendant shall not commit another federal, state, or local
crime.

While on supervised release, the defendant shall not illegally possess a controlled substance.

While on supervised release, the defendant shall not possess a firearm or destructive device.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised
release that the defendant pay any such fine or restitution in accordance with the Schedule
of Payments set forth in the Financial Penalties  sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set
forth below).  The defendant shall also comply with the following additional conditions:

The defendant shall not incur new credit card charges or open additional lines of credit without the
approval of the probation officer.

The defendant shall provide the probation officer with access to requested financial information.

The court does not deny federal benefits.

The defendant shall participate in an educational program for substance abuse, if deemed appropriate
by the probation officer.

If the defendant has not obtained his GED and a skill while incarcerated, he shall do so while on
supervised release as directed by the probation officer.

DEFENDANT:     KENYON RAHEEN GADSDEN                Judgment - Page _4_ of _6_ Page

CASE NUMBER:  2:96CR00182-001

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer within 72 hours of any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245 B (Rev. 5/93) Sheet 5 - Financial Penalties

DEFENDANT:     KENYON RAHEEN GADSDEN                    Judgment - Page 5 of 6 Pages
CASE NUMBER: 2:96CR00182-001

## FINANCIAL PENALTIES

The defendant shall pay the following total financial penalties in accordance with the schedule of payments set out below.

| Count | Assessment | Fine | Restitution |
|-------|-----------|------|-------------|
| 1 | $100.00 | | |
| Totals: | $100.00 | | |

## FINE

No fines have been imposed in this case.

## RESTITUTION

Restitution has not been ordered in this case.

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

The total fine and other monetary penalties shall be due as follows:

[X]     in full immediately as to the special assessment.
[ ]     in full not later than _____.
[ ]     in _____ installments of $_____ over a period of _____ months to commence 30 days after the date of this judgment. If this judgment imposes a period of incarceration, payment shall be due during the period of incarceration.
[ ]     in installments to commence 30 days after the date of this judgment. If this judgment imposes a period of incarceration, payment shall be due during the period of incarceration. During a period of probation or supervised release supervision payment of any unpaid balance shall be a condition of supervision and the U.S. probation officer shall establish and may periodically modify the payment schedule provided that the entire financial penalty is paid no later than the termination of supervision but in no event no later than 5 years after release from incarceration.

[ ]  The defendant shall pay the costs of prosecution.
[ ]  The defendant shall forfeit the defendant's interest in the following property to the United States.

All financial penalty payments are to be made to the Clerk of Court, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program.

AO 245 B (Rev. 5/93) Sheet 6 - Statement of Reasons

DEFENDANT:      KENYON RAHEEN GADSDEN                    Judgment - Page _6_ of _6_ Page
CASE NUMBER:  2:96CR00182-001

## STATEMENT OF REASONS

[x]    The court adopts the factual findings and guideline application in the presentence report.

                                OR

[ ]    The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary).


### Guideline Range Determined by the Court:

        Total Offense Level: ____43___

        Criminal History Category: ___VI___

        Imprisonment Range: _____ ~~to~~ _life_ ~~months~~

        Supervised Release Range: _____ ~~to~~ ___5___ years

        Fine Range: $_25,000.00____ to $_4,000,000.00___

            [x]    Fine waived or below the guideline range because of inability to pay.

        Restitution: $___N/A_____

            [ ]    Full restitution is not ordered for the following reason(s):

[ ]    The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

                                OR

[x]    The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s): The sentence of life imprisonment reflects the seriousness of the offense and meets the sentencing objectives of punishment and deterrence.
                                OR

[ ]    The sentence departs from the guideline range.

        [ ]    upon motion of the government, as a result of defendant's substantial assistance.

        [ ]    for the following reason(s):

# EXHIBIT E

# JUDGEMENT

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

KENYON RAHEEN GADSDEN,      \* Civ. No. _____

     Petitioner,            \*

     -vs-                \* Crim Nos.96-CR-182

JOHN FANELLO,           \* From the District Court
Warden, USP Allenwood,     For the Eastern District
     Respondent.        \* of Virginia

              \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE AND MODIFY
PETITIONER'S SENTENCE PURSUANT TO 28 U.S.C. SECTION 2241**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

As a matter of introduction, the Petitioner respectfully
submits that the events which transpired in the instant case
constitute a denial of the Petitioner's Due Process rights, as
guaranteed by the 5th Amendment of the United States Constitution
and a denial of his Sixth Amendment rights.  In short, the
Petitioner contends that his  sentence in the instant case should
be vacated due to an intervening change in the law.  Further such
errors were not merely procedural, but substantially infringed
upon the Petitioner's constitutional right to due process of law.

## STATEMENT OF ISSUES UNDER CONSIDERATION

Petitioner respectfully requests that this Court adjudicate the following issues of law, to wit:

1.  Whether the Petitioner's claims are properly raised in a motion pursuant to 28 U.S.C. § 2241?

2.  Whether the Petitioner's sentence and should be vacated in light of <u>Apprendi</u>?

## I.  The Petitioner's claims are properly raised in a motion pursuant to 28 U.S.C. § 2241

The Petitioner contends that his claims are properly raised in a motion pursuant to 28 U.S.C. § 2241.  Generally, a federal prisoner must file a motion pursuant to 28 U.S.C. §2255 to challenge his conviction or sentence.  Tripati v. Henman, 843 F.2d 1160, 1162 (9th Cir.) cert. denied 488 U.S. 982 (1988).  A §2255 motion is the appropriate remedy for violations that occur at or prior to the time of sentencing.  Id.  A petition pursuant to 28 U.S.C. §2241 is generally used to challenge the execution of an individual's sentence.  Id.; See also United States v. Mittelsteadt, 790 F.2d 39, 40-41 (7th Cir. 1986) (habeas corpus proceeding pursuant to §2241 is the proper remedy for challenging information in the PSI).  A §2241 petition is also appropriate if "it also appears that the remedy by (§2255) motion is inadequate or ineffective to test the legality of his detention.  Id.; United States v. Pirro, 104 F.3d 297 (9th Cir. 1997) (holding that delay in considering a §2255 motion caused by a pending appeal is not sufficient to make the §2255 inadequate or ineffective); See also Tripati, 843 F.2d at 1162-63 (§2255 motion was not inadequate or ineffective merely because the sentencing court

3

denied relief on the merits); <u>Estep v. United States</u>, 316 F.2d
767, 769 (9th Cir. 1963)(movant's unspecified fears of unequal
treatment by the sentencing courts did not render §2255 motion
inadequate); <u>Stirone v. Markley</u>, 345 F.2d 473, 475 (7th Cir.
1963)(suggesting that a §2255 remedy might be ineffective where
the sentencing court refuses to hear a §2255 petition altogether
or where the court delays in hearing the petition inordinately).

Although there is no clear definition of what constitutes
inadequate or ineffective, the Second Circuit held in <u>Triestman</u>
that "inadequate or ineffective" means "at least cases where the
petitioner cannot utilize §2255 and in which failure to allow for
collateral review would raise serious constitutional questions."
See <u>United States v. Triestman</u>, 124 F.3d 361 (2nd Cir. 1997). In
<u>Triestman</u>, the Second Circuit held that the defendant could raise
a claim of actual innocence to a 924(c) charge by means of a
motion pursuant to 28 U.S.C. §2241.

In the instant case, the Petitioner contends that 28 U.S.C. §
2255 provides an inadequate remedy.  The Petitioner has never
previously filed a petition pursuant to 28 U.S.C. § 2255.
However, over one year has elapsed since his conviction became
final.  Therefore unlike the remedy available for successive §
2255 litigants in the event of a new rule of law, those who have
never filed a § 2255 motion are left without clear direction of
how to proceed. Thus, the only avenue in which the Petitioner can

4

move to vacate his conviction and sentence in light of new rules of constitutional law is § 2241.

To date no Circuit Courts have applied the decision in Apprendi retroactively. However, the Petitioner respectfully disagrees with the decisions of the Circuits regarding retroactivity. In fact, the Petitioner would argue that the Supreme Court has in fact ruled on the retroactive application of Apprendi. On two occasions since deciding Apprendi, the U.S. Supreme Court has remanded cases in light of Apprendi, cases that were on collateral review. See Wims v. United States, 121 S.Ct. 32, 148 L.Ed.2d 3, 00 Cal. Daily Op. Serv. 8091 (Oct. 2, 2000); Smith v. United States, 121 S.Ct. 336, 148 L.Ed.2d 270, 69 USLW 3268, 00 Cal. Daily Op. Serv. 8407 (Oct. 16, 2000). Because the High Court remanded these cases for application of Apprendi, and specifically because these cases were on collateral review, it appears that the Supreme Court has already found Apprendi to be retroactively applicable.

If this is the case, the 28 U.S.C. § 2244 would dictate that the Petitioner would have one year from the date of the new rule of law to seek relief. This would mean one year from the date Apprendi was decided. However, since the local courts have denied and ignored the Supreme Court's application of Apprendi, the Petitioner must seek to preserve his right to contest these errors as they have occurred in his case, pending additional

5

clarification and enforcement by the Supreme Court. *See generally*, <u>United States v. Moss</u>, 2001 WL 637312, *6 (8th Cir. 2001) and <u>United States v. Smith</u>, 2001 WL 483361 (7th Cir. 2001) Therefore this instant petition pursuant to 28 U.S.C. § 2241 is now the appropriate manner in which to contest the erroneous and unlawful sentence. <u>See</u> <u>Harris v. United States</u>, __ F.Supp.2d __, 2000 WL 1641073, (D.N.J. Nov. 1, 2000)(holding that a motion pursuant to 28 U.S.C. § 2241 is the appropriate means for raising an issue based on the <u>Apprendi</u> decision in a case where the defendant had previously filed a § 2255 motion).

## II. THE PETITIONER'S SENTENCE SHOULD BE VACATED IN LIGHT OF <u>APPRENDI</u>.

The Petitioner's arguments in this matter turn upon a recent U.S. Supreme Court case, <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348 (2000). To summarize, that case and its progeny have changed the face of criminal law by providing that when the government seeks enhanced penalties based upon drug quantities, the quantity must be alleged in the indictment and submitted to a jury for a finding of proof beyond a reasonable doubt. In other words, under particular circumstances, drug quantity is an element of the offense, and that element must be conveyed to a defendant through the indictment. <u>Id</u>. at 2362-63.

This new line of reasoning completely changed the

6

interpretation of many federal crimes, including drug laws. While <u>Apprendi</u> involved a New Jersey hate crime statute, it is clear that its broad constitutional principles implicate the federal drug statutes. *See* <u>Apprendi</u>, (explicitly describing its holding as constitutionally based), and subsequent remands and circuit court cases.

At issue in <u>Apprendi</u> were two New Jersey statutes, one which classified possession of a firearm for an unlawful purpose as "second degree" offense warranting a five to ten year sentence and the other called the "hate crime law" which provides for an extended term of imprisonment if the trial judge finds that the defendant acted with a purpose to intimidate an individual or group of individuals due to race, color, gender, etc. <u>Apprendi</u>, 120 S.Ct. at 2351, *citing* N.J. Stat. Ann. § 2C:39-4(a)(West 1995); N.J. Stat. Ann. § 2C:44-3(e)(West Supp. 2000). In determining that the New Jersey procedure was unconstitutional, the United States Supreme Court analyzed the history of criminal law and decisions involving proof of all elements of a crime beyond a reasonable doubt. "At stake in this case are constitutional questions of surpassing importance:  the proscription of any deprivation of liberty without due process of law, Amdt. 14, and the guarantee that [i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury, Amdt. 6." <u>Id.</u> at 2355 (internal quoted omitted). These rights entitle

7

a criminal defendant to a determination by the jury that he is

guilty of every element of the crime charged beyond a reasonable

doubt.  Id.

> In sum, our reexamination of our cases in this
> area, and of the history upon which they rely,
> confirms the opinion that we expressed in Jones.
> Other than the fact of a prior conviction, any fact
> that increases the penalty for a crime beyond the
> prescribed statutory maximum must be submitted to a
> jury, and proved beyond a reasonable doubt.  With
> that exception, we endorse the rule set forth in
> the concurring opinions in that case:  "[I]t is
> unconstitutional for a legislature to remove from
> the jury the assessment of facts that increase the
> prescribed range of penalties to which a criminal
> defendant is exposed.  It is equally clear that
> such facts must be established by proof beyond a
> reasonable doubt."

Id. at 2362-63 (internal citations omitted) (quoting Jones v.

United States, 526 U.S. 227, 252-53, 119 S.Ct. 1215, 1228-29

(1999)).

In light of the constitutional rule set forth in Apprendi,

the U.S. Supreme Court found that the state hate crime statute

that authorized an increase in a defendant's maximum sentence

based only a judge's finding by a preponderance of the evidence

standard that the defendant acted with a purpose to intimidate

the victim based on race, violated the due process clause of the

U.S. Constitution.  "The New Jersey procedure challenged in this

case is an unacceptable departure from the jury tradition that is

an indispensable part of our criminal justice system."  Id. at

8

2366-67.  Accordingly, the Court reversed the decision of the New Jersey Supreme Court.  Id.

Simply stated, Apprendi adopts the position that "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.  It is equally clear that such facts must be established by proof beyond a reasonable doubt."  Apprendi, at 2362-63, quoting Jones v. United States, 526 U.S. 227, 252-53, 119 S.Ct. 1215, 1228-29 (1999) (Stevens, J. concurring), and citing id. at 253, 119 S.Ct. at 1229 (Scalia, J. concurring).  Therefore, Apprendi clearly mandates that any element that serves to increase a penalty for a crime beyond the statutory maximum must be submitted to the jury and proven beyond a reasonable doubt.

One such element is quantity of drugs.  The quantity of drugs must be submitted to a jury for a finding of proof beyond reasonable doubt if the enhanced penalties are obtained under 21 U.S.C. § 841(b)(1)(A) or (B).  United States v. Angle, 230 F.3d 113, 121 (4th Cir.2000); United States v. Doggett, 230 F.3d 160, 165 (5th Cir. 2000); United States v. Rebmann, 226 F.3d 521, 524 (6th Cir. 2000); United States v. Nance, 2000 WL 1880629, *3 (7th Cir. Dec. 29, 2000); United States v. Aguayo-Delgado, 220 F.3d 926, 931 (8th Cir. 2000); United States v. Norby, 225 F.3d 1053, 1056 (9th Cir. 2000); United States v. Rogers, 228 F.3d 1318,

9

1326-28 (11th Cir.2000).

Apprendi applies in the present case in four respects. First, it applies to render Petitioner's plea null and void, since he was unaware of the existence of that element of the offense--the amount of drugs involved--and that the government would have to prove that element if he went to trial.  Second, Apprendi demonstrates that the indictment naming Petitioner was fatally defective, since it did not give notice of the elements of the offense or, more importantly, properly allege the elements of the crime charged.  As a result, the indictment must be dismissed, and as the district court lacked jurisdiction to proceed against Petitioner, the conviction must also be vacated.

Third, Apprendi demonstrates that as an element of the offense, drug amount should have been reviewed by the district court before accepting Petitioner's plea.  Because the district court violated Rule 11, the plea and conviction must be vacated.

Fourth, Apprendi establishes that  it is unconstitutional for a legislature to remove from the jury the assessment of facts that increases the prescribed range of penalties to which a criminal defendant is exposed.  Because § 841(a)(1), the section upon which the government and district court relied in sentencing Petitioner for a § 846 violation, does exactly that, it must be deemed unconstitutional as written, and Petitioner's conviction must be vacated.

10

**A.    PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED, AS HE ENTERED A GUILTY PLEA UNKNOWINGLY AND UNINTELLIGENTLY.**

Petitioner's conviction in this case, must be vacated.  He pled guilty to what amounted to a general indictment, since the indictment did not allege what amounts of drugs were involved.  Because at the time Petitioner did not know these important facts, his plea was entered unknowingly and unintelligently.  A guilty plea must be made knowingly, voluntarily, and intelligently.  Boykin v. Alabama, 395 U.S. 238 (1969) See Bryant v. Cherry, 687 F.2d 48 (4th Cir.1982), cert. denied 459 U.S.1073.  In order to plead voluntarily, a defendant must know the direct consequences of his plea, including the actual value of any commitments made.  Mabry v. Johnson 104 S.Ct. 2543, 2547 (1984).

The Supreme Court has ruled that a plea must be found to be involuntary if it was based upon promises or threats which deprived it of a voluntary character.  Machibroda v. United States, 368 U.S. 487, 493 (1962). "The validity of a guilty plea hinges on whether it was a voluntary and intelligent choice among alternative courses of action open to the defendant."  Banks v. United States, 920 F.Supp. 688 (E.D.Va.1996).

When looking at whether or not a plea should be set aside, three areas of the plea negotiation should be evaluated.  This test was set forth in the case of United States v. Ribas-Dominicci, 50 F.3d 76 (1st Cir. 1995).  According to that court, "violations of any of the three

11

core concerns--absence  of coercion, understanding of the charges, and

knowledge of the consequences of the guilty plea--mandate that the plea

be set aside." Id. at 78.  The second factor, understanding of the

charges, mandates reversal of the conviction in the present case.

Petitioner did not have a full understanding of the charges, since an

element of the offense was never listed in the indictment, mentioned at

the time of the plea, or addressed at sentencing.  As noted above,

Petitioner did not know the existence of an element of the offense for

which he was charged, or that if he went to trial the United States

would have to prove drug amount beyond a reasonable doubt.

In sum, the amount of drugs involved was an element of the offense

and Petitioner did not have that information.  He was never notified of

this element, as the indictment did not list it, and he was not informed

of this element when the "nature of the charge" was reviewed before he

pleaded guilty. Petitioner entered into the plea agreement under a false

assumption regarding the Government's burden of proof on the drug amount

involved.

Further, a sentence in accordance with the indictment in this case,

an indictment charging no specific amount, would have to be imposed in

accordance with the lowest statutory maximum sentence.  This would have

put an upper limit on the Petitioner's sentence of 20 years, despite the

numerous guideline enhancements.

Therefore, Petitioner pleaded guilty unknowingly and involuntarily

and cannot be held to the plea; the subsequent sentence or any amount of

12

drugs attributed to his not proven to a jury beyond a reasonable doubt. Consequently, Petitioner's plea agreement must be set aside.

**B.    THE HOLDINGS OF APPRENDI SHOULD BE APPLIED TO THE DETERMINATION OF THE PETITIONER'S GUIDELINE RANGE.**

Justice and fairness also require that the holdings of Apprendi be applied not only to sentence increases in statutory schemes to *all methods of sentence increases*, including the Federal Sentencing Guidelines.  Thus, any sentencing guideline section or application that serves to increase a sentence, like an element, must be proved to a jury beyond a reasonable doubt. The Petitioner's guideline range, determined primarily on drug quantity, but also greatly enhanced by Guideline calculations, must be recalculated.

Justice O'Connor, in her Apprendi dissent, suggested that the broadness of the majority opinion might allow for the principles to apply to the sentencing guidelines:  "The principle thus would apply * * to all determinate-sentencing schemes in which the length of a defendant's sentence within the statutory range turns on specific factual determination (e.g., the federal Sentencing Guidelines)." Apprendi, 120 S.Ct. at 2393-94 (O'Connor, J., dissenting).

> Viewed through the lens of the separate opinions of Justices Scalia, Thomas, O'Conner, and Breyer, Apprendi's implications for the legitimacy of a variety of sentencing schemes, including the United States Sentencing Guidelines, have stirred enormous controversy. * * * Justice Thomas's concurrence argued that any fact that alters the range of punishments to which a defendant is exposed must be found by a jury, acknowledging that his proposed rule might invalidate the Sentencing Guidelines themselves. Justice Scalia's concurrence maintained that "all the facts which must exist in

13

order to subject the defendant to a legally prescribed
punishment must be found by the jury."  Justice O'Conner's
dissent expressed concern that the Court's holding "will have
the effect of invalidating significant sentencing reform
accomplished over the past three decades."  And Justice
Breyer, a key figure in the development of the Sentencing
Guidelines, lamented that "the rationale that underlies the
Court's rule suggests a principle * * * that, unless
restricted, threatens the workability of every criminal
justice system (if applied to judges) or threatens efforts to
make those systems more uniform, hence more fair (if applied
to [sentencing] commissions.

United States v. Mack, 229 F.3d 226, 236-237 (3rd Cir. 2000) (Becker,

C.J., concurring) (citations omitted).  "The Court did not cite Mistretta v.

United States, the case that originally upheld the constitutionality of the

Sentencing Guidelines."  Id.

In United States v. Harris, 2001 U.S. App. LEXIS 1189; 2001 FED

App. 0030P (6th Cir.), Judge Merritt wrote in dissent as follows:

I write to point out the injustice inherent in
sentencing a defendant charged with second degree murder
using the first degree murder guidelines. Perhaps this
sentencing decision is consistent with the letter of
Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147
L. Ed. 2d 435 (2000), because it does not sentence the
defendants to terms of imprisonment in excess of the
statutory maximum, nor does it alter the range of penalties
to which the defendants are exposed. But * * * the
fundamental basis of our decision in the instant case are
clearly contrary to the spirit of Apprendi, which says that
factual issues having a significant impact on the
defendant's sentence should be charged in the indictment and
proved to a jury beyond a reasonable doubt.  The Apprendi
approach seems to me to disfavor the current judicial and
prosecutorial practice of not giving notice by indictment of
the real crime at issue and of leaving most of the more
salient factual disputes for the sentencing hearing, where
the burden of proof is the less rigorous "preponderance of
the evidence" standard and the hearsay rules do not apply.
Following the logic of Apprendi, the government should not
have been able to cure its charging error simply by
convincing a judge outside the normal rules of evidence that

14

the preponderance of the evidence indicated that [the defendants] committed first degree murder. This is consistent with my longstanding belief that the Sentencing Guidelines – as interpreted in * * * our previous cases – violate the Due Process Clause.  See, e.g., <u>United States v. Davern</u>, 970 F.2d 1490, 1500 (6th Cir. 1992) (<em>en banc</em>).

<u>Id</u>. at 5-6.

The opinions of the dissenters noted above have now been adopted by justices in the majority in some courts.  Recently, the District of Columbia Circuit addressed whether a district court's enhancement of a defendant's sentence by four levels for his leadership role in various roles was improper in light of <u>Apprendi</u>.  <u>United States v. Fields</u>, 2001 WL 241804 (D.C.Cir., March 13, 2001).  The probation office's presentence investigation report recommended a four-level increase in the defendant's guideline range based upon guideline § 3B1.1(a) because the defendant was alleged to be an organizer or leader of criminal activity that involved five or more participants.  <u>Id</u>. at *5.  Defendant argued that, because the jury did not render a verdict on the issue of a leadership role, the enhancement was improper in light of <u>Apprendi</u>.  <u>Id</u>.  The D.C. Circuit agreed:

Because the fact of leadership role may increase a defendant's sentence beyond the prescribed statutory maximum, <u>Apprendi</u> applies.  Accordingly, the issue of leadership must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt.

<u>Id</u>.

Although the <u>Fields</u> Court went on to review the claim for plain error and found none, the holding is incredibly significant

15

nonetheless.  The D.C. Circuit finding provides that a sentencing

enhancement is subject to the Apprendi rule.  Petitioner urges this

court to find similarly.  The Guidelines enhancements applied to the

Petitioner were not submitted to a jury for  special verdicts, nor

where the alleged in the indictment.  Instead, the Government

concealed the full ramifications from the guidelines to induce a plea

in a situation where the defendant had absolutely nothing to lose by

going to trial.

This approach is also supported by the recent decision in

United States v. Norris, 2001 WL 431717 (E.D.N.Y., April 27, 2001):

> [S]ince the Supreme Court handed down Apprendi it has
> granted certiorari in some forty cases, twenty six of them
> federal drug cases in which the circuit courts approved
> Guideline sentence increased based not on jury verdicts but
> on a judge's findings by a preponderance of the evidence.
> The Supreme Court vacated the circuit court judgments, and
> remanded for further consideration in the light of Apprendi.

> The Supreme Court's decisions making these remands
> indicated clearly that the reasoning of the Apprendi
> decision is not to be restricted to instances where the
> sentence enhancement will cause a sentence to exceed the
> statutory maximum.  In many of the drug cases remanded the
> judges [had] imposed sentences that did not exceed the
> maximum fixed in the statute.

> A representative sample of the twenty-six drug cases
> remanded includes cases where the quantity of drugs, the
> defendant's managerial role in a conspiracy, or possession
> of a firearm where "sentencing factors" found by a district
> judge by a preponderance of the evidence. * * *

> In this court's opinion the circuit court decision take
> out of context the language in Apprendi that any fact "that
> increases the penalty for a crime *beyond the prescribed
> statutory maximum* must be submitted to a jury, and proved
> beyond a reasonable doubt."  120 S.Ct. at 2363 (emphasis
> supplied).  Plainly that is not the only circumstance where

16

an increase in penalty must be submitted to a jury.

    \* \* \*

    The enhancement in the New Jersey "hate crime" statute [at issue in <u>Apprendi</u>] is comparable to the Federal Guidelines for threatening or harassing communications (Guideline 2A6.1) and for threatening to assault with a firearm (Guideline 2A2.2). Like a district judge following the Guideline enhancements, the trial judge in New Jersey could increase the sentence based on the judge's own findings by a preponderance of the evidence.

    \* \* \*

    A defendant's Constitutional rights would not be so violated by a sentencing guidelines system in which all facts exposing the defendant to a particular sentence range must be included in the indictment and found by a jury to have been proven beyond a reasonable doubt. No doubt such a system would be inconvenient. But compromises for the sake of convenience should not be made at the expense of depriving [Petitioner] of his rights guaranteed by the United States Constitution.

<u>Id</u>. at 2001 WL 431717, \*5 (some citations omitted) (emphasis supplied). The same principles of the <u>Norris</u> case apply in this case. Petitioner received a sentence based upon facts not alleged in the indictment or submitted to the jury for a specific finding. In sum, because the sentencing guideline range for the amount of drugs alleged is not specifically charged in the indictment, nor admitted, or proved to a jury beyond a reasonable doubt, the sentence must be vacated. When the sentence is recalculated, no enhancement should be given based upon any guideline factor that was not admitted or submitted to the jury and proved beyond a reasonable doubt.

## CONCLUSION

The Petitioner respectfully prays that this court issue an

17

order vacating his sentence imposed because of a violation of
Petitioner's Due Process rights and a denial of his Sixth Amendment
right to effective assistance of counsel.

Respectfully Submitted,

Robert A. Ratliff
Attorney for Petitioner
11331 Grooms Road, Suite 2000
Cincinnati, Ohio 45242
(513) 469-7444

18

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

KENYON RAHEEN GADSDEN,             *

           Petitioner,           *

          -vs-              *

JOHN FANELLO,               *
Warden, USP Allenwood,
          Respondent.         *

Civ. No. _____

Crim Nos.96-CR-182

From the District Court
For the Eastern District
of Virginia

\*   \*   \*   \*   \*   \*   \*

**MOTION FOR APPEARANCE PRO HAC VICE**

---

COMES NOW, Robert A. Ratliff, counsel for the Petitioner, Kenyon Gadsden, and hereby requests that he be granted special or limited appearance as counsel in the above referenced case and that the normal requirement of local counsel designation be waived.  In support thereof, counsel for the Petitioner states as follows.

1.   Kenyon Gadsden has retained attorney, Rob Ratliff to serve as counsel for the limited purpose of filing a post-conviction motion pursuant to the provisions of Title 28 U.S.C. § 2241, in the United States District Court for the Middle District of Pennsylvania.

2.   Mr. Ratliff is a practicing attorney and duly admitted to the Bar of the State of Ohio on November 11, 1997 and admitted to practice before the Sixth Circuit Court of Appeals.  Additionally, Mr. Ratliff is admitted to practice

before the Court of Appeals for the Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits. As well as the District Court for the Eastern District of Wisconsin, the District of Colorado and the District Courts for the Northern and Southern District of Ohio.  Mr. Ratliff would attest that he is a member in good standing of all listed.

3.    Counsel would submit that the Petitioner is incarcerated and has available limited funds in order to retain local counsel.

Wherefore, in view of the foregoing, counsel requests that this motion for leave to appear Pro Hac Vice and waiver of local counsel be granted.

Respectfully Submitted,

By:    _____
       Robert A. Ratliff
       Attorney for Petitioner
       11331 Grooms Road, Suite 2000
       Cincinnati, Ohio 45242
       (513) 469-7444

2

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing Motion and Memorandum of Law appended hereto has been sent this 21 day of June , 2001, by regular U.S. Mail with sufficient postage affixed thereto to insure delivery thereof to:


David Barasch
Assistant U.S. Attorney
Federal Building
228 Walnut Street
Harrisburg, PA 17108

John Fanello
Warden
USP Allenwood
601 Liberty Street
White Deer, PA 17887


Robert A. Ratliff
Attorney for Petitioner
11331 Grooms Road, Suite 2000
Cincinnati, Ohio 45242
(513) 469-7444